**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

LISA MARIE HERRERA,

        Plaintiff,

    v.                                        Civ. No. 20-318 SCY/LF

CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION TO STRIKE AND DENYING**
**MOTION FOR SUMMARY JUDGMENT**
**BASED ON STATUTE OF LIMITATIONS[1]**

    Plaintiff Lisa Marie Herrera alleges that Mark Webster, Branch President of the Las Vegas, New Mexico Branch of The Church of Jesus Christ of Latter-day Saints, sexually abused her for a period of four years in the 1960s. Plaintiff brings this case against Defendant, the Corporation of the President of The Church of Jesus Christ of Latter-day Saints, on the theory that Defendant enabled the abuse and that the abuse was within the course and scope of Webster's position with Defendant. Because the abuse occurred many decades ago, Defendant moves for summary judgment, relying on the various statutes of limitations that have governed child sexual abuse claims in New Mexico since the time of the alleged abuse. Doc. 68. Defendant argues that Plaintiff's claim is time barred because Plaintiff has long known of the alleged sexual abuse and that this alleged abuse caused her psychological harm.

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct all proceedings and to enter an order of judgment. Docs. 4, 6 & 7.

Plaintiff counters that the statutes either did not run or were tolled. The tolling provisions she cites are New Mexico's judicially created "discovery rule" and a state statutory provision that tolls the application of the statute of limitations for incompetent persons. In support of her arguments, Plaintiff relies heavily on a declaration from Dr. Victoria Reynolds, Ph.D., who opines that the psychological consequences of the childhood sexual abuse prevented Plaintiff from understanding that she had a legal remedy for the abuse. Dr. Reynolds also opines that Plaintiff has historically been unable, and remains unable, to manage her personal care or business affairs, and that Plaintiff did not fully process or understand the consequences of Webster's abuse on her life. Doc. 77-2. Defendant moves to strike Dr. Reynolds' declaration on the basis that Plaintiff failed to timely disclose Dr. Reynolds' opinions. Doc. 86.

The Court rejects Defendant's argument that Dr. Reynolds' testimony should be excluded based on untimely disclosure. Further, whether the applicable statutes of limitations ran and whether New Mexico's discovery rule applies are questions for the jury to decide given disputes of fact as to when Plaintiff knew, or had reason to know, of the impact of the alleged sexual abuse. Because the Court denies Defendant's motion for summary judgment on these bases, it declines to resolve issues related to application of New Mexico's tolling statute for incompetent persons.

## BACKGROUND

### I.     Procedural History

Plaintiff filed her complaint in state court on March 11, 2020. Doc. 1 at 5. Defendant removed this case to federal court on the basis of diversity jurisdiction on April 9, 2020. Doc. 1. In her complaint, Plaintiff alleges that Defendant placed Webster in a position of prominence, trust, and authority, while children such as Plaintiff were taught to obey such leaders. Plaintiff alleges that Webster's sexual abuse was within the course and scope of his position provided by

Defendant, and enabled by Defendant, making Defendant liable for the harm caused by Webster's actions. The complaint brings three claims: negligence, vicarious liability, and intentional infliction of emotional distress. All claims arise under New Mexico state tort law.

Defendant filed the present motion for summary judgment on December 18, 2020, arguing that the relevant statutes of limitations bar this action. Doc. 68. Plaintiff filed an opposition to summary judgment, arguing that these statutes of limitations have either not run under the "discovery rule," or have been tolled due to Plaintiff's legal incapacity. Doc. 76. Plaintiff contends there are disputed issues of material fact as to whether a reasonable person in Plaintiff's position would have discovered this claim, as well as whether she has been incapacitated since the 1960s. As mentioned above, Plaintiff's argument relies heavily on a declaration from Dr. Victoria Reynolds, Ph.D. Doc. 77-2.

After Plaintiff filed her response to the motion for summary judgment, Defendant moved to strike Dr. Reynolds' declaration on the basis that the opinions therein were not timely disclosed under the requirements of the Federal Rules of Civil Procedure and according to the Court's scheduling order. Doc. 86. Plaintiff's expert disclosure deadline was August 31, 2020. Doc. 14. On that date, Plaintiff named Dr. Reynolds, Doc. 86 at 6-7, and furnished a copy of her expert report, Doc. 77-2 at 9-51. Defendant deposed her on November 2, 2020. Doc. 86 at 1. Thereafter, on January 19, 2021, Dr. Reynolds submitted a declaration. Doc. 99. Defendant moves to strike this declaration, arguing that the opinions in it are "new" because they were not disclosed in her report and, further, that these new opinions contradict Dr. Reynolds' deposition testimony. Plaintiff opposed the motion to strike, arguing that the declaration, the expert report, and the deposition testimony are consistent. Doc. 99. Defendant filed a reply, and briefing is complete on the motion. Doc. 100.

Meanwhile, Defendant filed its reply in support of the motion for summary judgment based on the statute of limitations. Doc. 87. In reply, Defendant sets forth 36 additional facts and attached an additional exhibit. *Id.* at 9-16, 33-38. The Court therefore gave Plaintiff the opportunity to file a surreply, addressing only the additional facts and the new exhibit. Doc. 128. Plaintiff did so on November 10, 2021, Doc. 133; briefing is now complete and the motion is ready for decision.

## II.    Undisputed Facts on Summary Judgment

In the 1960s, Mark Webster was the branch president (local clergy) of the Las Vegas, New Mexico congregation of The Church of Jesus Christ of Latter-day Saints. Doc. 68 at 2 ¶ 1; Doc. 76 at 4 ¶ 1. Plaintiff alleges that over the course of four years, when Plaintiff was 7 to 11 years old (approximately 1965 to 1969), Webster sexually abused her. Doc. 68 at 2 ¶ 4; Doc. 76 at 4 ¶ 4. Plaintiff testified that Webster would take her for a ride in his car, with her dad's permission, and would park on top of a hill and sexually abuse her. Doc. 68 at 2 ¶ 5; Doc. 76 at 4 ¶ 5.

On May 18, 2019, Plaintiff went to a meeting for survivors of sexual abuse at Charlie's Spic & Span in Las Vegas, New Mexico, where she met the counsel representing her in this litigation. Doc. 76 at 12 ¶ 47; Doc. 87 at 9 ¶ 47. She filed this lawsuit on March 11, 2020, many decades after the relevant alleged conduct took place. Doc. 1 at 5.

### A.    Dr. Reynolds' Expert Opinion[2]

On July 23 and 24, 2020, Dr. Victoria Reynolds, Ph.D. reviewed historical medical records, conducted a two-day, twelve-hour evaluation of Plaintiff, in person, in a private room,

---

[2] This section of the Memorandum Opinion describes the opinion of the expert as stated in her declaration. Defendant does not dispute that the expert says what she says. Doc. 87 at 4. Rather, Defendant incorporates its position that Dr. Reynolds' declaration should be stricken. *Id.* at 3.

and wrote a report on the trauma and impacts of the sexual abuse by Webster on Plaintiff. Doc. 76 at 6 ¶ 4. Based on Dr. Reynolds' assessment, it is her opinion that Plaintiff has met, and continues to meet, the criteria for several psychiatric diagnoses, including Posttraumatic Stress Disorder, Polysubstance Abuse and Dependence Disorder, Bulimia Nervosa, Obsessive Compulsive Disorder, and Borderline Personality Disorder. *Id.* ¶ 5. The symptoms of these disorders began in her early adolescence in reaction to and in conjunction with her traumatic experiences of sexual abuse by Mark Webster. *Id.*

These disorders and their symptoms are generally known to be distressing, to impair daily functioning, and have caused such problems for Plaintiff throughout her life. *Id.* Studies have shown that traumatic experiences in childhood, such as childhood sexual abuse, have a profound effect on children throughout their lives. When a child is subjected to trauma, like sexual abuse, the child develops complex adaptations to accommodate survival, including extreme avoidant behaviors and counter-phobic behaviors requiring numbing and denial. *Id.* ¶ 6. A child's adaptations to early sexual abuse, for example, can often lead to subsequent trauma exposure throughout the child's life. In such cases, the developmental damage of the sexual abuse may go undetected, be overlooked, or discounted, given the subsequent urgency of continued victimization, crises, and functional impairment in the adult survivor's life. *Id.* ¶ 7.

Plaintiff's lifetime of trauma exposure and victimization after Mark Webster's sexual abuse followed this course. *Id.* at 7 ¶ 8. Early trauma such as Plaintiff's sexual abuse re-shapes and distorts the victim's understanding of the trauma, the injury it caused, and her awareness of the connection between the two. Studies have shown that the neurobiology of the brain and the

---

The Court addresses that motion later in this Memorandum Opinion. Further, in re-stating Dr. Reynolds' testimony, the Court neither accepts nor rejects that testimony.

way it processes information is altered, with life-long implications for a survivor's ability to function and appropriately manage her affairs and understand her injuries and their causes. *Id.* ¶ 9. Further complicating Plaintiff's ability to function and understand these matters, in early adolescence, Plaintiff started using alcohol and other substances to cope with the impacts of Webster's sexual abuse. By her mid-teens, she was using hard street drugs like hallucinogens, heroin, methamphetamine, inhalants, and crack. *Id.* ¶ 10.[3]

Dr. Reynolds states that, early in life, Plaintiff suffered serious impairment in her functioning and in pursuing the normal developmental tasks of adolescence and young adulthood, such as creating friendships, engaging in safe relationships with males, being able to pay attention and succeed in her schoolwork, and graduating from high school. *Id.* ¶ 12. Plaintiff never developed an occupation and had serious difficulty staying employed. The pattern continued throughout her life. *Id.* ¶ 15.

Plaintiff's struggles with substance abuse, including alcohol, hard drugs, and prescription pills, began in early adolescence and also continued throughout her lifetime. *Id.* at 8 ¶ 20. While Plaintiff has, at times, reported sobriety to providers after the year 1994, records provide a more accurate picture and show that she continued to be dependent on street drugs and inappropriate

---

[3] Defendant disputes this fact on the basis that "Dr. Reynold's notes of her interview do not support these allegations." Doc. 87 at 4 ¶ 10. Defendant does not provide a citation or attach an exhibit to support this assertion, thus waiving its dispute under Local Rule 56.1. Moreover, Defendant does not allege or provide an example where Dr. Reynold's notes contradict these allegations. And, if the issue instead relates to what is *not* in Dr. Reynold's notes (report contains facts that are not in her notes), Defendant can use this to attempt to impeach Dr. Reynolds on cross-examination. *See Home Design Servs., Inc. v. Trumble*, No. 09cv964, 2011 WL 662745, at *18 (D. Colo. Feb. 14, 2011), *report and recommendation overruled in part and adopted in relevant part*, 2011 WL 1638910, at *6 (D. Colo. Apr. 29, 2011). However, Defendant cites no authority in support of a contention that, if an asserted fact is not contained in an expert's notes, that asserted fact is precluded from being in the expert's report. To the contrary, case law on the subject indicates that, although such circumstances may bear on the weight of the expert's testimony they do not bar its admissibility. *Id.* (citing cases).

use of prescription anxiety medication throughout these purported periods of "sobriety." Any report of sobriety from Plaintiff appears to be, at best, highly unstable and not representative of true remission. *Id.* ¶ 21. Even on the date of Dr. Reynold's assessment, Plaintiff had recently ingested cocaine. Moreover, it was necessary for Plaintiff to take a Xanax so that her distress could be managed, albeit minimally, to a level that permitted the evaluation process to continue. *Id.* at 9 ¶ 25.

Plaintiff has been functionally impaired in her activities of daily living and has exhibited these impairments her entire life. *Id.* ¶ 26. Throughout her life Plaintiff has not proved able to take daily care of herself for any prolonged period. *Id.* ¶ 27. Throughout her adulthood, Plaintiff had to live on and off in her mother's house so that her mother could monitor her safety and perform functions that allowed Plaintiff to get through each day. After her mother's death, Plaintiff has relied on a neighbor to perform those same functions. This neighbor performs daily tasks such as preparing Plaintiff's medication, keeping Plaintiff's calendar, and accompanying her on almost every outing and to every appointment in order to help Plaintiff manage her anxiety. This neighbor even locks Plaintiff in her apartment in an attempt to control Plaintiff's addiction issues. *Id.* ¶ 28.

Plaintiff has lived in a housing community typically reserved for the elderly and ill. Although she is just now 62 years of age,[4] she has been living in this community for quite some time already. This appears to be in part due to her functional constraints and impairment, and her dependence on services typically reserved for the elderly. For instance, Plaintiff cannot drive or travel away from home unaccompanied. Further, she struggles with social avoidance, as well as the basic daily tasks related to her physical and mental health, which she relies on her elderly

---

[44] At the time of Dr. Reynolds' report.

neighbors to provide. These factors make elderly housing more suitable to Plaintiff's functional abilities and needs. *Id.* ¶ 30.

In addition to her ongoing struggles with substance abuse over the course of her life, Plaintiff's ingrained misperception of her own complicity in the abuse and her feelings of self-blame, self-hatred, and self-disgust are so vivid and intense that they have created a barrier to her understanding of her injuries, their root cause in Webster's sexual abuse, and any functional understanding that she may have legal recourse. *Id.* at 9-10 ¶ 31. Misperceptions of self-blame and a belief in one's own complicity in "allowing," failing to stop or even tell anyone about the abuse, are all common adaptations in survivors of childhood sexual abuse. Sexual predators foster a feeling of complicity in the child victim, and that feeling of complicity, shame, responsibility, and self-blame serve to keep child victims from reporting their abuse. This is apparent in Plaintiff's experience, who explains her non-reporting by stating, "I was embarrassed. I was a whore." *Id.* at 10 ¶ 35.

Plaintiff's attributions of responsibility for the sexual abuse, which are intensely self-blaming, exist in a simplified state which has not been updated since the abuse occurred and has not been mitigated or corrected throughout her adulthood. Like many childhood sexual abuse survivors, Plaintiff's understanding of herself as "a whore" and her corresponding sense of responsibility for that identity is based in the distorted belief that, as a child, she allowed Webster to commit sexual acts with her. Such schematic distortions of blame and responsibility were never altered, updated, or corrected in Plaintiff's adulthood. Quite the contrary, Plaintiff found herself trapped in survival strategies that only reinforced her trauma-based identity. In her mind, she is still "a whore" and bears responsibility for the sexual abuse. These attributions negatively

impact her ability to understand and appreciate that the fault for her abuse belongs to others, not herself. *Id.* at 10-11 ¶ 36.

Victims often remain silent even into adulthood for similar reasons, or impulsively disclose only to more strongly avoid further discussion or action related to the abuse. *Id.* at 11 ¶ 37. A childhood trauma victim's understanding of any connection between their trauma and their injuries is often disrupted or severed. Victims very often do not know and understand the connection between the trauma and the injuries it caused without intensive and focused therapy by specialized professionals. *Id.* ¶ 38. Many victims who believe they were complicit in their abuse feel they have no right to seek legal assistance. Plaintiff's reactions and misperceptions in this regard are the rule, rather than the exception with sexual abuse victims. *Id.* ¶ 39. In Plaintiff's case, she may have disclosed the "headlines" of the abuse at various times in her history, but the adaptations and mechanisms developed in response to surviving her childhood trauma, particularly adaptations that involved numbing, avoidance and self-blame, interfered with her ability to connect her distress and impairment to her trauma, and to any understanding of legal remedies. *Id.* ¶ 40.

Plaintiff exhibits many mechanisms and adaptations often found in sexual abuse victims, and she does not appear to have developed a true reasonable knowledge and understanding of the injuries related to her childhood sexual abuse experiences. These include long-term substance abuse issues, chronic dissociative processes, and significantly distorted thinking exhibited by extreme feelings of self-blame and complicity in the abuse. These have combined to impair her daily functioning and disrupt her ability to process and address the trauma or otherwise appreciate its effects and legal implications. *Id.* ¶ 41. The myriad of adaptations and mechanisms developed in Plaintiff as a survival mechanism have prevented her from developing a reasonable

understanding or expectation of potential legal recourses she may have related to this trauma.

Any such understanding, even at the time of Dr. Reynolds' evaluation after this case was

instituted, appeared "very recent and very minimal." *Id.* ¶ 42. For example, in the medical

records cited by Defendant, the "Treatment Plan" was to target "Pattern of abusive relationships"

and "Depressive symptomology, such as eating issues, sadness and low self-esteem, with the

objectives including that 'Ct will be able to engage in a 5 min. conversation with no signs of

helplessness or hopelessness., [sic] over the next 90-120 days.'" *Id.* ¶ 43.

Plaintiff's adaptations and reactions to Webster's prolonged sexual abuse (e.g.,

dissociation, dysregulations of identity and emotions, intense attributions of self-blame,

substance abuse, etc.) ensured that she did not—and still does not currently—fully grasp the

connection between these damages and the sexual abuse. Nor does she have reasonable insight

into the ways in which her life is being controlled by the damage the sexual abuse wrought. *Id.* at

12 ¶ 44. For a victim of childhood sexual abuse to develop an understanding that an injury was

connected directly to the abuse typically requires prolonged, sustained safety, and sobriety

combined with the intensive guidance and assistance of psychological professionals trained in

trauma-informed interventions. Plaintiff's history does not support a finding that any such

trauma-specific, targeted efforts occurred. To the contrary, Plaintiff's treatment was focused on

her reaction to immediate crises and losses, and on learning basic coping skills to reduce her

health risk behaviors and to increase her well-being. *Id.* ¶ 45.

B.   <u>Plaintiff's Deposition Testimony</u>

Plaintiff dropped out of school in the 11th grade. In explaining why she never went back

for her GED, she stated:

> I tried. Okay? I tried. But my mother was giving me the money for the GED at
> Highlands, but I – I think at the time it was only $10. My mother was poor, huh. I
> went like two or three times. I couldn't get that math for nothing. I'm good at the

> social studies and that, but the math, I couldn't get it. My mother told me this,
> "Why don't you just go buy yourself a pair of pants or something"—because $10
> was a lot back then—"because you're not getting it. Get a job like me,
> [Plaintiff]." Some of us—she shouldn't have said that, but some of us aren't good
> for school. "Just get a mopping job." So I did.

Doc. 76 at 7 ¶ 13; Doc. 87 at 5 ¶ 13.

Plaintiff has received disability benefits throughout her lifetime; her best recollection is

that she has been receiving disability since she was approximately 17 or 18. Doc. 76 at 7 ¶ 14;

Doc. 87 at 5 ¶ 14.[5] Plaintiff has had some part time housekeeping work but has not been able to

maintain full-time employment for any sustainable period of time. Doc. 76 at 8 ¶ 16; Doc. 87 at 5

¶ 16. In high school, Plaintiff got her first job through a program with high schoolers during the

summertime. Doc. 76 at 8 ¶ 17; Doc. 87 at 5 ¶ 17.

Plaintiff testified:

> And then I met this lady that knew that I had a lot of issues, Ms. Aranda. She
> passed away. She said she—for me to try my best and she would get me in there,
> like steady, so that I would have like a good paying job. But I didn't. The drugs
> were more important than that. And they were more important than my kids. If
> you look at me like scum, that's because I was scum.

Doc. 77-3 at 3 (Plf's dep. at 30:2-9).

Plaintiff testified that after her first divorce, "I—I started being ugly. I didn't even care

about my kids or nothing. The alcohol, the vodka took me like—like fire takes a house." Doc. 76

at 7 ¶ 11; Doc. 77-3 at 4 (Plf's dep. at 35:25-36:3); Doc. 87 at 5 ¶ 11. Plaintiff's drinking and

---

[5] The disability records were not available as of the filing of the briefs, Doc. 76 at 7 n.4, but the parties do not dispute that this is Plaintiff's testimony. Defendant disputes that Plaintiff has been on disability on the basis that she produced no supporting records, Doc. 87 at 10 ¶ H, but Plaintiff's testimony that she is receiving disability is competent evidence on summary judgment. Whether she has produced supporting records goes to her credibility, not the admissibility of her sworn testimony. At this point, the Court must draw all reasonable inferences in Plaintiff's favor and is precluded from making credibility determinations. *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008) ("On summary judgment, a district court may not weigh the credibility of the witnesses.").

drugs were so disruptive in her daily life that she eventually lost custody of her older son. Doc. 76 at 8 ¶ 18; Doc. 87 at 5 ¶ 18. Plaintiff's dysfunctional lifestyle resulted in losing custody of her younger son as well. Doc. 76 at 8 ¶ 19; Doc. 87 at 5 ¶ 19. She remarried "[i]n the late '80s" and was married for six or seven years, although she wasn't sure about either of these numbers. Doc. 133-1 at 3 (Plf's dep. at 18:20-19:20).

During her deposition, Plaintiff discussed her continued use of illicit drugs. "And drugs— I'm not going to lie to you. Once in a while, the devil will come in when I'm having some issues that I can't—I can't—I can't deal with it. I won't do it every day, but I'll do a puff of cocaine or something like that." Doc. 76 at 8 ¶ 22; Doc. 77-3 at 9 (Plf's dep. at 138:3-7); Doc. 87 at 6 ¶ 22. Plaintiff testified that she had taken her Xanax the morning of her deposition, that her doctor had her taking five milligrams, but that her psychiatrist was trying to get her off of it, as she had been on Xanax for more than 15 years. Doc. 76 at 8 ¶ 23; Doc. 77-3 at 5 (Plf's dep. at 39:13-40:1); Doc. 87 at 6 ¶ 23. Plaintiff's prescription medication addiction led to her obtaining pills on the street, including Valium and Percocet. Doc. 76 at 9 ¶ 24; Doc. 87 at 6 ¶ 24.

In Plaintiff's current residence, she has a friend and neighbor who helps her manage her daily tasks. For example, in discussing her Xanax prescription and attempts by her doctor to help ease her off her dependence on it, that her "neighbor cuts them in . . . little pieces" for her to take. Doc. 76 at 9 ¶ 29; Doc. 77-3 at 5 (Plf's dep. at 39:15-16); Doc. 87 at 6 ¶ 29. During her deposition, when asked what year her son was born, Plaintiff responded, "I don't know. [My friend] knows all those things." Doc. 76 at 9 ¶ 29; Doc. 77-3 at 8 (Plf's dep. at 84:19-21); Doc. 87 at 6 ¶ 29.

Throughout her deposition Plaintiff continually referenced that she was a "whore" who "allowed" the abuse to happen. In discussing the abuse, she explained, "At first, it was ugly. I

couldn't stand myself. That's when I started my throwing up. But then as time went—I already knew—I was already programmed to take my panties off. I already knew what was going to happen. And I—my body started enjoying it, if—if that makes any sense. Now that I'm grown up, it fucking makes me nauseated to think that my body would like it when he was doing that shit to me. How could I like it? I don't understand it. Was I the one? I don't know." Doc. 76 at 10 ¶ 32; Doc. 77-3 at 10 (Plf's dep. at 163:17-164:1); Doc. 87 at 7 ¶ 32.

When discussing whether she said anything about the abuse at the time, she described the abuse as something she had caused, stating, "You would never say nothing. How do you think I was going to tell [my dad] that [Webster] was sticking his fingers in my thing, where I was licking his popsicle. How was I going to tell him that. I couldn't. I was embarrassed of myself. I—I thought of myself as a whore. I called myself a whore." Doc. 76 at 10 ¶ 33; Doc. 77-3 at 7-8 (Plf's dep. at 80:23-81:4); Doc. 87 at 7 ¶ 33. In discussing why she did not somehow avoid the abuse, she explained, "I didn't leave when I was little when Webster did that. Why should I leave? I was already a little whore. I consider myself a little whore. He made me a little whore." Doc. 76 at 10 ¶ 34; Doc. 77-3 at 10 (Plf's dep. at 161:11-14); Doc. 87 at 8 ¶ 34. Webster groomed Plaintiff to believe this. Doc. 76 at 10 ¶ 34; Doc. 87 at 8 ¶ 34. For example, Webster promised to buy Plaintiff a doll her family could not afford. In discussing the abuse in conjunction with the doll, she stated "It's like if I was selling my ass for a Barbie doll. That's how I feel sometimes." Doc. 76 at 10 ¶ 34; Doc. 77-3 at 11 (Plf's dep. at 168:19-21); Doc. 87 at 8 ¶ 34.

C.    Defendant's Evidence and Plaintiff's Response[6]

Defendant disputes Dr. Reynolds' opinion that throughout Plaintiff's life, she has been impaired in her daily functioning and disrupted in her ability to process and address the trauma or otherwise appreciate its effects and legal implications. Doc. 87. Defendant points to evidence that Plaintiff understood that what Webster did to her was wrong, and that she functioned normally and was able to make basic decisions throughout her life.

Plaintiff married Dennis Silva in 1975 at age 17, while pregnant with his child. Doc. 87 at 9 ¶ A; Doc. 133 at 1 ¶ A. Plaintiff testified she wasn't sure how long she was married, but guessed that it was around 11 years. Doc. 133-1 at 3 (Plf's dep. at 17:8-20). Plaintiff and Silva had two kids, Paul (born around 1976) and John (born around 1980). Doc. 87 at 9 ¶ B; Doc. 133 at 1-2 ¶ B. Plaintiff testified that Silva did not "beat" her, "just kicked [her] in the stomach once." Doc. 133-1 at 7 (Plf's dep. at 34:19-20). Plaintiff testified that "he's a workaholic. After work, he would go and paint cars and smoke a joint or drink a beer while they were doing their work. And my kids would barely see them . . . ." Doc. 133-1 at 7 (Plf's dep. at 34:21-24). Plaintiff's medical records reflect that she "identified this as an abusive relationship." Doc. 133 at 2 ¶ B; Doc. 87 at 34. Plaintiff also testified to at least one instance of attempted sexual assault by Silva. Doc. 133-1 at 7 (Plf's dep. at 36:4-9).

A few years after her divorce from Silva, Plaintiff married Robert Trammell. She left him after six or seven years because he was abusive. Doc. 87 at 10 ¶ C; Doc. 133 at 3 ¶ C. Plaintiff testified that she was guessing that the marriage was "[i]n the late '80's" and that she did not

---

[6] This section is taken from Defendant's asserted facts in its reply brief. Where those facts are disputed by Plaintiff with a citation to record evidence, or where the facts are subject to multiple inferences, the Court will so note. All reasonable inferences must be drawn in Plaintiff's favor as the non-moving party.

know precisely because the marriage happened when "we were high, we were drunk." Doc. 133-1 at 3 (Plf's dep. at 19:3-5).

Plaintiff's son John was born with a birth defect. Doc. 87 at 10 ¶ D; Doc. 133 at 3 ¶ D. Plaintiff stayed with him in the hospital. *Id*. She testified, "I was a good mother, and now I'm trying to be that good mother again, but it's taking us time." Doc. 77-3 at 4 (Plf's dep. at 35:21-22). Plaintiff testified that one of her sons did not want to live with her and instead went to live with his paternal grandmother when he was still a young child. *Id.* (Plf's dep. at 35:1-2). Plaintiff also testified that Silva took her to court to take her son away from her because she had the child around an abusive boyfriend. *Id.* (Plf's dep. at 35:6-9).

Defendant contends that "Plaintiff testified that it wasn't until later in her life that she 'started being ugly' and abusing alcohol and drugs." Doc. 87 at 10 ¶ E (citing Plf's dep. at 35:24-36:3). The passage Defendant cites from Plaintiff's deposition discusses a period in Plaintiff's life after separating from Silva. *Id.* But Plaintiff points out that she reported to Dr. Reynolds that she began drug and alcohol abuse in junior high, with instances of whiskey intoxication, and later use of hallucinogens, heroin, methamphetamine, and crack during her teen years. Doc. 133 at 4-5 ¶ E.

Defendant disputes that Plaintiff dropped out of school because she was impaired in her functioning, pointing out that Plaintiff dropped out because she was pregnant; tried to get her GED; and testified she was "good at the social studies." Doc. 87 at 10 ¶ F. Plaintiff responds to clarify that she "went like two or three times" to a GED course at Highlands but was unable to complete the course, and that she also described herself as "n[o]t good for school." Doc. 133 at 5 ¶ F; Doc. 77-3 at 3 (Plf's dep. at 29:1-3, 5-10).

Defendant disputes that Plaintiff could not work throughout her lifetime, noting that she worked at a state hospital for a summer; she was a janitor for a while at the New Mexico Behavioral Health Institute; she cleaned houses while married to Trammell, and her clients trusted her with their car to run errands. Doc. 87 at 10 ¶ G; Doc. 77-3 at 3 (Plf's dep. at 29:21-30:1, 31:9-18). Plaintiff clarifies that the "state hospital" and NMBHI jobs were the same thing and consisted of a part-time job while she was in school, and that it was housekeeping rather than janitorial. Doc. 133 at 6 ¶ G; Doc. 77-3 at 3 (Plf's dep. at 31:9-25). Plaintiff also disputes that her housekeeping work was steady work and describes them as "little jobs" that Trammel set up for her. Doc. 133 at 6 ¶ G; Doc. 77-3 at 3 (Plf's dep. at 32:3-21). She quit because Trammel was beating her at the job site. *Id.*

Defendant also contends that Plaintiff has been involved in court proceedings. For example, a man named Robert raped Plaintiff. Plaintiff went to a neighbor, who reported it to the police. The perpetrator was sentenced to 18 months in prison. Doc. 87 at 11 ¶ K; Doc. 133 at 8 ¶ K. In 2007, Plaintiff's son, Paul, committed suicide. Doc. 87 at 11 ¶ L; Doc. 133 at 8 ¶ L. Plaintiff's sister, Terry, was murdered in 2009, and Plaintiff went to what she described as "docket calls" to make sure her sister's body was cremated. Doc. 87 at 11 ¶¶ M, N; Doc. 133 at 8-9 ¶¶ M, N. Plaintiff stated she was either "deposed" or "testified under oath" for the case. Doc. 77-3 at 5 (Plf's dep. at 37:6-13). Plaintiff was involved in an auto accident with a friend, and was a plaintiff and testified in the resulting civil suit in which she ultimately recovered $25,000. Doc. 87 at 11 ¶ O; Doc. 133 at 9 ¶ O.

Defendant argues Plaintiff's recent life has been relatively stable; she has lived at the same place since 2009. To live there, she had to "not bring drug addicts or prostitutes or anything in." Doc. 87 at 11 ¶ P; Doc. 133 at 9 ¶ O. In her deposition, she testified she has not consumed

16

alcohol since moving in there. Doc. 87 at 11 ¶ Q; Doc. 133 at 9 ¶ Q. Defendant notes that a 2006 "Behavioral Health Clinical Review Form" states that Plaintiff was "maintaining sobriety from all substances at this time except alcohol." Doc. 87 at 12 ¶ S. These records list her mental status as depressed, fearful, and anxious, and with suicidal ideation, but also "rational" and "coherent," with "intact memory," "average intelligence," and "fair" insight and judgment. She had major depression, but "without psychotic features." Doc. 87 at 12 ¶ T. In a section titled, "Current Level of Functioning," the provider wrote, "Ct is able to care for ADLs." (ADLs stands for activities of daily living.) She was also listed as "consistent in attending appointments." Doc. 87 at 12 ¶ U. A treatment note from December 2011 states, "She has addressed her past history of abuse and violent relationships," Doc. 87 at 38, and that she "reported past [history] of sexual abuse by the man who baptized her," *id*. at 34. It states that Plaintiff was able to take care of her ADLs, that she had been "sober and straight from substances for two years," and that she lived alone in adequate housing. *Id*. at 35. Finally, it stated Plaintiff had "medium" comprehension ability, was "eager to learn," and did not have any factors that would affect teaching her. *Id*. at 36. Plaintiff does not dispute that the records say what they say, but notes that the conclusions in those records are disputed by Dr. Reynolds. Doc. 133 at 10 ¶¶ S-U; *id.* at 14 ¶ DD.

Defendant also highlights disclosures Plaintiff has made throughout her life related to her childhood sexual abuse. Plaintiff disclosed the abuse to her counselor, JoAnn LaFerrier, in 1980, and Defendant contends that the two of them reported Webster to law enforcement. Doc. 68 at 2 ¶ 6. Plaintiff testified in her deposition as follows:

> I told her "Mr. Webster used to fondle me. I don't know if it was"—excuse the language—"fucking me, but he kept doing this, not only to me, to other girls." And she told me "Let's get his name and where he lives, and let's get the cop— let's get in the thing." But they said he had died. I didn't know he had died, but they said that he had died. And I don't remember what year he died, but—sorry. That's my feeling. Okay?

Doc. 68 at 14 (Plf's dep. at 24:8-18). This testimony makes clear that Plaintiff disclosed Webster's abuse to counselor LaFerrier. The parties dispute, however, whether the implication of this testimony is that Plaintiff reported Webster to law enforcement. Doc. 68 at 3 ¶ 7; Doc. 76 at 4 ¶ 7; Doc. 87 at 12-13 ¶ X; Doc. 133 at 11 ¶ X. Although the only reasonable inference to be drawn from this testimony is that someone reported the abuse to law enforcement, drawing all reasonable inferences in Plaintiff's favor, someone other than Plaintiff (such as LaFerrier) might have reported it. Further, drawing all inferences in favor of Plaintiff, the Court cannot conclude that whoever did the reporting was acting as an agent of LaFerrier rather than independently. In other words, the Court does not conclude for purpose of this motion that Plaintiff, or Plaintiff's agent, reported the abuse to the police in 1980.

In 2006, another counselor wrote that Plaintiff "has [a] childhood h[istory] of physical, sexual and emotional abuse by family members and also by clergy who [Plaintiff] was sent to live with by parents." Doc. 68 at 26; *see* Doc. 68 at 3 ¶ 8. Plaintiff disputes that this is evidence that she informed anyone of Webster's abuse specifically. Doc. 76 at 4-5 ¶ 8. Although the Court agrees that the record does not provide a detailed description about Plaintiff's disclosure, the record references sexual abuse and abuse by a clergy. Plaintiff makes no allegation that any clergy other than Webster abused her and so the only reasonable inference that can be drawn from this medical record is that Plaintiff's disclosure of abuse by clergy was in reference to Webster's sexual abuse. Similarly, at some unspecified point, Plaintiff disclosed in counseling that when she was a child, "there was a lot of abuse, of beating up and sex, but I didn't mention names." Doc. 68 at 19 (Plf's dep. at 130:16-21). She may have told other counselors about the abuse, but she is not sure. Doc. 87 at 13 ¶¶ AA-BB; Doc. 133 at 12-13 ¶¶ AA-BB.

Decades ago, when a friend, Sandy Archuleta, confided that Webster abused her, Plaintiff responded: "[Webster] did that to me, that fucking gross pig. We would laugh, and we would cry." Doc. 133-1 at 12 (Plf's dep. at 79:17-19); Doc. 87 at 12 ¶ W; Doc. 133 at 11 ¶ W. At some point in time, she took a friend named Don Woolsey to the place where the abuse occurred and told him, "This is where I used to come when that man used to do all that shit to me." Doc. 87 at 13 ¶ Y; Doc. 133 at 12 ¶ Y. Plaintiff also recently informed her neighbor, Barbara Johnston, about the sexual abuse and this litigation. Doc. 87 at 14 ¶ EE; Doc. 133 at 14-15 ¶ EE. A friend named Pam Rhodes "knew that [Plaintiff] was abused a lot." Doc. 87 at 14 ¶ FF; Doc. 133 at 15 ¶ FF. Approximately two years ago, Plaintiff told her friend Jane Saiz that she was sexually abused. Doc. 87 at 14 ¶ GG; Doc. 133 at 15 ¶ GG. At some unspecified point after her son Paul died in 2007, Plaintiff told her other son John about what Webster did and "then I told him that I was going to bring the Mormons down." Doc. 87 at 13 ¶ CC; Doc. 133 at 13 ¶ CC. At about the time this litigation commenced, Plaintiff told her siblings about the abuse. Doc. 87 at 14 ¶ HH; Doc. 133 at 15 ¶ HH. Also at an unspecified time, Plaintiff told her physician, Dr. Chris Ruge, Doc. 87 at 14 ¶ II; Doc. 133 at 15 ¶ II; and a healthcare provider named Stacy Vigil, Doc. 87 at 14 ¶ JJ; Doc. 133 at 15 ¶ JJ.

Plaintiff went to church once in the year before her deposition. Doc. 87 at 14 ¶ KK; Doc. 133 at 17 ¶ KK; Doc. 133-1 at 15 (Plf's dep. at 91:10-14). While there, she gave what she described as testimony, standing up and saying her name and that she used to be a Mormon. Doc. 133-1 at 15 (Plf's dep. at 91:17-18, 92:14-21). She intended to give a testimony that one of their members was having sex with her as a little girl, but something stopped her and she sat down after saying her name. Doc. 133-1 at 15 (Plf's dep. at 92:14-21). Church missionaries started visiting her after this. She told them that Webster had abused her. Doc. 87 at 14 ¶ LL; Doc. 133

at 17 ¶ LL. Plaintiff also recently told someone in the Church named President Burney that "a

man named Webster in the Mormon Church sexually abused me when I was little," and told

another church member named Mr. Montoya about the abuse two years before her deposition.

Doc. 87 at 15 ¶ MM; Doc. 133 at 17-18 ¶ MM.

Defendant further argues that Plaintiff has always known the abuse was wrong and that it

damaged her. Doc. 87 at 15. Plaintiff testified she knew Webster was "a nasty man" and that

"Webster's been with me all my life." Doc. 87 at 15 ¶ NN. In her deposition, Plaintiff answered:

> Q. [W]hen did you start to understand that what happened to you as a child was
> affecting your life?
>
> . . . .
>
> A. When I didn't want to screw with somebody. I don't know how to explain
> myself.

Doc. 68 at 23 (Plf's dep. at 164:16-21). Subsequently, Plaintiff explained that meant that

Webster's abuse affected all her sexual relationships since she was a teenager and made her

upset every time she tried to have sex. Doc. 68 at 24 (Plf's dep. at 166:8-25); Doc. 87 at 15 ¶¶

OO, QQ.  Plaintiff has described the "bitterness" and "hatred" she feels for Webster. Doc. 87 at

15 ¶ PP. After her son Paul died in 2007, she told her son John what Webster had done to her

"because he didn't … understand why I was having so many issues." Doc. 87 at 15 ¶ RR.

Plaintiff does not dispute that she testified to this effect in her deposition. Doc. 133 at 18-19 ¶¶

NN, OO, QQ.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a

reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on

each side so that a rational trier of fact could resolve the issue either way," and it is material "if

under the substantive law it is essential to the proper disposition of the claim." *Becker v.

Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing

a motion for summary judgment, the court must view the evidence and all reasonable inferences

therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d

1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted).

Initially, the party seeking summary judgment has the burden of showing that there is no

genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033,

1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show

that genuine issues remain for trial. *Id.* But, "the plain language of Rule 56(c) mandates the entry

of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,'

since a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." *Id.* at 322-23. When "the nonmoving party has

failed to make a sufficient showing on an essential element of her case with respect to which she

has the burden of proof," the moving party is "entitled to a judgment as a matter of law." *Id.* at

323. Therefore, "a movant that will not bear the burden of persuasion at trial need not negate the

nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The

movant may show an entitlement to summary judgment "simply by pointing out to the court a

lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

## DISCUSSION

### I.      Motion To Strike

"Rule 26(a)(2) requires that expert reports 'contain a complete statement of all opinions

to be expressed.'" *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 951-52 (10th Cir. 2002) (quoting

Fed. R. Civ. P. 26(a)(2)(B)). If a party fails to disclose information required by Rule 26(a), it

may not use any undisclosed information at trial, unless the failure is substantially justified or

harmless. *Id.* (quoting Fed. R. Civ. P. 37(c)(1)). "Paragraph (2)(B) requires that persons retained

or specially employed to provide expert testimony . . . must prepare a detailed and complete

written report, stating the testimony the witness is expected to present during direct examination,

together with the reasons therefor." Fed. R. Civ. P. 26, Advisory Committee Notes, 1993

Amendment, Subdivision (a).[7] In other words, opinions that an expert will express at trial in the

course of a direct examination must be included in his or her expert report.

Defendant contends that Dr. Reynolds' opinions in her declaration, which the Court

described above, were not timely disclosed in her expert report. Defendant argues: "the

paragraphs in the declaration quite frequently do not correlate in any systematic way with Dr.

Reynolds' report"; "the paragraphs of the declaration often consist of several sentences which

are cited to different parts of the report or to no part of the report, sometimes separated by many

pages and not always presented in the order in which they appear in the report"; "[a] wide range

of Plaintiff's life history and behaviors is summarized in the declaration as indicative of

functional impairment"; and "the declaration mentions impairment where the cited passages of

the report do not." Doc. 86 at 2-3. Defendant does not cite any authority stating that an expert's

---

[7] "Courts give weight to the advisory committee notes unless they contradict the plain language
of the rule." *United States v. Jones*, 818 F.3d 1091, 1100 n.6 (10th Cir. 2016).

declaration must match the expert's report in terms of formatting, organization, or word choice.

The Court rejects such a standard. The Court is more concerned about *whether* the opinions were

disclosed in the report than *how* they were disclosed.

Defendant also argues that, at her deposition, Dr. Reynolds expressly disclaimed any

intention to express an opinion on Plaintiff's incapacity:

> Q: And did you provide argument then to counsel that Ms. [redacted] was somehow incapable of understanding that she had to bring a claim within three years?
>
> A. Did I provide them with an argument?  No.
>
> Q.  Yeah. Are you going to argue that she was somehow incapacitated from identifying that she – from understanding that she had been abused 50 years ago?
>
> A.  It's not my role to say she was incapaci -- my role is to set out the things that were impinging on her such that if -- if a legal -- yeah, if the legal argument is to be made for incapacity, can it be useful. So no. Am I going to make that argument? No.

Doc. 86 at 9.

The Court disagrees that this was a disclaimer of any opinions set forth in the declaration.

The Court reads this deposition testimony as the expert stating that her medical assessment of

Plaintiff's psychological functioning is not tantamount to a legal argument on the issue of her

capacity. That a psychologist would make a medical assessment (for instance, if Dr. Reynolds

said Plaintiff has been functionally impaired in her activities of daily living, and Plaintiff's

adaptations and reactions to Webster's prolonged sexual abuse ensured that she did not fully

grasp the connection between these damages and the sexual abuse) but not a legal argument (for

instance, if Dr. Reynolds said the evidence supports the definition of incapacity under New

Mexico law) does not mean her medical assessment cannot be used to support the legal

argument. When asked at her deposition whether she was making a legal argument as to

incapacity, this expert—reasonably enough—said that she was not. She is a psychologist, not a

lawyer. Plaintiff's expert has provided medical opinions and Plaintiff's lawyer has referenced

those opinions in support of her argument that Plaintiff meets the legal definition of incapacity.

That the lawyer, not the psychologist, made the legal argument provides no basis to dismiss the

medical assessments Dr. Reynolds made or to reject the legal argument Plaintiff's counsel made.

As for as the underlying psychological opinions, which Plaintiff's counsel have used to

make their legal arguments, the Court finds they were disclosed in the expert's report:

> Lisa's belief that she was complicit in her own abuse, in part *because of her silence* ensured that the damage of Mark Webster's grooming and silencing replicated itself. Each day that passed where she didn't tell someone, even after the abuse was over, re-enacted the silencing of the original trauma and her perpetual self-blame for not coming forward to tell someone about it. Lisa's ongoing self-blame also reflects how little she understands, even now, that Mark Webster's tactics ensured that she remained powerless, compliant and silent for as long as possible.
>
> For all the above reasons, Lisa did not disclose Mark Webster's sexual abuse to anyone with any authority to take action until she reached adulthood. Nor did she understand that, as a crime victim, she had legal rights that she could pursue. Furthermore, although she did tell a therapist, Lisa's adaptations and reactions to this prolonged abuse (e.g., dissociation, dysregulations of identity and emotions, substance abuse, etc. as discussed below) ensured that she did not - and still does not currently -- fully grasp or have insight into the ways in which her life is being controlled by the damage it wrought.

Doc. 77-2 at 25 (emphasis in original).

> Unless otherwise specified, Lisa's reactions, thoughts, feelings and behaviors detailed in the remainder of this report should not be construed as representing any reliable or sustained awareness on her part of the connections between her behavior or functioning and Mark Webster's sexual abuse. In my extended assessment with her it was very clear to me that Lisa's ability to access memories of the sexual abuse and her capacity to make sense of her own reactions and behavior in light of it is severely distorted, fragmented, inconsistent and dependent on a variety of contextual factors that she has little ability to regulate or control.

*Id.* at 26.

> It is important to note that trauma survivors do not consistently recognize that they are having reexperiencing symptoms or that what they are going through are memories of aspects of their trauma. So, while the following examples illustrate

24

how Lisa's memories for the sexual abuse appear, they do not necessarily
correlate with awareness . . . .

*Id.* at 32-33.

> Lisa is currently able, albeit in a fragmented way, to described [sic] the details of
> his abuse. However, the most notable and tragic memory of Mark Webster's
> abuse can be seen in Lisa's distorted self-concept, and in her life-long belief in
> her complicity in his violations. She summarized it this way: "Mr. Webster made
> me the whore I am today."

> It is not unusual for the victim of childhood sexual abuse to live in silence and in
> ignorance of its many impacts, particularly when the perpetrator is in a position of
> significant power, as was Mark Webster and when the child comes from a
> powerless and dysfunctional family, as Lisa's was. When the perpetrator is both
> esteemed by the child's parents and held in high regard within his community and
> the institution he serves -- such as teachers, priests and religious elders -- the child
> rightly understands that, likely, no one will believe her if she discloses, or will
> attempt to collude in her silence for fear of the consequences.

> While Lisa has never entirely forgotten Mark Webster's sexual abuse, and while
> she has, at least twice in her life adult [sic] disclosed the "headlines" of this abuse
> to mental health providers prior to 2017, she has nevertheless remained
> incapacitated in multiple ways throughout her adult life that precluded her ever
> understanding or pursuing her legal rights.

> The most extreme, damaging and persistent sources of this incapacitation relate to
> her severe polysubstance abuse, her unmodified belief in her own complicity and
> self-blame for Mark Webster's sexual abuse, and her functional impairments in
> building a safe life for herself in which she can manage adult responsibilities such
> as parenting, holding down a job, or managing her health, finances or her
> medications.

> Lisa has never on her own, or in therapy, connected her feelings of extreme
> shame, self-hatred and self-blame for not stopping or escaping his abuse to the
> traumatic nature of Webster's sexual violations. She has never, therefore, been
> able to take perspective on her unquestioned belief in her own sense of
> responsibility for the sexual abuse. It never, therefore, occurred to her to that there
> would be any point in reporting such a crime to law enforcement or in seeking
> legal claims.

*Id.* at 44.

Although the declaration elaborates on these opinions in some respects, the essence of the

declaration does not diverge from the essence of the report. Said differently, the expert report

provided Defendant adequate notice of the opinions in the declaration. As long as the declaration does not offer *new* opinions, no requirement exists that the report and the declaration be identical.

Alternatively, even if any of the opinions are new, a Rule 26(a) violation may be excused if it is justified or harmless. Fed. R. Civ. P. 37(c)(1); *see Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) ("A trial court has broad discretion to decide if a Rule 26(a) violation is justified or is harmless."). In making this determination, the Court should consider: (1) whether the other party will be prejudiced, (2) the ability to cure any prejudice, (3) whether allowing the evidence would disrupt the trial, and (4) the violator's bad faith or willfulness. *Jacobsen*, 287 F.3d at 952-53; *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir. 1999).

The Court need not address these factors in light of its above ruling and in light of the fact that the parties did not address these factors in their briefs. The Court notes, however, that exclusion of expert testimony is an extreme sanction reserved for serious violations. *See Jacobsen*, 287 F.3d at 954 (reversing and remanding, noting even where Rule 26(e) was violated that the district court "could allow [the experts] time to file complete expert reports without jeopardizing the trial schedule" and the plaintiff could then file rebuttal reports). The Tenth Circuit encourages district courts to hear cases on their merits and to consider the efficacy of lesser sanctions under Rule 37(c). *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920-21 (10th Cir. 1992); Fed. R. Civ. P. 37(c)(1)(A)-(C); *Harvey v. THI of N.M. at Albuquerque Care Ctr., LLC*, No. 12cv727, 2015 WL 13667111, at *6 (D.N.M. Mar. 31, 2015) ("Without a finding of bad faith or gamesmanship . . . courts are loathe to invoke the strong medicine of precluding expert testimony." (internal quotation marks omitted; alteration in original)). This is especially true

when expert testimony is vital to a party's argument. As set forth later in this Opinion, one of the statutes of limitations at issue in this case specifically contemplates the use of expert testimony. Thus, even though it would be Plaintiff's burden to address the *Woodworker* factors in the event the Court found Plaintiff to have committed a discovery violation, *Kone v. Tate*, No. 20-1080, 2021 WL 1210009, at *6 (D. Kan. Mar. 31, 2021), the Court would be disinclined to grant the extreme sanction of exclusion of expert testimony without having the parties address the *Woodworker* factors and whether lesser sanctions would be appropriate.

For these reasons, the Court denies Defendant's Motion To Strike Declaration Of Victoria Reynolds, Ph.D., Doc. 86.

## II.    Summary Judgement Based on Statute of Limitations

Since the 1960s, New Mexico has had a variety of different statutes of limitations that govern or have governed the conduct at issue in this case. Defendant argues that, if any one of these statutes of limitations expired, Defendant has a vested or substantive right in that statute being applied to Defendant's conduct while the statute was in force. Doc. 68 at 4-5; *see Grygorwicz v. Trujillo*, 2006-NMCA-089, ¶ 20, 140 P.3d 550, 555. Plaintiff does not contest this. Instead, Plaintiff argues that, at a minimum, a material issue of fact exists as to whether any statute of limitations expired, and this material issue of fact prevents the Defendant from prevailing on summary judgment.

The Court agrees with Defendant that, if any of the statutes of limitations expired while they were applicable, Plaintiff's lawsuit is time barred. Analyzing each of the applicable statute of limitations, however, the Court concludes that Plaintiff has shown a material issue of fact as to whether the applicable statute of limitations expired while in effect.

A.    Legal standard

"A federal court sitting in diversity applies state law for statute of limitations purposes."

*Burnham v. Humphrey Hosp. Reit Tr., Inc.*, 403 F.3d 709, 712 (10th Cir. 2005). "[W]e must

apply [state] law in deciding whether . . . claims are time-barred. Additionally, we must follow

[the state's] tolling rules, as they are an integral part of the several policies served by the statute

of limitations." *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir.

2008) (citation and internal quotation marks omitted). "In so doing, we apply the most recent

statement of state law by the [state supreme court]. Absent such guidance, we consider decisions

of a state's intermediate appellate courts as some evidence of how the state supreme court would

decide the issue, though such decisions are only persuasive authority." *Id.* (citation and internal

quotation marks omitted).

B.    History of the statutes of limitations for claims of child sexual abuse in New
      Mexico

The parties agree that, prior to 1993, child sexual abuse claims in New Mexico fell under

the general personal injury statute of limitations in NMSA § 37-1-8 (three years).[8] In 1993, the

New Mexico legislature adopted a statute of limitations specific to childhood sexual abuse

claims. Subsection A stated:

---

[8] The text of this statute has not changed since 1976. It states:

> Actions must be brought against sureties on official bonds and on bonds of
> guardians, conservators, personal representatives and persons acting in a fiduciary
> capacity, within two years after the liability of the principal or the person for
> whom they are sureties is finally established or determined by a judgment or
> decree of the court, and for an injury to the person or reputation of any person,
> within three years.

NMSA § 37-1-8.

> An action for damages based on personal injury caused by childhood sexual abuse shall be commenced by a person, before the latest of the following dates:
>
>> (1) the first instant of the person's twenty-fourth birthday;
>>
>> (2) three years from the date of the time that a person knew or had reason to know, as established by competent medical or psychological testimony, that an injury was caused by childhood sexual abuse; or
>>
>> (3) three years from the date that a person began receiving treatment administered by a licensed, competent medical practitioner or psychologist for the purpose of treating a disassociated, repressed or forgotten act of childhood sexual abuse.

NMSA § 37-1-30(A) (1993). In 1995, this statute was amended to slightly reword subsection 2 and remove subsection 3:

> An action for damages based on personal injury caused by childhood sexual abuse shall be commenced by a person before the latest of the following dates:
>
>> (1) the first instant of the person's twenty-fourth birthday; or
>>
>> (2) three years from the date of the time that a person knew or had reason to know of the childhood sexual abuse and that the childhood sexual abuse resulted in an injury to the person, as established by competent medical or psychological testimony.

NMSA § 37-1-30(A) (1995). Finally, in 2017, the statute was amended again. That statute, which remains in effect today, states:

> An action for damages based on personal injury caused by childhood sexual abuse shall be commenced by a person before the latest of the following dates:
>
>> (1) the first instant of the person's twenty-fourth birthday; or
>>
>> (2) three years from the date that a person first disclosed the person's childhood sexual abuse to a licensed medical or mental health care provider in the context of receiving health care from the provider.

NMSA § 37-1-30(A) (2017).

Plaintiff asserts there are no material differences between the 1993 and the 1995 statute. Doc. 76 at 37 n.7. The Court agrees that the changes between the 1993 and 1995 versions do not appear substantive in a way that affects the Court's analysis in this case. Like the parties' briefs,

the Court will confine its analysis to subsection 2 from 1993 (which analysis also applies to the slightly reworded 1995 version).

      C.    <u>Tolling provisions</u>

      As noted above, the relevant alleged conduct occurred in the 1960s; therefore, at the time of the alleged injury, the three-year general personal injury statute of limitations applied. This means, unless a tolling provision applies, Plaintiff's time to sue ran long before the enactment of the child-sex-abuse statute of limitations in 1993.

      One relevant tolling provision provides:

> The times limited for the bringing of actions by the preceding provisions of this chapter shall, in favor of minors and incapacitated persons, be extended so that they shall have one year from and after the termination of such incapacity within which to commence said actions.

NMSA § 37-1-10.

      Plaintiff does not argue, and could not credibly argue, that the tolling provision for minors applies beyond the 1970s—Plaintiff turned eighteen in April 1976 and so this only gave her until April 1977 to file suit. Instead, Plaintiff relies on the tolling provision for incapacitated persons, asserting that she has been incapacitated for purposes of this statute at least until a year before she filed her lawsuit. The incapacity or disability in this tolling provision "must be such that the person is unable to manage his business affairs or estate, or to comprehend his legal rights or liabilities." *Lent v. Emp. Sec. Comm'n of State of N.M.*, 1982-NMCA-147, ¶ 13, 99 N.M. 407, 410 (internal quotation marks omitted). Plaintiff argues there is a genuine issue of fact for the jury as to whether Plaintiff (1) has historically been unable, and remains unable, to manage her personal care or business affairs, and (2) did not otherwise understand her legal rights and liabilities. Doc. 76 at 15.

Even though it is not Plaintiff who is moving for summary judgment, it is nonetheless her burden to "prov[e] the existence of facts which, if proven true, would warrant a tolling of the statute of limitations." *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1428 (10th Cir. 1996) (internal quotation marks and citations omitted)). Here, Plaintiff's burden is enormous. Because the statute of limitations is tolled for only one year after the termination of Plaintiff's incapacity, Plaintiff must show virtually continuous incapacity for more than 40 years. Demonstrating intermittent capacity during this period is insufficient. If, prior to Plaintiff filing her lawsuit, a gap of more than a year exists during which Plaintiff failed to prove she was incapacitated, her tolling argument based on incapacity fails.

This is not the only tolling argument Plaintiff brings, however. Plaintiff also argues for the application of a separate, judicially-created tolling provision, known as "the discovery rule." In New Mexico, the discovery rule provides that "'the cause of action accrues when the plaintiff knows or with reasonable diligence should have known of the injury and its cause.'" *Martinez-Sandoval v. Kirsch*, 1994-NMCA-115, ¶ 4, 884 P.2d 507, 509 (quoting *Roberts v. Sw. Cmty. Health Servs.*, 1992-NMSC-042, ¶ 24, 837 P.2d 442, 451). Plaintiff argues that, under the discovery rule, a child sexual abuse claim does not accrue until a reasonable survivor of child sexual abuse would have connected the injury to the sexual abuse. Doc. 76 at 30-36.

Whether the discovery rule applies to this case is a difficult question. Plaintiff does not allege she repressed memories of her abuse; to the contrary, the record demonstrates Plaintiff has long remembered specific instances of Webster's sexual abuse. Plaintiff has acknowledged "he did that to me, that fucking gross pig"; that he was "a nasty man"; and that she started to understand his abuse affected all her sexual relationships since she was a teenager because it made her upset every time she tried to have sex. She told her son she was "having so many

issues" because of Webster's abuse and she was going to "bring the Mormons down." Although, drawing all reasonable factual inferences in her favor, she did not disclose all the details of the abuse, it is undisputed that she disclosed the "headlines" of the abuse multiple times: to counselors, family members, Mormon church officials, and friends. Thus, a reasonable jury easily could conclude that Plaintiff has long been aware of the abuse, that it caused her psychological harm, and that the conduct was wrongful.

But the standard on summary judgment is not what a reasonable factfinder could conclude, but whether, drawing all reasonable inferences in Plaintiff's favor, a reasonable factfinder could also conclude the opposite. And, in answering this question, the Court must look to New Mexico courts for guidance. Having considered that guidance and having drawn all reasonable inferences in Plaintiff's favor, the Court concludes that the testimony of Dr. Reynolds creates a dispute of material fact as to whether Plaintiff's long-term substance abuse issues, chronic dissociative processes, numbness, avoidance, and significantly distorted feelings of complicity in the abuse, due to self-blame and self-hatred, prevented her from connecting her distress and impairment to her childhood sexual abuse. In other words, a reasonable factfinder could find that Plaintiff, although she understood that Webster harmed her, still fundamentally blamed herself for the abuse and, due to the distorted processing the abuse caused, could not draw a connection between the abuse and potential legal remedies. Because the Court finds a question of fact exists as to whether the discovery rule applies, the Court declines to decide whether, drawing all reasonable inferences in favor of Plaintiff, a reasonable factfinder could conclude that Plaintiff was incapacitated for almost her entire adult life.

D.    The discovery rule

The time for a plaintiff to bring a claim "'accrues when the plaintiff discovers or with reasonable diligence should have discovered that a claim exists.'" *Williams v. Stewart*, 2005-

NMCA-061, ¶ 12, 112 P.3d 281, 285 (quoting *Roberts v. Southwest Cmty. Health Servs*., 114 N.M. 248, 255, 837 P.2d 442, 449 (1992)). The New Mexico Court of Appeals addressed the discovery rule in the context of child sex abuse allegations in *Martinez-Sandoval v. Kirsch*, 1994-NMCA-115, 884 P.2d 507, 509. The plaintiff in that case brought claims based "on alleged sexual abuse and sexual exploitation" by her former parish priest, Father Robert J. Kirsch, from 1973 to 1977. *Id.* ¶¶ 1-2. "Kirsch initiated sexual contact with Plaintiff in the fall of 1973, when she was 15." *Id.* ¶ 7. "Sometime in the next few months Kirsch told Plaintiff that he had an infection. She saw her family physician and was treated for a venereal disease." *Id.* In August of 1976, she became pregnant and had an abortion in the fall. *Id.* ¶ 10. The plaintiff filed her complaint on August 28, 1991. *Id.* ¶ 3.

The plaintiff contended that "her cause of action accrued when she discovered her claim while undergoing psychotherapy in 1991, well after the limitations cutoff date." *Id.* ¶ 4. "Plaintiff does not contend that she repressed her memory of the events forming the basis of her claim. Also, she admits that as early as 1974 she knew that she was suffering from severe psychological problems. What she bases her invocation of the discovery rule on is her failure to ascertain the causal relationship between Kirsch's alleged misconduct and her severe psychological injury. She claims that not until her 1991 psychotherapy did she make that connection." *Id.* ¶ 5.

The court of appeals explicitly refused to decide whether this tolling theory was viable under New Mexico law. The court stated:

> Defendants contend that in determining whether Plaintiff acted with reasonable diligence in discovering the cause of her injury, the standard of reasonableness is that of a normal person who knows the facts of which Plaintiff was aware. *See E.J.M. v. Archdiocese of Philadelphia*, 424 Pa.Super. 449, 622 A.2d 1388, 1393 (1993); *A. McD. v. Rosen*, 423 Pa.Super. 304, 621 A.2d 128, 131 (1993) (plaintiff's mental incapacity will not be considered in assessing diligence); *cf. ABC v. Archdiocese of St. Paul & Minneapolis*, 513 N.W.2d 482, 486 (Minn. Ct. App. 1994) (rejecting subjective standard). If that were the test, Plaintiff would

not be able to prevail because a normal person exercising reasonable diligence should have discovered the connection between the alleged misconduct and Plaintiff's psychological difficulties. But we assume, again without deciding, that the proper test is as follows:

> The reasonable person who serves as the standard in this evaluation ... is not a detached outside observer assessing the situation without being affected by it. Rather, it is a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint.... [W]e look at a "reasonable person *in the position of the Plaintiff*[.]" If such an initially reasonable person would, by reason of the experience forming the basis for the plaintiff's complaint, have his or her judgment altered in some way, such altered judgment then becomes the standard. The cause of action will not accrue until such an individual would have discovered the damage. In other words, if the defendant's conduct would, in an ordinary reasonable person, cause an injury which by its very nature prevents the discovery of its cause, the action cannot be said to have accrued. Accrual of the cause of action occurs when the ordinary reasonable person who had been subject to the experience would have discovered that the injury was caused by that experience.

> *Riley* [*v. Presnell*, 409 Mass. 239,] 565 N.E.2d [780,] 785-86 [(1991)]. Plaintiff presented expert testimony by a psychologist that most reasonable people who had been subjected to the misconduct alleged in this case would not have been able to appreciate the causal connection between the misconduct and the severe psychological injury.

*Id.* ¶ 21 (all alterations in original except for within the citation to *Riley*). Because it was not case determinative, the *Martinez-Sandoval* court was able to *assume*, without deciding, that "reasonable person" for purposes of the discovery rules means a reasonable person who has been through the same experiences the plaintiff alleges. Having left the issue unresolved, *Martinez-Sandoval* provides no guidance about how the "reasonable person" should be defined in cases where the outcome turns on that definition.

Similarly, the *Martinez-Sandoval* court explicitly declined to decide whether a plaintiff's inability to draw a connection between her psychological injuries and her abuse would act to toll the statute of limitations. Because any psychological injuries the plaintiff experienced occurred *in combination* with her physical injuries, and the plaintiff was aware of her physical injuries

before the statute of limitation ran, the court reasoned that it did not matter if the plaintiff
discovered her psychological injuries after the statute of limitations ran. *Id.* ¶ 24 ("Plaintiff's
acquisition of a venereal disease and her pregnancy leading to an abortion were sufficiently
substantial injuries that once she knew that they were caused by Kirsch, the limitations period
would no longer be delayed by the discovery rule. We refuse to hold that a venereal disease and
a pregnancy terminating in an abortion are consequences too trivial to found a cause of action.").

Importantly, the *Martinez-Sandoval* court indicated that the outcome might have been
different if the plaintiff had separately, or solely, alleged psychological injuries. The court stated:
"Perhaps it could be argued that the sexual misconduct causing Plaintiff's venereal disease and
pregnancy can be isolated from the remainder of Kirsch's alleged misconduct, thereby leaving
Plaintiff with a viable cause of action based on that remainder. But Plaintiff makes no such
argument on appeal." *Id.* ¶ 27. Instead, "Plaintiff treated Kirsch's alleged misconduct as a
continuing tort, forming the predicate of one indivisible cause of action. Plaintiff's approach
accords with the general rule that when a series of actions by a defendant cause one indivisible
harm, Plaintiff has only one indivisible cause of action." *Id.* "Thus, regardless of whether
Plaintiff knew or should have known of the severe psychological damage caused by Kirsch's
alleged misconduct, Plaintiff knew and should have known well before the limitations cutoff date
that the alleged misconduct had caused her other substantial injury. The limitations period is not
tolled simply because a plaintiff does not know the full extent of her injury; the statute begins to
run once she knows or should know sufficient facts to constitute a cause of action." *Id.* ¶ 26.

Nor did it matter that "Plaintiff may not have been able to discover on her own the cause
of her psychological problems." *Id.* ¶ 28. Although the plaintiff may not have been able to draw
this causal connection on her own, there was "no contention that the cause was 'inherently

unknowable.'" *Id.* "[I]f Plaintiff had brought a claim based on the venereal disease and pregnancy, a competent attorney handling the case would soon have retained experts who would have uncovered the psychological harm and its cause." *Id*. Thus, *Martinez-Sandoval* makes clear that, at least before 1993, a plaintiff's claim could be time-barred even where the plaintiff did not understand the full extent of her injuries when the statute of limitations ran, as long as she understood at least some of her injuries at that time. *Id.* ¶ 26. *Martinez-Sandoval*, however, explicitly declined to indicate what result it would have reached had the alleged psychological injuries not been accompanied by physical injuries about which the plaintiff was aware before the statute of limitations ran. *Id.* ¶¶ 19, 22, 28.

Related to the issue of whether a plaintiff can draw a causal connection between a defendant's actions and her psychological injuries is whether a plaintiff is capable of understanding that a defendant's actions were wrongful. As with the above issues the *Martinez-Sandoval* court identified and then explicitly declined to decide, the court refused to decide whether a claim could accrue before a plaintiff realized the abuse suffered was wrongful.[9] This is because the evidence showed that, even if the *Martinez-Sandoval* plaintiff did not fully appreciate the wrongfulness of her abuser's conduct, she had sufficient knowledge of its wrongfulness within the statute of limitations period. *Id.* ¶ 25 ("Plaintiff stopped going to mass in 1975, when she was 17. In 1977 Plaintiff terminated her relationship with Kirsch. Plaintiff's expert witness testified that by the time Plaintiff was twenty-five (in 1984), she would expect Plaintiff to know that her past sexual relationship with Kirsch was wrong and socially

---

[9] On this point, however, the court did indicate how it would likely rule if forced to decide this issue. 1994-NMCA-115, ¶ 25 (describing the issue of whether it was also necessary to establish that "Plaintiff knew or reasonably should have known that Kirsch's sexual involvement with her was wrongful," as a "proposition which we question").

unacceptable. In these circumstances the accrual of Plaintiff's cause of action cannot be delayed beyond the limitations cutoff date in 1988 on the ground that Plaintiff still may not have appreciated, in some sense, that Kirsch's conduct was wrongful.").

In other words, New Mexico law prior to 1993 left open the question presented in this case: whether a person exercising reasonable diligence would have discovered the connection between the alleged misconduct and the plaintiff's psychological difficulties. Along with leaving this question open, New Mexico law also left open a more nuanced predicate to this question: whether a person exercising reasonable diligence means a person who experienced the same sexual abuse as the plaintiff at the same age as the plaintiff.

Although New Mexico law prior to 1993 may not have answered this question, Defendant argues that the Tenth Circuit answered it in 2016 when it issued an unpublished decision in *Sweesy v. Sun Life Assurance Co. of Canada (USA)*. The defendant in *Sweesy* allegedly took fraudulent financial advantage of an elderly dementia patient, sixty-six-year-old El Dean Lederhos. 643 F. App'x 785, 786 (10th Cir. 2016). The plaintiff filed suit well past the expiration of the statute of limitations but contended that "the discovery rule should operate differently where, as here, the aggrieved party was allegedly incapacitated by mental disease." *Id.* at 793. The plaintiff urged the Tenth Circuit to ask "when a hypothetical reasonable person *suffering from Alzheimer's Disease* knew or should have known of the factual basis for filing suit." *Id.* at 792 (emphasis added). The Tenth Circuit rejected this formulation, concluding: "We predict that, under these factual circumstances, the New Mexico Supreme Court would adopt an objective standard for the application of the discovery rule under § 37-1-4—specifically, one that does not take into account the subjective circumstances, including mental incapacity, of Mr. Lederhos." *Id.* at 794.

This case, Defendant asserts, supports its argument that the Court must ask not whether Plaintiff's psychological difficulties prevented her from: (1) drawing a causal connection between the alleged abuse and her alleged psychological harms, and (2) understanding that she had legal claims. Such questions, Defendant argues, inject a subjective component into the reasonable person analysis that deviates from consideration of what causal connection an objective reasonable person would make and whether that objective reasonable person would understand she had a legal claim. *See* Doc. 87 at 27.

The Court agrees that *Sweesy* correctly holds that whether a plaintiff should have known that she had a legal claim "'imports an analysis of objectivity.'" 643 F. App'x at 794 (quoting *Williams v. Stewart*, 2005-NMCA-061, ¶ 14, 112 P.3d 281, 285). The Court disagrees, however, that the holding in *Sweesy*, even if it were binding, extends to the situation where an abuser's conduct is what prevented the victim from understanding she had a legal claim and from drawing a connection between the abuse and the ensuing psychological harm. In *Sweesy*, there was no allegation that Mr. Lederhos's dementia was caused by the defendant's alleged wrongdoing, or any other allegation that justified defining an ordinary reasonable person as a person who has dementia. And in New Mexico personal injury cases, when a tortfeasor's wrongful actions prevent a plaintiff from discovering that she was harmed as a result of those wrongful actions, the reasonable person inquiry must take into account the position in which the tortfeasor's wrongful actions placed the plaintiff.

This analysis of New Mexico law begins with *Martinez-Sandoval*. Remember that the court there assumed without deciding that for accrual/discovery-of-claim purposes, a reasonable person means one who is:

> not a detached outside observer assessing the situation without being affected by it. Rather, it is a reasonable person who has been subjected to the conduct which

forms the basis for the plaintiff's complaint. We look at a reasonable person *in the position of the Plaintiff*. If such an initially reasonable person would, by reason of the experience forming the basis for the plaintiff's complaint, have his or her judgment altered in some way, such altered judgment then becomes the standard. The cause of action will not accrue until such an individual would have discovered the damage. In other words, if the defendant's conduct would, in an ordinary reasonable person, cause an injury which by its very nature prevents the discovery of its cause, the action cannot be said to have accrued. Accrual of the cause of action occurs when the ordinary reasonable person who had been subject to the experience would have discovered that the injury was caused by that experience.

*Martinez-Sandoval*, 1994-NMCA-115, ¶ 21 (internal alterations and quotation marks omitted; emphasis in original).

Although the New Mexico Court of Appeals left this question open in *Martinez-Sandoval*, it later squarely addressed it in *Kevin J. v. Sager*, 2000-NMCA-012, 999 P.2d 1026. In *Kevin J.*, the plaintiff alleged that, in August 1977, Dr. Sager sexually abused the plaintiff during a physical examination. 2000-NMCA-012, ¶ 2. The plaintiff did not claim that he repressed any memory of the alleged abuse. *Id.* In August 1992, the plaintiff first told a licensed counselor of the alleged abuse by Dr. Sager. *Id.* ¶ 3. The counselor, Douglas Feil, told the plaintiff that the alleged conduct by Dr. Sager amounted to abuse and that the plaintiff should write a letter to the American Medical Association about it. *Id.* Also in 1992, Feil noted that the plaintiff was able to see some of the negative impact of the alleged abuse and was more able to call it "abuse." *Id.* But Feil believed that the plaintiff only used the word "abuse" because Feil had originally invoked the word. *Id.* The plaintiff did not have "any level of psychological understanding or recognition of what had happened or the impact it had had on his life" at that time. *Id.* In 1993, the plaintiff told Feil that he did not want to accept that the abuse was significant because the plaintiff blamed himself for the abuse and viewed himself as defective. *Id.* ¶ 4.

In the fall of 1993, at Feil's urging, the plaintiff drafted a letter to the Colorado Medical Association in which he wrote, "Though I want to deny it, the incident affected me greatly,

reinforcing doubts that I already had about my sexuality." *Id.* ¶ 5. Feil testified that the letter was

a true statement of how the plaintiff felt at that time. *Id.* Feil further testified that the plaintiff had

a cognitive understanding, on some level, of the effect that the alleged abuse had on his life at

that time. *Id.* Feil testified that, in his opinion, the plaintiff did not "pull it all together" and

understand the abuse had affected him on an emotional level until August 1994. *Id.* The plaintiff

filed suit on February 5, 1997. *Id.* ¶ 2.

   Unlike *Martinez-Sandoval*, however, *Kevin J.* did not turn on the discovery rule under the

general personal injury statute of limitations. That is because, as discussed above, the New

Mexico legislature adopted a statute of limitations specific to childhood sexual abuse claims in

1993 (and modified slightly in 1995). NMSA § 37-1-30. The relevant portion of the 1995 version

of this statute permitted suit within three years of "the date of the time that a person knew or had

reason to know, as established by competent medical or psychological testimony, that an injury

was caused by childhood sexual abuse." *Id.* § 37-1-30(A)(2); *see Kevin J.*, 2000-NMCA-012, ¶¶

6-8.[10] The court of appeals explained that "Section 37-1-30 appears to have been written with

modern psychological theory in mind." *Kevin J.*, 2000-NMCA-012, ¶ 12. "In cases of childhood

sexual abuse, it frequently appears to be the case that the child is aware of the episode or

episodes of abuse and is also aware of psychological dysfunction, but because of coping or

defense mechanisms the child is not aware that the psychological dysfunction is caused by the

abuse." *Id.* "Accordingly, reading the statute as a whole in its logical sense and applying the

requirement for medical or psychological testimony to the entire section, we believe that the

legislature intended the statute of limitations to begin running at the time a plaintiff knew or had

---

[10] The *Kevin J.* court did not discuss the 1993 version of the statute.

reason to know of the connection between the alleged childhood sexual abuse and the injury, as established by competent medical or psychological testimony." *Id.* ¶ 13.

"Therefore, . . . the testimony from both Plaintiff and Feil regarding Plaintiff's actions or statements is not in itself determinative of the point at which the statute of limitations began to run." *Id.* ¶ 15. "Since Section 37-1-30(A)(2) requires expert testimony, facts alone are insufficient to determine when an individual knew or had reason to know of the connection between the abuse and the injury." *Id.* The court of appeals concluded that "we cannot ignore Feil's testimony that, even though Plaintiff had some cognitive understanding and realization of the abuse and its effect upon him prior to February 5, 1994, Plaintiff did not finally pull it all together and realize the impact that the abuse had on his life until after February 5, 1994." *Id.* "As we noted previously, Feil testified that 'it's a process that unfolds for people.'" *Id.* Because the expert testimony was "susceptible to different permissible inferences" regarding the question of whether the plaintiff knew or had reason to know that his injuries were caused by the alleged abuse before 1994, summary judgment was improper and the statute of limitations question was for the jury. *Id.* ¶ 20.

Thus, in concluding that a factual question existed regarding whether the plaintiff in *Kevin J.* discovered he had a legal claim before such claim was time barred, the court took into consideration how the alleged abuse might have affected the plaintiff's ability to discover that he had a claim. *Kevin J.*, therefore, makes clear that, when applying the sexual abuse statute of limitations the legislature passed in 1993 (or the 1995 similar iteration of that statute), courts must consider the effect the alleged sexual abuse might have had on the plaintiff's ability to discover that he has a claim.

But this teaching from *Kevin J.* does not necessarily apply to whether Plaintiff's claim here expired before 1993 under the general personal injury statute of limitations. *See Kevin J.*, 2000-NMCA-012, ¶ 16 (observing that "the factual context of [the holding in *Martinez-Sandoval*] is different from the present case because *Martinez-Sandoval* addresses the general statute of limitations for torts resulting in physical injuries while in the present case we deal with a specialized statute that is particularly applicable to psychological injuries"). Therefore, the Court looks to other cases to determine whether, in applying the discovery rule of the general statute of limitations for torts, the Court should view the reasonable person as a reasonable person who suffered the same sexual abuse Plaintiff allegedly suffered.

The court of appeals addressed a similar question in *Williams v. Stewart*, 2005-NMCA-061, 112 P.3d 281, a case *Sweesy* quoted as concluding that "[t]he standard of 'reasonable diligence' [inherent in the discovery rule] imports an analysis of objectivity." *Sweesy*, 643 F. App'x at 794 (citing *Williams*, 2005-NMCA-061, ¶ 14)). *Williams* concerned the alleged practice of Los Alamos National Laboratory ("LANL") to have organs, tissues, and other body parts removed in the course of autopsies performed at area hospitals. 2005-NMCA-061, ¶ 2. The body parts were then delivered to LANL so that their plutonium content could be studied. *Id.* Little or no effort was made to obtain the informed consent either of the decedents before their deaths or, after their deaths, of their families. *Id.* ¶ 3. The program received significant publicity in the early nineties, leading the district court to conclude, as a matter of law, that "Plaintiffs should have discovered their claims by June 1995." *Id.* ¶ 7. The court of appeals reversed.

In reversing, the court of appeals concluded that the question for the factfinder is "the level of awareness the publicity would generate to a reasonable person *in Plaintiffs' communities*." *Id.* ¶ 17 (emphasis added). The court noted that "some of the Plaintiffs are elderly

and live in a small, isolated village in Northern New Mexico and at least one is primarily Spanish speaking and claimed that he could not have understood the publicity without an interpreter." *Id.* "As such, it remains an open question whether reasonably prudent persons *in Plaintiffs' position* would have realized that" they had a claim based on these newspaper articles. *Id.* ¶ 18 (emphasis added). In other words, *Williams* did not ask what a generic reasonable person should have known. It asked what a reasonable Spanish-speaking resident in a rural community should have known. This supports a finding that the discovery rule inquiry is what a "reasonable child sexual abuse victim" would have realized about his or her injuries, not what a generically "reasonable person," without psychological difficulties, would have realized.

Defendant argues that New Mexico would reject Plaintiff's "psychological difficulties" theory because the law is clear that a particular plaintiff's lack of personal knowledge as to her cause of action is not sufficient to toll a statute of limitations. Doc. 87 at 26; *Yurcic v. City of Gallup*, 2013-NMCA-039, ¶ 21, 298 P.3d 500, 506 ("to the extent Plaintiff argues that she did not individually gain inquiry notice of the damage until 2006, we conclude that the requirement of diligence as a co-owner of the visibly damaged property warrants enforcement of the statute of limitations against her"). But this proposition of law is not in conflict with the "psychological difficulties" argument. The Court agrees with Defendant that the discovery rule is not invoked merely because *this* plaintiff lacked personal knowledge of the facts underlying her cause of action: the statute of limitations is tolled until the plaintiff either knew or with reasonable diligence *should* have known the facts. The Court predicts, however, that the New Mexico Supreme Court would find that the "reasonable diligence" standard asks whether a reasonable

person, *who experienced the same abuse the plaintiff allegedly experienced,* should have

discovered the cause of action.[11]

This rule seems particularly apt as applied to childhood sexual abuse claims. Applying

the rule Defendant advocates would provide civil impunity to a defendant whose abuse would

have prevented a reasonable person from connecting the abuse to the harm and from realizing

she had a legal claim. This would conceivably allow sexual predators to avoid civil

consequences for their actions not on the basis that a plaintiff was derelict in pursuing a claim,

but because the defendant committed abuse in a way that prevented the plaintiff from connecting

the abuse to a potential legitimate claim. Application of Defendant's proposed rule would

insulate the consequences of wrongful behavior from review by the virtue of that very same

wrongful conduct. Based on its review of case law from New Mexico intermediate courts, the

Court finds that, under these circumstances, the New Mexico Supreme Court would conclude

that a reasonable person, for purposes of the discovery rule, means a reasonable person placed in

the same situation as the plaintiff.

E.    Issues for the jury

The New Mexico Court of Appeals has "held that where there are disputed questions of

material fact as to whether a plaintiff is barred by the statute of limitations, these questions are to

be decided by a jury." *State v. Whittington*, 2009-NMCA-06, ¶ 18, 144 N.M. 85, 89 (internal

quotation marks omitted); *see, e.g.*, *Williams v. Stewart*, 2005-NMCA-061, ¶ 16, 137 N.M. 420,

425 (New Mexico has "characterized the application of the discovery rule as a jury question,

---

[11] Because the case law asks what the plaintiff knew or should have known, the personal
knowledge of a particular plaintiff is relevant when asking whether the statute of limitations has
run. But a particular plaintiff's *lack* of personal knowledge is not sufficient to save a claim from
the statute of limitations unless the plaintiff can additionally show that a person exercising
reasonable diligence would not have discovered the cause of action.

particularly when conflicting inferences may be drawn"); *Hance v. Karlis*, 94 F.3d 655 (10th Cir. 1996) (applying the same standard under Colorado law and noting that whether the facts "would have led a reasonable person to conclude" he or she had been harmed by the defendant's actions is appropriately determined by a jury); *Bistline v. Parker*, 918 F.3d 849, 862 (10th Cir. 2019) (similar conclusions under Utah law).

"Determination of the timeliness of a claim as a matter of law is only proper if, under the undisputed facts, there is no room for a reasonable difference of opinion." *City of Roswell v. Chavez*, 1989-NMCA-037, ¶ 14, 108 N.M. 608, 611; *see also Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1428 (10th Cir. 1996) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Therefore, in order to withstand summary judgment in the case at bar, Plaintiffs carry the burden of proving the existence of facts which, if proven true, would warrant a tolling of the statutes of limitation." (internal quotation marks and citations omitted)).

Both parties in this case agree that this is the governing standard. Doc. 87 at 27 ("Application of the discovery rule presents a jury question only when there are disputed issues of material fact or 'conflicting inferences may be drawn' from the facts."); Doc. 76 at 2 ("New Mexico courts have consistently held that statute of limitations determinations are determinations for the jury."). Nonetheless, the Tenth Circuit's unpublished decision in *Sweesy* holds that, although whether a statute of limitations applies is typically a jury question in New Mexico, when a claim began to accrue (i.e., when Plaintiff discovered she had a legal claim) is a question for the court. 643 F. App'x 785 at 790. The Court disagrees with *Sweesy* and concludes that the New Mexico Supreme Court would hold that when a claim accrues is a question for a jury, not a judge (unless a reasonable jury could only reach one result).

First, *Sweesy*'s holding is contrary to the New Mexico Court of Appeals' decisions holding that the discovery rule is a question for the jury. *E.g.*, *Williams*, 2005-NMCA-061, ¶ 16 ("the application of the discovery rule [i]s a jury question, particularly when conflicting inferences may be drawn") (citing *Kevin J.*, 2000-NMCA-012, ¶ 20 ("Because there are differing permissible inferences that the fact finder could make summary judgment was not proper in this case. The question of when plaintiff knew or had reason to know of the alleged abuse and its impact is a question for the jury to decide." (internal alterations omitted))).

Second, the Court's conclusion is buttressed by its review of the authority *Sweesy* cited for its statement that accrual is a judge, not a jury, question—*Roberts v. Southwest Community Health Services*, 1992-NMSC-042, 837 P.2d 442, 446. *Roberts* is the genesis of the discovery rule in New Mexico. In that case, a surgeon left a sponge inside of the plaintiff. *Id.* ¶¶ 2-3. That plaintiff filed suit more than three years after the surgeon left the sponge inside of her, but less than three years after she discovered the injury caused by the surgeon's malpractice. *Id.* ¶ 16. The New Mexico legislature did not specify whether the three-year statute of limitations ran from the date of the malpractice occurred or the date the plaintiff first learned of the malpractice. *Id.* ¶ 15 (citing the personal injury statute of limitations, NMSA § 37-1-8). Previously, when confronted with the same issue (a sponge left inside a patient who did not immediately discover the malpractice), the New Mexico Supreme Court stated, "We cannot supply what the Legislature has omitted. We are convinced that if the Legislature had intended the principle of discovery to apply to tort actions, it would have specifically so provided, as it did with regard to discovery in cases of fraud and in actions for injuries to or conversion of property." *Roybal v. White*, 1963-NMSC-111, ¶ 10, 383 P.2d 250, 252, *overruled by Roberts*, 1992-NMSC-042, ¶ 10.

Twenty-nine years later, in *Roberts*, the New Mexico Supreme Court changed its view: "While the date of the negligent act rule may have been the majority rule when *Roybal* was decided, it has been under constant intellectual bombardment, and no longer retains that position. The great weight of authority, both in decisions and commentary, today recognizes some form of the 'discovery rule,' *i.e.,* that the cause of action accrues when the plaintiff discovers or with reasonable diligence should have discovered that a claim exists." *Roberts*, 1992-NMSC-042, ¶ 24 (internal citation and quotation marks omitted). In deviating from *Roybal*'s pronouncement that it "cannot supply what the Legislature has omitted", the New Mexico Supreme Court made the statement *Sweesy* quoted: "In the absence of explicit instructions from the legislature, when a cause of action accrues under a statute of limitations is a judicial determination." *Roberts*, 1992-NMSC-042, ¶ 15, 837 P.2d at 446. In context, it is clear this statement did not refer to judges deciding the *factual* question of exactly when a claim was discovered. Instead, it referred to judges deciding the *legal* question of whether a cause of action accrues at the time of the commission of the tort or at the time of the discovery of the injury.

A review of the cases *Roberts* cited in support of the statement the Tenth Circuit quotes supports this conclusion, as each of those cases also addressed whether, absent explicit language from the legislature about whether a statute of limitations accrues at the time of the injury or at the time of the discovery of the injury, this legal question is subject to judicial determination. *See Harig v. Johns-Manville Prod. Corp.*, 284 Md. 70, 75, 394 A.2d 299, 302 (1978) (stating in an asbestos case, "While [the statute of limitation at issue] mandates when suit on a civil action at law is foreclosed, it does not define the word 'accrues' and thus does not indicate when the three-year time period is triggered. Absent such statutory definition, the question of when a cause of action accrues is left to judicial determination."); *Franklin v. Albert*, 381 Mass. 611, 617, 411

N.E.2d 458, 462 (1980) (considering whether a malpractice claim should accrue at the time of

the malpractice or the time of the discovery of the malpractice and stating, "Absent explicit

legislative direction, the determination of when a cause of action accrues, causing the statute of

limitations to run, has long been the product of judicial interpretation in this Commonwealth.");

*Raymond v. Eli Lilly & Co.*, 117 N.H. 164, 167, 371 A.2d 170, 172 (1977) (considering whether

the statute of limitations is tolled "until the time of the discovery of the cause of action in a case

in which the plaintiff's injury was allegedly caused by a drug and the plaintiff, exercising

reasonable diligence, did not learn of the possible causal connection between the drug and her

injury until two or three years after the injury occurred"; and concluding, "The statute does not

define the word 'accrued.' In the absence of a statutory definition, the time of accrual is left to

judicial determination."); *Berry v. Branner*, 245 Or. 307, 313, 421 P.2d 996, 999 (1966) (stating

in a case where a surgical needle was left in the plaintiff's abdomen, "The contention is made

that a decision of this kind [deciding whether statute of limitations accrues at time of malpractice

or when malpractice discovered] amounts to judicial legislation. The legislature, however, did

not provide that the time of accrual was when the physician performed the negligent act. This

court did. The legislature left the matter undetermined. A determination that the time of accrual

is the time of discovery is no more judicial legislation than a determination that it is the time of

the commission of the act.").

Moreover, although *Roberts* decided the legal question of whether the general personal

injury statute of limitations accrues at the time of the tort or at the time the injury is discovered,

the *Roberts* court explicitly declined to decide the question of "whether plaintiff in the instant

case knew or with reasonable diligence should have known of the injury and its cause." 1992-

NMSC-042, ¶ 28. Instead, *Roberts* concluded this is a "question of fact that is specifically within

the trial court's competence." *Id*. Although *Roberts* did not specify whether, on remand, the trial

judge or jury should decide this question, New Mexico case law generally reserves questions of

fact for the jury, unless a factual issue is so clear that no reasonable jury could find to the

contrary. *Dungan v. Smith*, 1966-NMSC-118, ¶ 6, 415 P.2d 549, 550.

Finally, binding Tenth Circuit precedent has interpreted *Roberts* consistently with the

Court's current interpretation. In *Lujan v. Regents of the University of California*, the court held

that the discovery rule would not apply in wrongful death cases. 69 F.3d 1511 (10th Cir. 1995).

Unlike New Mexico's personal injury statute of limitations, which did not address when a cause

of action accrues and therefore left the issue to judicial determination, the New Mexico

legislature provided that a cause of action under the New Mexico wrongful death statute accrues

"*as of* the date of death." *Id.* at 1520. The Tenth Circuit supported this conclusion by noting that

*Roberts* applied the discovery rule in the *absence* of explicit instructions from the legislature

about when a cause of action accrued. *Id.* at 1521 ("In [*Roberts*], however, the court was required

to decide when the cause of action accrued. The court was quick to point out that determining

when a cause of action accrues is a judicial function only 'in the absence of explicit instructions

from the legislature.'" (quoting *Roberts,* 114 N.M. at 252) (internal alterations omitted)). It is

clear that the Tenth Circuit also viewed the relevant language in *Roberts* as holding that, when

the legislature does not provide a clear rule for accrual, the question of whether the discovery

rule applies to a particular statute of limitations is a judicial determination. This is not the same

as holding that, where the discovery rule applies to a particular statute of limitations, it is a

judge's role to consider the facts as applied to the discovery rule.

The Court's review of New Mexico case law and binding Tenth Circuit precedent leaves

it convinced that, when a question of fact exists as to when a plaintiff knows or with reasonable

diligence should have known of the injury and its cause, resolution of that question is left for a jury.

      F.    <u>Defendant is not entitled to summary judgment as a matter of law.</u>

Based on the analysis above, the Court concludes that Plaintiff's claim was clearly tolled until April 1977, one year after she reached the age of majority. After that, the analysis takes three separate forms: the period of 1977 to 1993, governed by the discovery rule; the period of 1993 to 2017, governed by childhood-sex-abuse statute of limitations; and the period of 2017 to 2020, governed by the statute currently in effect. The Court begins with the middle period first, because analysis of the childhood-sex-abuse statute of limitations during that time, and New Mexico case law interpreting that statute, provides the clearest answer.

From 1993 to 2017, the statute-of-limitations question turns on "the date of the time that a person knew or had reason to know, as established by competent medical or psychological testimony, that an injury was caused by childhood sexual abuse." NMSA § 37-1-30(A) (1993). Defendant argues that "the undisputed facts prove that Plaintiff always knew she had been abused, and always knew the abuse had caused her some injury." Doc. 87 at 29. As set forth above, various statements Plaintiff has made throughout her life provide evidence that Plaintiff was aware of the abuse, that it caused her psychological harm, and that the conduct was wrongful. The facts in the present case and *Kevin J.*, however, are similar. Given the New Mexico Court of Appeals' conclusion that the statute of limitations issue in *Kevin J.* must be sent to a jury, the Court concludes that the same statute of limitations issue in the present case must also be sent to the jury.

*Kevin J.* emphasized that a reasonable factfinder could credit expert testimony and find, in the plaintiff's favor, that "the discovery of the connection between the alleged abuse and injury by the Plaintiff was a process, and under that process it did not become clear to Plaintiff,

such that [s]he knew or had reason to know, that [her] injuries were caused by the alleged abuse"
for many decades. *Kevin J.*, 2000-NMCA-012, ¶ 20.

      As described above at length, Plaintiff in this case has presented evidence in the form of
expert testimony from Dr. Reynolds, supplemented by evidence in Plaintiff's deposition, that
Plaintiff's adaptations and reactions to Webster's prolonged sexual abuse (e.g., dissociation,
dysregulations of identity and emotions, intense attributions of self-blame, substance abuse, etc.)
ensured that she did not—and still does not currently—fully grasp the connection between these
damages and the sexual abuse. Dr. Reynolds's Decl., Doc. 77-2 at ¶ 25. Dr. Reynolds asserts that
early trauma such as Plaintiff's childhood sexual abuse re-shapes and distorts the victim's
understanding of the trauma, the injury it caused, and her awareness of the connection between
the two. *Id*. ¶ 9. She states that studies have shown that the neurobiology of the brain and the
way it processes information is altered in the process with life-long implications for a survivor's
ability to function and appropriately manage her affairs and understand her injuries and their
causes. *Id*. A childhood trauma victim's understanding of any connection between her trauma
and her injuries is often disrupted or severed. *Id.* ¶ 10. Victims very often do not know and
understand the connection between the trauma and the injuries it caused without intensive and
focused therapy by specialized professionals. *Id.* Many victims who believe they were complicit
in their abuse feel they have no right to seek legal assistance. *Id.* ¶ 20. Plaintiff's reactions and
misperceptions in this regard are the rule, rather than the exception with sexual abuse victims. *Id.*

      In addition to Dr. Reynold's testimony about the affect child sexual abuse generally has
on victims, the Court also relies on the similarities between *Kevin J.* and the present case. The
plaintiffs in both cases allege sexual abuse that occurred when they were children.  Neither
repressed their memories of this abuse and both disclosed the abuse to a counselor at some point.

During these discussions, the plaintiffs agreed that the abuser's actions were wrong and should be reported. Further, both plaintiffs were aware of at least some of the negative psychological impact the abuse had on their lives. In both cases, however, psychological experts testified that the plaintiffs' feelings of self-blame prevented the plaintiffs from recognizing the full impact the abuse had on their lives. Even though the plaintiffs might have had some understanding that the abuse had some negative psychological impact, their feelings of self-blame prevented them from putting it all together. Thus, like the present case, evidence existed in *Kevin J.* that the plaintiff remembered the abuse, knew the abuse was wrong, and knew the abuse caused some psychological damage. 2000-NMCA-012, ¶¶ 3, 22. Nonetheless, *Kevin J.* affirmed the denial of the defendant's motion for summary judgment and concluded "it is a question for the finder of fact to determine at what time Plaintiff knew or had reason to know that the alleged abuse caused him injury." *Id.* ¶ 22. Based on *Kevin J.*, the Court predicts that the New Mexico Supreme Court would determine that a jury should decide whether the statute of limitations in effect between 1993 and 2017 should apply in this case.

Whether the statute of limitations decision should go to a jury is a more difficult question for the period between 1977 to 1993. First, the general personal injury statute of limitations in effect during this timeframe, unlike the statute of limitations specifically tailored for sexual abuse victims that came into effect in 1993 and that was at issue in *Kevin J.*, did not have a provision that explicitly contemplated looking to expert medical testimony to determine when an alleged victim knew or had reason to know that an injury was caused by childhood sexual abuse. Instead, whether the general personal injury statute of limitations barred Plaintiff's claim before

1993 turns on application of the discovery rule described in *Roberts*.[12] The operative question under this rule is whether, drawing all reasonable inferences in favor of Plaintiff, a material question of fact exists as to whether Plaintiff knew, or a reasonable person who suffered the same sexual abuse would have known, that she had a legal claim.

Second, although *Martinez-Sandoval*, the lead sexual abuse case addressing the discovery rule during this time frame, identified several issues now before this Court, it did not resolve those issues. These issues surfaced again several years later in *Kevin J.* There, the defendant relied on *Martinez-Sandoval* "[i]n support of his argument that Plaintiff had sufficient knowledge of the causal connection between the alleged abuse and injury prior to February 5, 1994." *Kevin J.*, 2000-NMCA-012, ¶ 16. As a result, the New Mexico Court of Appeals in *Kevin J.* did later analyze *Martinez-Sandoval* and resolve some of these issues. Accordingly, although *Kevin J.* dealt with a different statute of limitations, in predicting whether the New Mexico Supreme Court would conclude that a jury should decide whether Plaintiff's claim was time barred before 1993, the Court must again turn to *Kevin J.* for guidance.

The *Kevin J.* court distinguished *Martinez-Sandoval* in two different ways. First, the *Kevin J.* court observed that "the factual context of that holding is different from the present case because *Martinez-Sandoval* addresses the general statute of limitations for torts resulting in

---

[12] As explained at the beginning of the Discussion section, the Court agrees with Defendant that if a statute of limitations expired while it was applicable, it bars Plaintiff's claim regardless of future amendments to the statute. It appears that *Roberts* announced a new judicially created rule in 1992—the discovery rule—and overruled prior precedent holding that a claim accrued at the date of the tort, not the discovery of the injury. 1992-NMSC-042, ¶ 20. Defendant does not argue the discovery rule should not be applied retroactively to Plaintiff's claim. The Court notes that *Roberts* itself applied the rule retroactively to potentially save a claim that would have already expired under the date-of-tort accrual rule. *Id.* ¶¶ 16, 28.

physical injuries while in the present case we deal with a specialized statute that is particularly

applicable to psychological injuries." 2000-NMCA-012, ¶ 16.

Second, the court noted that *Martinez-Sandoval* was about physical injuries, that is,

injuries which were apparent at the time of the conduct: the plaintiff having caught a sexually

transmitted disease from the defendant, and defendant causing plaintiff to become pregnant. *Id.* ¶

17. In *Kevin J.*, "Plaintiff does not allege any physical injury that should have led him to discover

any psychological injury such as that set forth by the plaintiff in *Martinez-Sandoval*." *Id.* ¶ 18.

"It appears that Plaintiff only bases a claim on the psychological damages that he claims Dr.

Sager caused. We are not faced with the question of when Plaintiff knew or should have known

of a physical condition that should have led him to discover his psychological condition, but

rather when Plaintiff knew or should have known of the alleged psychological injury that is the

basis for his claim and that the psychological injury was caused by Dr. Sager's alleged abuse."

*Id.*

Therefore, the question is whether, reading *Martinez-Sandoval* and *Kevin J.* together, the

most relevant distinction is the difference between the two statutes of limitations, or the

difference between alleging physical injuries versus purely psychological injuries. In other

words, if *Kevin J.* had stopped at saying *Martinez-Sandoval* came out differently because the

general personal injury statute of limitations did not incorporate a rule similar to the 1993 statute,

the argument that *Martinez-Sandoval* bars Plaintiff's claims would be much stronger. As set

forth above, however, relevant cases that continued where *Martinez-Sandoval* left off

demonstrate that the discovery rule incorporates into its analysis what a reasonable survivor of

childhood sexual abuse knew or should have known. As the court in *Kevin J.* stated, the

operative question before it was "when Plaintiff knew or should have known of the alleged

psychological injury that is the basis for his claim and that the psychological injury was caused by Dr. Sager's alleged abuse." *Id.* The Court must ask this same question in the present case.

In addition, *Martinez-Sandoval* itself implied that the result in that case would have been different had that plaintiff alleged psychological injuries in separate causes of action. *E.g.*, *Kevin J.*, 2000-NMCA-012, ¶ 17 (*Martinez-Sandoval* "also noted that the plaintiff may have been able to isolate other causes of action in her original complaint, other than the venereal disease and the pregnancy, which may have survived."). Plaintiff here, alleging only psychological injuries, is more like the hypothetical plaintiff the *Martinez-Sandoval* court indicated might have prevailed.

Moreover, as described above at length, Plaintiff has presented evidence in the form of expert testimony from Dr. Reynolds that Plaintiff's psychological damage prevented her from understanding that she had a legal cause of action. Dr. Reynolds' opinion distinguishes this case from *Martinez-Sandoval*, where the plaintiff's own expert witness "testified that by the time Plaintiff was twenty-five (in 1984), she would expect Plaintiff to know that her past sexual relationship with Kirsch was wrong." 1994-NMCA-115, ¶ 25.

The Court finds that it is a jury question whether the statute of limitations was tolled between 1977 and 1993.

Finally, the Court turns to the statute of limitations from 2017 to the filing of this suit on March 11, 2020. The statute governing this period gives the plaintiff until her 24th birthday or "three years from the date that a person first disclosed the person's childhood sexual abuse to a licensed medical or mental health care provider in the context of receiving health care from the provider." NMSA § 37-1-30(A)(1)-(2) (2017). The parties dispute when Plaintiff first disclosed her childhood sexual abuse to a "licensed" health care provider in the context of "receiving health care" from the provider. Doc. 76 at 38-43; Doc. 87 at 29-31.

First, Defendant argues that Plaintiff admits telling her counselor, LaFerrier, about the abuse in 1980. Doc. 87 at 29. But Defendant, who is the movant on summary judgment, did not submit any evidence that LaFerrier was a licensed mental health care provider. Rather than alleging that LaFerrier was a licensed provider, Defendant speculates that "LaFerrier *would have been* licensed under the Professional Psychologist Act, N.M.S.A. § 61-9-2 (1978), which was in effect in 1980." *Id.* at 30 (emphasis added). Speculation is not fodder for summary judgment.[13] Because a question of fact exists as to whether the medical provider Plaintiff saw in 1980 was licensed, Defendant cannot prevail on this ground.

Second, Defendant argues that Plaintiff also disclosed the abuse to licensed medical professionals in 2006 and 2010. *Id.* at 30 (citing Exhibits B and C). Neither Defendants' list of undisputed facts, nor Defendants' exhibits, clarify the nature of these disclosures. The 2006 medical record is an intake form for behavioral health therapy. Doc. 68 at 25. It recites a history of sexual abuse but does not state to whom or when Plaintiff made any disclosures of sexual abuse, let alone whether it was to a licensed provider in the context of receiving health care from that provider. *Id.* at 27. The 2010 medical record is another intake assessment that states Plaintiff has a history of sexual abuse. Doc. 87 at 34. This record, however, also fails to clarify to whom or when Plaintiff made any disclosures of sexual abuse. *Id.* A further medical record states that Plaintiff "addressed her past history of abuse" in December 2011, but nothing about this note

---

[13] In her surreply, Plaintiff points out that the record refers to a "counselor", not a "psychologist." Doc. 133 at 11. Therefore, Plaintiff argues, to the extent the Court is inclined to make assumptions based on state licensure requirements, the Court should look to the Counseling and Therapy Practice Act, NMSA §§ 61-9A-1 to -30, which did not become effective until July 1, 1993—*well after* Plaintiff saw LaFerrier in 1980. This does not precisely refute Defendant's point that LaFerrier *could* have been licensed in some medical profession, but it does support the assertion that the Court has insufficient information on which to grant summary judgment.

refers to sexual abuse or Webster. *Id.* at 38. And, as Plaintiff points out, to what "abuse" this reference refers is ambiguous as she has experienced various instances of abuse by various people throughout her life. Doc. 133 at 14. Thus, drawing all reasonable inferences in favor of Plaintiff, a material question of fact exists as to whether the persons to whom Plaintiff disclosed Webster's sexual abuse were licensed.

A material question of fact also exists as to whether any disclosure was made in the context of "receiving health care from the provider." NMSA § 37-1-30(A)(2). Intake may be a step necessary to receiving health care from a provider but does not necessarily constitute the receipt of health care from "the provider" (referring to the licensed provider). For instance, a patient who attended an intake interview but then never returned to actually see the licensed health care provider may not have made the statement in context of receiving health care from a licensed provider. The Court finds that Defendant's burden of production on summary judgment is not satisfied by simple references to a history of sexual abuse in Plaintiff's medical file. To satisfy its burden, Defendant would need to provide evidence demonstrating that the specific requirements of the statute were met.

Finally, Defendant argues that, "two years before she filed suit, she disclosed the abuse to Stacy Vigil, a Licensed Professional Clinical Counselor." Doc. 87 at 30. "Plaintiff does not dispute she disclosed the abuse of Mark Webster to Stacy Vigil but does dispute it occurred "at least two years before filing suit.'" Doc. 133 at 15 ¶ JJ. The Court agrees there is no evidence pinpointing the exact timeline of the disclosure, but it would have necessarily happened sometime during Plaintiff's treatment relationship with Ms. Vigil. Plaintiff testified that she first met Ms. Vigil "three or four years" prior to her deposition in July 2020, and last spoke with Ms. Vigil one month prior to the deposition. Doc. 133-1 at 26 (Plf's Dep. at 193:3-22). Thus, drawing

all reasonable inferences in favor of Plaintiff, Plaintiff's disclosure could have occurred less than two years before filing suit (or, even after Plaintiff filed suit). Plaintiff's disclosure to Ms. Vigil, therefore, cannot serve as the basis for summary judgment.

Further, the Court agrees with Plaintiff that there is no competent evidence on summary judgment that Ms. Vigil was a licensed mental health practitioner at the time of the disclosure. Defendant provides links to two websites, https://www.kidscounselingnm.com/meet-the-team and https://npiprofile.com/npi/1316085574, reflecting Ms. Vigil's licensure status. Doc. 87 at 14 ¶ JJ. Plaintiff disputes that the Court can take judicial notice of these privately-run websites. Doc. 133 at 16. Plaintiff notes instead that "the official website for searching licensure in the State of New Mexico [is] verification.rld.state.nm.us." Doc. 133 at 16. The Court agrees with Plaintiff.

A district court should take judicial notice of the contents of a website unless they are unreliable. *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224-25 (10th Cir. 2007). Plaintiff points out that npiprofile.com specifically includes a disclaimer that its contents are not reliable. Doc. 133 at 16 ("This site could include technical or other mistakes, inaccuracies or typographical errors. . . . [T]he materials or services at this site may be out of date, and we make no commitment to update such materials or services." (capitalization altered)). In addition, Ms. Vigil's NPI profile states that it has not been updated in six years.

Therefore, the Court agrees with Plaintiff that Defendant is not entitled to summary judgment as a matter of law on whether the current statute of limitations in NMSA § 37-1-30 expired prior to the filing of this suit.

G.    Mental incapacity

Plaintiff also argues that Dr. Reynolds' evidence establishes continuous incapacity from the time Plaintiff became an adult at least until one year before she filed this lawsuit. This is an extremely difficult task, even when drawing all inferences in Plaintiff's favor. The plaintiff has

the burden of establishing the application of a tolling provision. *Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 12, 91 P.3d 58, 65. As a result, Plaintiff must provide evidence that she has been incompetent nearly her entire adult life. Although Plaintiff presented evidence to cover various periods of Plaintiff's life, a dearth of evidence exists as to some other periods of her life. Thus, it is doubtful that Plaintiff made this showing. Ultimately, however, because the Court denies Defendant's motion on the basis of the discovery rule, it need not address Plaintiff's incompetency argument. The question of whether evidence of incompetency should be submitted to the jury is reserved for motions in limine or motions related to jury instructions.

## **CONCLUSION**

Defendant's Motion To Strike Declaration Of Victoria Reynolds, Ph.D., Doc. 86, and Defendant's Motion For Summary Judgment Regarding Statute Of Limitations And Memorandum In Support, Doc. 68, are DENIED.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by consent