## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LISA MARIE HERRERA,

        Plaintiff,

      v.                                     Civ. No. 20-318 SCY/LF

CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST
OF LATTER-DAY SAINTS,

        Defendant.

## MEMORANDUM OPINION AND ORDER ON PENDING MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION TO STRIKE AFFIDAVIT, AND ORDER FOR RULE 56(f) BRIEFING[1]

Plaintiff Lisa Marie Herrera alleges that Mark Webster, Branch President of the Las Vegas, New Mexico Branch of the Church of Jesus Christ of Latter-day Saints, sexually abused her for a period of four years in the 1960s. Plaintiff brings this case against Defendant, the Corporation of the President of the Church of Jesus Christ of Latter-day Saints, on the theory that Defendant enabled the abuse and that the abuse was within the course and scope of Webster's position with Defendant. Defendant brings three motions for summary judgment. Plaintiff brings one motion for summary judgment and one motion to strike the declaration of a defense witness, Paul Rytting.

The Court grants Defendant's motion for summary judgment related to punitive damages (Doc. 94) because, even if Webster was a managerial employee, his alleged sexual abuse occurred outside the scope of his employment, Defendant did not authorize or ratify his conduct,

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct all proceedings and to enter an order of judgment. Docs. 4, 6 & 7.

and Plaintiff does not allege that persons other than Webster engaged in wrongful conduct sufficient to support application of the cumulative conduct doctrine. Defendant's motion for summary judgment related to Plaintiff's intentional infliction of emotional distress claim (Doc. 103) succeeds because insufficient evidence exists to support a conclusion that Defendant placed Webster in a leadership role knowing he was unfit for that role. The Court also grants Defendant's motion for summary judgment on liability (Doc. 95) as it pertains to Plaintiff's theories of vicarious liability. These claims fail because Webster was not acting within his scope of employment when he sexually abused Plaintiff,[2] because Webster did not have apparent authority from Defendant to sexually abuse her, because Defendant did not ratify Webster's abuse, and because Defendant did not bestow substantial powers on Webster that aided him in sexually abusing Plaintiff. Defendant is not entitled to summary judgment on Plaintiff's direct (non-vicarious) liability claim (Doc. 95) because it owed Plaintiff a duty of care. The Court, however, orders additional briefing on whether Defendant breached its duty of care.

Regarding Plaintiff's motions, the Court grants Plaintiff's motion to strike the declaration of Paul Rytting (Doc. 142). However, it denies Plaintiff's motion for summary judgment on liability (Doc. 97) for the same reason it granted Defendant's motion for summary judgment on Plaintiff's vicarious liability claims under the aided-in-agency doctrine: Defendant did not bestow substantial power on Webster that aided him in sexually abusing Plaintiff.

## FACTS AND PROCEDURAL HISTORY

A.     Background

Plaintiff filed her complaint in state court on March 11, 2020. Doc. 1 at 5-13 ("Compl.").

---

[2] For purposes of the summary judgment briefing, Defendant does not dispute that Webster sexually abused Plaintiff.

Defendant removed this case from state court on the basis of diversity jurisdiction on April 9, 2020. Doc. 1. In her complaint, Plaintiff alleges that Defendant placed Webster in a position of prominence, trust, and authority, while children such as Plaintiff were taught to obey such leaders. Plaintiff alleges that Defendant enabled Webster's sexual abuse, that the sexual abuse occurred in the course and scope of the position Defendant provided Webster and, therefore, Defendant is liable for the harm Webster's sexual abuse caused. The complaint brings three counts: (I) negligence, (II) vicarious liability, and (III) intentional infliction of emotional distress. All claims arise under state tort law.

The Court previously denied Defendant's motion for summary judgment based on the relevant statutes of limitations. Doc. 158 (finding that whether any of those statutes serve to time-bar Plaintiff's claims is a jury question). Presently before the Court are various motions and filings which the Court addresses in this Order:

- Defendant's "Motion For Partial Summary Judgment Relating To Punitive Damages," Doc. 94; Plaintiff's response, Doc. 137; and Defendant's reply, Doc. 149 ("Punitive Damages MSJ");

- Defendant's "Motion For Summary Judgment And Memorandum In Support," Doc. 95; Plaintiff's response, Doc. 139; and Defendant's reply, Doc. 148 ("Defendant's Liability MSJ");

- Defendant's "Motion For Partial Summa[r]y Judgment On Plaintiff's Claim For Intentional Infliction Of Emotional Distress," Doc. 103; Plaintiff's response, Doc. 138; and Defendant's reply, Doc. 150 ("Defendant's IIED MSJ");

- Plaintiff's "Omnibus Statement Of Additional Material Facts In Response To Defendant's Purported Undisputed Facts In Motions For Summary Judgment," Doc. 135, which sets forth Plaintiff's factual contentions pertaining to Defendant's three MSJs described above; and Defendant's response, Doc. 151;

- "Plaintiff's Sealed Motion For Partial Summary Judgment As To Liability," Doc. 97; Defendant's response, Doc. 134; and Plaintiff's reply, Doc. 141; and

- Plaintiff's "Motion To Strike Declaration Of Paul Rytting," Doc. 142, which requests the Court strike an affidavit Defendant submitted as an exhibit to Doc. 134, described

above; and Defendant's response, Doc. 153. Plaintiff did not file a reply in support of the motion to strike.

B.     Facts on Defendant's Motions for Summary Judgment

In the context of Defendant's motions for summary judgment, the Court draws all reasonable inferences in favor of the non-moving party, Plaintiff. For purposes of summary judgment, the parties agree that, in the 1960s, Mark Webster was the Branch President (local clergy) of the Las Vegas, New Mexico congregation of The Church of Jesus Christ of Latter-day Saints. Doc. 94 at 2 ¶ 1; Doc. 137 at 1 ¶ 1. Over the course of four years, when Plaintiff was 7 to 11 years old (approximately 1965 to 1969), Webster sexually abused her. Doc. 94 at 2 ¶ 4; Doc. 137 at 1 ¶ 4. Plaintiff testified that Webster would take her for a ride in a station wagon, with her dad's permission, and would park on top of a hill and sexually abuse her. Doc. 94 at 2 ¶ 5; Doc. 137 at 1-2 ¶ 5.

The parties do not agree on the extent to which the Church permitted local leadership to be alone with children or to instruct them in sexual matters. Nor do they agree about the nature of the authority and power of local leadership such as Webster. The evidence Defendant attempts to present, however—the declaration of Paul Rytting—is inadmissible. Therefore, the Court adopts almost all of Plaintiff's asserted facts for purposes of summary judgment.

1.     Declaration of Paul Rytting

Defendant's motions for summary judgment, and its opposition to Plaintiff's statement of facts in Plaintiff's motion for summary judgment, rely largely on the "Declaration of Paul Rytting in Support of Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment as to Liability" (Doc. 134 at 24-26). Rytting states:

> I am the Director of Risk Management for The Church of Jesus Christ of Latter-day Saints (the "Church"). I have worked in similar or related positions for over fifteen years. I have extensive ecclesiastical experience within the Church, having

served in various Church leadership positions throughout my life. I make these statements based upon institutional and personal knowledge.

Rytting Decl. ¶ 1. Rytting then makes a variety of statements about Church scripture and Church authority over members.

Plaintiff moves to strike this declaration, arguing that Rytting was not timely disclosed as an expert witness and that Rytting lacks personal knowledge of the matters in his declaration. Doc. 142. As Plaintiff points out, Rytting's affidavit does not specify which of his statements are based on personal knowledge and which are based on "institutional knowledge." This distinction is crucial; Federal Rule of Civil Procedure 56(c)(4) provides, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rytting's statements about Church practices in the 1960s cannot be based on personal knowledge, Plaintiff argues, because Rytting was "an infant, toddler and young child in the 1960's," making it implausible that he personally had a supervisory or organizational level of knowledge about Church operations during that time. Doc. 142 at 3.

In response, Defendant does not argue that Rytting's declaration is based on personal knowledge. In fact, Defendant acknowledges that Rytting's knowledge is based on hearsay: "while he may not have personally perceived the policies and procedures in the 1960s, he did read the historical documents provided in discovery and offered factual information from those documents." Doc. 153 at 3. Defendant, however, does not argue that any hearsay exception applies. Thus, the Court does not consider whether the content of the historical documents

Rytting apparently relied on would be admissible as regularly conducted business activity or through some other hearsay exception.[3]

In response to Plaintiff's assertion that Rytting's affidavit constitutes expert testimony, Defendant argues that Rytting "did not import any scientific, technical, or specialized knowledge as contemplated by Rule 702. Instead, he provided the factual knowledge of a corporation as its representative." Doc. 153 at 3. The Court disagrees. Rytting's testimony about various policies the Church had in place in the 1960s constitutes specialized knowledge. Nor does Defendant contend that Rytting is aware of these 1960-era polices based on his personal experience. Instead, Defendant contends that he became aware of these 1960-era polices through his studies and through his post-1960-era association with the Church. Doc. 153 at 2-3. Specialized knowledge that Rytting acquired through study and work experience falls squarely within the definition of expert testimony. Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion . . . ."); Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

Not having cited an exception to the hearsay rule and not having disclosed Rytting as an expert, Defendant argues that his testimony is admissible because of his status as a corporate representative. Doc. 153 at 2. Defendant argues that a person who learns the history of an

---

[3] It is possible that the opinion Rytting provides in his affidavit is based on a source that could present the information at trial as non-hearsay or through an exception. Defendant, however, does not attempt to establish how Rytting's affidavit testimony could be replaced by admissible testimony at trial. And, even if it did, the Tenth Circuit has recently and clearly rejected the notion that hearsay can "be considered at summary judgment because it could later be replaced at trial by admissible live testimony." *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1272 (10th Cir. 2021).

institution through a life-long association with and long-time work for an institution can testify about that history without being designated as an expert. *Id.* at 3.

To make its point, rather than citing law, Defendant cites hypothetical examples. First, Defendant suggests that a Catholic youth member could testify, without being designated as an expert, that "St. Peter was the first Pope of the Catholic Church" because this is a fact taught to young Catholic children prior to First Communion at age 8. Doc. 153 at 2-3. Next, Defendant suggests that a second-grade student could testify, without being designated as an expert, that George Washington was the first President of the United States. Doc. 153 at 3. Defendant's hypotheticals, however, do not support the remarkable notion that anyone who is taught something can then testify about what he or she was taught without the need to be declared as an expert.

What Defendant's hypotheticals illustrate is simply that some facts are so widely accepted that they are unlikely to be challenged. But, if the outcome of a case turned on who was the first Pope or the first United States President, and these facts were legitimately in dispute (such that the Court could not take judicial notice of them), they likely could not be established without expert testimony.[4] Expert testimony, for instance, would be needed to establish St. Peter's temperament or George Washington's treatment of his enslaved persons. That is, Defendant's hypotheticals do not indicate that historical facts can be established without expert testimony; instead, they simply provide two examples of historical facts not in controversy and

---

[4] For instance, an argument could be made that John Hanson, President under the Articles of Confederation from 1781 to 1782, was the first President of the United States. Similarly, an argument could be made that Elias Boudinot, President under the Articles of Confederation after the signing of the Treaty of Paris in 1783, was the first President.

so not likely to be challenged. In contrast to these non-controversial facts, Church policy in the 1960s is in controversy.

Although Defendant's hypotheticals are unpersuasive and Defendant cites no law to support its argument that, despite lack of personal knowledge, Rytting's testimony is admissible by virtue of his status as a Rule 30(b)(6) witness, its position is not wholly devoid of legal support. Federal Rule of Civil Procedure 30(b)(6) provides that a corporate representative may give deposition testimony "about information known or reasonably available to the organization," and thus there is no requirement that the testimony be based on personal knowledge. At least one district court in the Tenth Circuit has extended Rule 30(b)(6)'s language concerning deposition testimony to allow a corporate representative to present information learned from another (not based on personal knowledge) through a summary judgment affidavit. The district court there concluded, "with regard to Plaintiff's argument that Mr. Rees' Declaration must be stricken because it is not based on personal knowledge, the Court finds the personal knowledge requirement of Rule 56(c)(4) inapplicable to Mr. Rees' Declaration due to Mr. Rees' status as a Rule 30(b)(6) representative." *Seifried v. Portfolio Recovery Assocs., LLC*, No. 12cv32, 2013 WL 6185478, at *1 (E.D. Okla. Nov. 25, 2013). The district court reasoned, "[i]ndeed, one of the defining features of the Rule 30(b)(6) mechanism is that the organization, through its duty to prepare a witness capable of speaking for the organization on the matters specified in the notice, will oftentimes create a witness who can then relay the information known or reasonably available to the organization." *Id*. at *2. The *Seifried* court's conclusion that Rule 56(c)(4)'s personal-knowledge requirement does not apply to affidavits submitted by Rule 30(b)(6) witnesses, however, appears to stake out a minority position that the Tenth Circuit has not endorsed.

To the contrary, the Tenth Circuit has repeatedly made clear that under Rule 56(c)(4)'s personal-knowledge requirement, facts cannot be established at the summary judgment stage through an affidavit that relies on hearsay. *See Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1273 n.16 (10th Cir. 2021) ("FWS's position would, troublingly, create a rule where parties moving for summary judgment could succeed by submitting affidavits containing favorable, but unsworn, hearsay statements or even multiple levels of hearsay, all of which would be acceptable as long as the affidavit also stated (through more inadmissible, unsworn hearsay) that each hearsay declarant would be willing to testify."); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (on summary judgment, "the content or substance of the evidence must be admissible" and thus "courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form"). Neither party cites, and the Court is unaware of, any Tenth Circuit decision that has addressed whether an exception to Rule 56(c)(4)'s personal-knowledge requirement exists for affidavits submitted by Rule 30(b)(6) witnesses. Such an exception, however, would be inconsistent with the reasoning of *Bernhardt* and *Argo*. Moreover, the Tenth Circuit's repeated holdings that Rule 56(c)(4) requires personal knowledge constitutes binding precedent and the Court is disinclined to carve out an exception to the Tenth Circuit's mandate absent some indication that the Tenth Circuit would endorse such an exception.

And, the Court does not believe the Tenth Circuit would conclude that Rule 30(b)(6) provides a mechanism for a corporate representative to obtain summary judgment through self-serving statements that are based on hearsay rather than personal knowledge. Rule 56 is more specific than Rule 30(b)(6) regarding affidavits in opposition to summary judgment. Because Rule 56 does not provide an exception through which corporate representatives could submit

affidavits based on information learned from others, other district courts in the Tenth Circuit have reasoned that affidavits of corporate representatives must be based on personal knowledge. *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, No. 16cv135, 2019 WL 3500896, at *12 (D. Utah Aug. 1, 2019) (collecting cases). Nonbinding cases have also explained that the testimony of corporate representatives at trial must be based on personal knowledge, under Federal Rule of Evidence 602,[5] unless *the opposing party* seeks to introduce 30(b)(6) deposition testimony at trial under Federal Rule of Civil Procedure 32(a)(3). *See, e.g.*, *Hipwell v. Air & Liquid Sys. Corp.*, No. 20cv63, 2022 WL 3999955, at *5 (D. Utah Aug. 31, 2022); *Union Pump Co. v. Centrifugal Tech. Inc*., 404 F. App'x 899, 907-08 (5th Cir. 2010). And if testimony based on corporate knowledge is not admissible at trial (except in deposition format and proffered by the opposing party), it should not be admissible at summary judgment when submitted in an affidavit filed in support of the corporate entity's motion for summary judgment.

Finally, the Court observes that one of Rule 30(b)(6)'s goals—providing an efficient mechanism to obtain discovery about an entity—is different than Rule 56(c)(4)'s goal of ensuring that dispositive decisions are based only on evidence admissible under the Federal Rules of Evidence. That is, that the justification for allowing a corporate representative to provide deposition testimony based on information learned from another does not obviously extend to affidavits the corporate representative submits in support of a motion for summary judgment. Because Defendant acknowledges in its response that at least some of Rytting's statements are based on hearsay, does not identify which statements are not based on hearsay,

---

[5] "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703."

and provides no hearsay exceptions, the Court grants Plaintiff's motion to strike. The Court thus

proceeds to evaluate the facts on summary judgment without reference to Rytting's declaration.

        2.    <u>A Branch President's authority included having sexual discussions alone with children</u>

Plaintiff contends that "[d]uring the 1960's, a Branch President within Defendant's

organization had many duties to include conducting personal, private interviews with members,

including children" and in the 1950s, "church leaders asked young church members about their

personal worthiness." Doc. 135 at 3-5 ¶¶ N, Y. Defendant does not dispute these facts in its reply

to Plaintiff's statement of facts, Doc. 151 at 1 ("the Church does not dispute paragraphs . . . L-

Y"), but elsewhere in its briefing, Defendant argues that this is not true. *E.g.*, Doc. 148 at 2-3.[6]

In support of her assertions, Plaintiff cites Defendant's responses to Requests for

Admission. Defendant admits that "Webster served as the Branch President of the Las Vegas

New Mexico Branch of Defendant between 1963 and 1968 and admits he was expected to

perform the duties of a Branch President as described in the 1963 General Handbook of

Instructions." Doc. 97-5 at 1. Defendant also admits that "Webster was permitted to interview

---

[6] The argument elsewhere in Defendant's briefing violates the Local Rules' requirement that: "The reply must contain a concise statement of those facts set forth in the response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the response will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56(b).

Resolution of the issues before the Court, however, does not turn on whether the Court considers facts Defendant asserts elsewhere in its briefing. Although Defendant's failure to follow Local Rule 56(b) did not affect the Court's decision in this Order and district courts have wide latitude in interpreting and applying their local rules, *Bylin v. Billings*, 568 F.3d 1224, 1230 n.7 (10th Cir. 2009), in future motions for summary judgment Defendant should take care to follow Local Rule 56(b).

children for baptism, which were typically accompanied by parents, and interview members over 12 years of age for temple recommends and other matters." *Id.* at 7.

Plaintiff next cites passages from the General Handbook. The handbook says that the authority of LDS bishops[7] includes "issuing recommends for . . . baptisms" and clarifies that baptisms should happen at age eight. Doc. 97-6 at 15. Another bullet point list of duties includes both "issuing recommends for baptism" as well as "conducting personal, private interviews." Doc. 97-7 at 10. Yet another passage states:

> Arrangements for interviews and private reports (all such interviews to be conducted by the bishop in private, except priesthood leaders' oral evaluation reports to be made to the entire bishopric): (a) temple; (b) baptism; (c) priesthood; (d) prospective missionaries; (e) prospective servicemen; (f) oral evaluation reports.

Doc. 97-6 at 18. A reasonable factfinder could conclude from this evidence that Church policy instructed Branch Presidents to meet with children at age eight in private.

The parties also dispute whether the Church encouraged or permitted sexual instruction to be provided to children. Plaintiff contends that "[i]n the 1950's, church leaders asked young church members about their personal worthiness." Doc. 135 ¶ Y. (Plaintiff does not define "young"). As mentioned above, Defendant did not dispute this fact in its reply to Plaintiff's statement of additional facts. Plaintiff further contends that "[w]hen church leaders asked young church members about their personal worthiness, those questions included questions regarding sexual purity, whether the young member was morally straight, and about chastity." Doc. 97 ¶ 26. Defendant argues that "[t]he Michael Blair deposition cited by Plaintiff does not support this

---

[7] This also includes the duties of "branch presidents" such as Webster, in places too small to support organization into wards and bishops. Doc. 97-6 at 14.

assertion" and offers its own declaration to counter this assertion. Doc. 151 at 2.[8] But the

deposition testimony Plaintiff cites *does* support a conclusion that, in the Church's view,

"personal worthiness" involves sexual purity:

> Q: Let me ask you first, when you were just growing up as a member of the church, did any leaders ever ask you about your personal worthiness, for example, when you became an elder in the church?
>
> A. Yes. Normal questions that are asked at that time.
>
> Q. Sure. And did those personal worthiness include questions regarding sexual purity?
>
> A. Yes. That would have been a question that's asked, are you morally straight.
>
> Q. And were there questions about chastity as well?
>
> A. Yes.

Doc. 97-8 at 70 (deposition of Michael Blair).[9]

Plaintiff also states that "Defendant instructed leaders such as Webster" to give sexual

instructions to "youth." Doc. 135 at 13. In support, Plaintiff cites minutes from a 1974 Church

conference in Albuquerque:

> The subject of interviewing was then discussed by Elder Young. He strongly advocated that the Bishop never be alone in the building or without another person in the adjoining clerks office while he is interviewing a woman. If the Bishop is sufficiently humble the Lord will indicate the advice and counsel to give. If you don't know how to counsel say "I don't know." When the interview is conducted to determine the nature of transgressions the Bishop must fully pursue the extent of the transgression with questions such as What else did you do? How much? How did you get yourself into this problem in the first place? With sexual sins Elder Young insists both parties to the act must be corrected. He indicated

---

[8] As explained above, the Court strikes the declaration Defendant relies on. But even if the Court were to consider the declaration, it would do no more than create a dispute of fact, which would not be resolved in Defendant's favor on Defendant's motions for summary judgment.

[9] The pages from the deposition establishing the foundation for Michael Blair's testimony are not included in this exhibit. However, Defendant does not challenge the admissibility of Blair's testimony.

that Satan's doctrine is that it is wrong to tattle on another—which doctrine is
false. When a person confesses a sexual transgression, he should be queried as to
the other sexual experiences he has had including homosexuality, petting, drugs,
when he has masturbated.

. . . .

Elder Young then discussed moral ethics of youth. He reviewed the common
decisions of "necking" "petting" and "heavy petting" and illustrated the line
between a pure young lady and fornication. These points were indicated as so-
called limits along that line. He indicated these activities lead only toward
fornication and that it is desirable not to get on the line in the first place. Kissing
on the lips is the first step down the line and is an act of sexual stimulation. If
your youth are to remain pure, they must be taught the ethic and avoid that which
stimulates them sexually. When asked for a date a young woman keeping this
standard will state "I don't kiss. This is my ethic. If you want to take me out on
that basis. Fine."

Doc. 135-3 at 7-8.

Drawing all reasonable factual inferences in favor of Plaintiff, the Court concludes for

purposes of Defendant's motions for summary judgment that a Branch President's authority

included having sexual discussions alone with children.

        3.     <u>Webster's power and authority by virtue of his position in Defendant's
organization</u>

The parties dispute the nature and extent of Webster's power and authority by virtue of

his position as Branch President. In opposition to Defendant's motion for summary judgment on

liability, Plaintiff argues that Webster occupied a position of substantial power or authority to

control important elements of Plaintiff's life. Doc. 139 at 22-24. In support of this argument,

Plaintiff offers the following facts.

Defendant placed Mark Webster as a Branch President of the Las Vegas, New Mexico

Branch of Defendant's organization from 1963 to 1968. Doc. 135 ¶¶ MM, TT. Defendant, prior

to the placement of Mark Webster in a leadership position in Las Vegas, New Mexico, through

its representatives and leaders in New Mexico, instructed those within its organization of the

"need to follow our leaders." *Id.* ¶ SS. During Mark Webster's time in leadership positions, Defendant's Stake President "cautioned [Defendant's members] to overlook the faults in [their] leaders and teachers." *Id.* ¶ GGG.

During the 1960s, a Branch President within Defendant's organization had many duties and powers. These included:

- Conducting personal, private interviews with members, including children. *Id.* ¶ N.

- Supervising priesthood programs for persons under the age of 21. *Id.* ¶ O.

- Supervising the girls' program. *Id.* ¶ P.

- Presiding over Boys Leadership Council meetings for youth. *Id.* ¶ Q.

- Supervising all auxiliary organizations (such as scouts) and supervising other memberships holding positions within Defendant's organization within the Branch. *Id.* ¶ R.

- Arranging for the baptism of children. *Id.* ¶ S.

- Giving "special attention" to children to ensure they are "prepared for and taught about baptism by their parents and also by other Church officers." *Id.* ¶ T.

- Directing the confirmation of children in Defendant's organization. *Id.* ¶ U.

- Providing approval for a member to gain entry into one of Defendant's temples, known as a "Temple Recommend." *Id.* ¶ W. Members of Defendant's organization over the age of eight were prohibited from entering a temple unless they had a valid Temple Recommend. *Id.* ¶ V. In order to provide a Temple Recommend, a Branch President was to closely examine the worthiness of individuals for such honor, including "conduct[ing] a thorough, searching interview of each applicant for a recommend every time application is made, irrespective of how well the person is known to the interviewer." *Id.* ¶ X.

- Revoking a Temple Recommend if the Branch President adjudged the recipient "unworthy," thereby prohibiting a member from access to temples and important connections and activities within the organization. *Id.* ¶ DD.

- Addressing the sexual sins of branch members. *Id.* ¶ FF.

- Waiving any penalty within the organization for misdeeds, including potential excommunication or other limitations on membership. *Id.* ¶ GG.

- Overseeing "home teaching" programs not conducted on Church-owned properties. *Id.* ¶ QQQ.

- Overseeing Defendant's "court" to try members. *Id.* ¶ RRR.

Specifically, Plaintiff asserts that in the 1950s and 1960s, Mark Webster served as a youth leader through Defendant's organization, including scoutmaster, superintendent of Sunday school, leader of the Young Men's Mutual Improvement Association, and leader of the youth improvement program, as well as an apparent role with the young girls' association, known as the "Beehive girls." *Id.* ¶ YY. He served in a role of authority as it relates to Defendant's teaching (missionary) activities in certain areas of New Mexico. *Id.* ¶ ZZ.

Plaintiff was baptized in Defendant's organization on December 17, 1966, by Mark Webster. *Id.* ¶ KKK. Plaintiff's family was poor while Mark Webster was Branch President. *Id.* ¶ LLL. As Branch President, Webster had supervisory authority over Defendant's local relief program designed to assist needy persons and families in Las Vegas, New Mexico, and had to approve any assistance provided. *Id.* ¶ MMM. As Branch President, Webster would reject requests for assistance from the relief program for reasons persons associated with the program believed to be inappropriate. *Id.* ¶ NNN.[10] Webster routinely provided transportation for youth

_____

[10] Defendant disputes this fact by pointing out that it is:

> based on inadmissible hearsay in the Statement of Lela Holmes. (Doc. 40-1.) She says she "was concerned" that Webster "was rejecting requests for assistance to people I believed deserved help." Her "concern" is not evidence. She says one person, "T.K., informed me that Mr. Webster denied her assistance because she was not treating him properly." *Id.* This is inadmissible hearsay. She says "the daughter of another person denied assistance said that Mr. Webster would only approve assistance for her mother if she did what he wanted." *Id.* This, too, is inadmissible hearsay.

Doc. 151 at 3. The Court agrees with Defendant, but as explained below, this fact is not material to the Court's analysis.

on behalf of Defendant by vehicle in conjunction with Defendant-sanctioned and -sponsored activities and Webster's duties as a youth leader in Defendant's organization. *Id.* ¶ XXX.

When asked whether she believed it was part of a Branch President's responsibilities to molest children, Plaintiff explained:

> I'll tell you something. I think sometimes them being branch presidents or whatever, they have more access to getting to the kid, because the parents trust them. . . . My parents trust. They send me to Salt Lake City and to Arizona. My dad send me not thinking he was going to screw me. He send me because I – this is how I feel, that he trusted him that he was not going to let no harm come to us. And look what happened." [sic]

*Id.* ¶ PPP.

As First Counselor to Webster, Plaintiff's father held a leadership position in Defendant's organization with authorities and responsibilities similar to those of Branch President Webster and which Defendant encouraged Webster to delegate to him. *Id.* ¶ TTT. Plaintiff's father was extremely involved in Defendant's organization and Plaintiff testified that he "loved the Mormon Church" and thus he trusted persons of authority in Defendant's organization including Webster to take Plaintiff. *Id.* ¶ UUU.[11] Plaintiff understood Webster to be a significant authority in Defendant's organization, a "big shot" with authority to "take the kids" and Plaintiff relied on that authority to go with him. *Id.* ¶ VVV. Often Webster would take Plaintiff home while his subordinate, Plaintiff's father, remained at Defendant's church performing tasks, and Webster would sexually abuse Plaintiff while her father did Defendant's business at Webster's delegation and/or direction. *Id.* ¶ WWW.

---

[11] Defendant argues that "[t]he cited deposition pages do not support Plaintiff's statement that Plaintiff's father 'trusted persons of authority in Defendant's organization including Webster to take Plaintiff.'" Doc. 151 at 4; *see* Doc. 135-4 at 4-5 (Plaintiff's deposition). Defendant is correct, but as discussed below, this fact is not material as accepting it does not help Plaintiff.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted).

Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.* But, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. When "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she

has the burden of proof," the moving party is "entitled to a judgment as a matter of law." *Id.* at 323. Therefore, "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The movant may show an entitlement to summary judgment "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

## DISCUSSION

## I.   Liability MSJ

### A.   Direct liability

Defendant moves for summary judgment on Plaintiff's negligence claim, arguing that the undisputed evidence shows that Defendant is not directly liable for negligence. Doc. 95 at 3. Defendant correctly asserts that "duty" is an element of a cause of action for a negligence claim. Doc. 95 at 3; *Romero v. Giant Stop-N-Go of New Mexico, Inc*., 2009-NMCA-059, ¶ 5, 146 N.M. 520, 522 (a claim for negligence requires a plaintiff to plead and prove four elements: (1) duty; (2) breach; (3) causation; (4) damages). Defendant argues that Webster's abuse of Plaintiff was not foreseeable; therefore, Defendant did not have a duty to protect Plaintiff from Webster. Doc. 95 at 3-6. As Plaintiff correctly points out, this is not the law in New Mexico. Consequently, the Court rejects Defendant's argument that it owed Plaintiff no duty and that it is entitled to summary judgment on Count I on that ground.

### 1.   New Mexico law on duty

In support of its argument, Defendant cites *Herrera v. Quality Pontiac*, 2003-NMSC-018, 73 P.3d 181. As Defendant correctly notes, the New Mexico Supreme Court in *Herrera* wrote, "Foreseeability is a critical and essential component of New Mexico's duty analysis because no one is bound to guard against or take measures to avert that which he or she would not reasonably anticipate as likely to happen." Doc. 95 at 6 (quoting *Herrera*, 2003-NMSC-018,

¶ 20). Defendant also quotes the *Herrera* court's conclusion that, "As a general rule, a person does not have a duty to protect another from harm caused by the criminal acts of third persons unless the person has a special relationship with the other giving rise to a duty." Doc. 95 at 3.

As Plaintiff correctly notes, however, Defendant fails to consider the New Mexico Supreme Court's subsequent game-changing decision in *Rodriguez v. Del Sol Shopping Center Associates, L.P.*, 2014-NMSC-014, 326 P.3d 465. There, the New Mexico Supreme Court declared that: "The duty of ordinary care applies unless the [defendant] can establish a policy reason, *unrelated to foreseeability considerations*, that compels a limitation on the duty or an exemption from the duty to exercise ordinary care." *Id.* ¶ 5 (emphasis added). The court "overrule[d] prior cases insofar as they conflict with this opinion's clarification of the appropriate duty analysis in New Mexico." *Id.* ¶ 3.

Defendant offers no policy reason, unrelated to foreseeability considerations, to support its position that it owed Plaintiff no duty. Contrary to Defendant's arguments, therefore, the Court finds that Defendant at least owed Plaintiff a duty of ordinary care. "Every person has a duty to exercise ordinary care for the safety of the person and the property of others." UJI 13-1604 NMRA. "[A] duty of ordinary care under the circumstances includ[es] the duty to exercise ordinary care to prevent harmful conduct from a third person, *even if the third person's conduct is intentional*." *Rodriguez*, 2014-NMSC-014, ¶ 5 (citation omitted) (emphasis added).[12]

---

[12] Plaintiff argues that New Mexico has a public policy of "heightened protection for children" and a "[p]olicy to protect children when children's engagement is encouraged by Defendant," and that appointing Webster as a youth leader created a "special relationship." Doc. 139 at 13-16. Because Plaintiff places this argument in the section of her brief dedicated to establishing the existence of a duty and the Court agrees that a duty exists, the Court does not consider the undeveloped issues of whether a duty of care greater than that of ordinary care exists and, if so, what exactly that duty entails. These questions may be suitable for Plaintiff to raise in supplemental briefing, given the Court's rulings in this Opinion.

In reply, Defendant claims that, after *Rodriguez*, in *Morris v. Giant Four Corners, Inc.*, 2021-NMSC-028, 498 P.3d 238, "*the New Mexico Supreme Court said* foreseeability cannot always be divorced from duty." Doc. 148 at 8 (emphasis added). The portion of *Morris* Defendant then quotes in support of what Defendant says "*the New Mexico Supreme Court said*", however, did not come from the New Mexico Supreme Court at all. Instead, it came from the dissent and represents a view the New Mexico Supreme Court rejected, not one the New Mexico Supreme Court endorsed. Specifically, the majority in *Morris* reiterated *Rodriguez*'s holding that, even where the tort of negligent entrustment is at issue, duty is a question of law that must be analyzed without reference to foreseeability. *Id.* ¶¶ 11, 24, 46. The dissent disagreed. *Id.* ¶¶ 88-93, 95 (Vigil, J., dissenting). The Court rejects Defendant's argument because it relies on the opinion of a dissenting justice that a majority of the court rejected.[13]

2.    Foreseeability

Just because duty and foreseeability must be considered apart, however, does not mean that foreseeability should not be considered at all. Although foreseeability is generally a question of fact reserved for the jury, if no reasonable jury could conclude from the facts a plaintiff presents that a defendant breached its duty, or that the breach caused the injury, a district court can grant summary judgment for the defendant as a matter of law. *Rodriguez*, 2014-NMSC-014, ¶ 24. Plaintiff argues that Defendant waived this argument by moving for summary judgment on the question of the existence of a duty (where foreseeability is not a consideration) rather than on breach of duty (where foreseeability is an issue). Doc. 139 at 5, 17 n.7.

---

[13] The Court is troubled that Defendant would quote a dissenting opinion, not acknowledge that the quote came from a dissenting opinion and, instead, affirmatively misrepresent that the "*the New Mexico Supreme Court said*" something opposite to what the New Mexico Supreme Court actually said. Although the Court does not believe this misrepresentation to be intentional, Defendant is cautioned to take more care in the future.

The Court agrees that, in arguing that Plaintiff cannot establish the existence of a duty because Defendant could not foresee Webster's alleged conduct, Defendant did not squarely present the issue of whether a reasonable jury could find for Plaintiff on the question of breach of duty (a question of fact that implicates considerations of foreseeability). Likely as a result of Defendant's focus on the question of duty, Plaintiff devoted only one paragraph (as an alternative to its primary argument that foreseeability is not a proper consideration in determining the existence of duty) to the question of whether a genuine issue of material fact exists as to whether Defendant could foresee Webster's alleged conduct. Plaintiff understandably did not focus on whether evidence existed from which a reasonable jury could conclude that Defendant breached its duty and whether Webster's conduct and Plaintiff's injuries were foreseeable.

Even though Defendant did not squarely raise this issue in its summary judgment motion, the Court disagrees with Plaintiff that Defendant waived or forfeited the argument altogether. Waiver applies when issues or arguments are not raised. *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief."). Despite Defendant having conflated the issues of duty and foreseeability, Defendant did address the issue of foreseeability under outdated New Mexico case law. Under these circumstances, the Court declines to find that Defendant waived the issue. *See United States v. Walker*, 918 F.3d 1134, 1153-54 (10th Cir. 2019) ("[W]hether issues should be deemed waived is a matter of discretion.").

It would be unfair to grant summary judgment on this ground, however, without notice to Plaintiff and an opportunity to respond. Fed. R. Civ. P. 56(f)(2) (a court may grant a motion for summary judgment "on grounds not raised by a party" only after "[a]fter giving notice and a

reasonable time to respond"). Thus, although the Court denies Defendant's motion on the issue of duty, it concludes that the question of whether a reasonable jury could find that Webster's alleged conduct and Plaintiff's alleged injuries were foreseeable to Defendant is an issue that should be addressed pre-trial. Accordingly, the Court hereby gives notice that it is considering whether to grant summary judgment in Defendant's favor on the issue of whether a reasonable jury could find that it breached its duty of care.

Consistent with Rule 56(f)(2), the Court orders supplemental briefing on the issues of foreseeability and breach. In deciding this issue, the Court will consider the arguments Defendant made in its Reply brief. Doc. 148 at 8-10. By April 21, 2023, Defendant may file a brief of no greater than 25 pages in length addressing this issue and that incorporates or supplements any material facts or arguments it wishes to present. Regardless of whether Defendant files any brief, Plaintiff may file a brief of no greater than 25 pages in length by May 12, 2023, likewise incorporating any additional facts or arguments, devoted to addressing whether evidence exists through which a reasonable jury could find that Defendant breached its duty to Plaintiff. No later than May 26, 2023, Defendant may file a reply, no greater than 15 pages in length.

B.     Vicarious liability

Defendant moves for summary judgment on Plaintiff's claim that the Church can be held vicariously liable for Webster's abuse. Doc. 95 at 7-11.

1.     Scope of employment

Defendant argues that Webster was acting outside the scope of his employment and respondeat superior liability therefore does not lie. "[A]n employer is liable for an employee's torts committed within the scope of his or her employment. Thus, under these principles, an employer is not generally liable for an employee's intentional torts because an employee who

intentionally injures another individual is generally considered to be acting outside the scope of his or her employment. Intentional torts arising from sexual harassment are generally considered to be outside the scope of employment." *Ocana v. Am. Furniture Co*., 2004-NMSC-018, ¶ 29, 91 P.3d 58, 70-71 (citations omitted).

Although Plaintiff does not dispute that this is the general rule, she argues that this general rule does not apply here. Doc. 139 at 18 ("A principal is liable under respondeat superior even for intentional torts committed by its agents if those acts were within the scope of their agency."). In this case, Plaintiff asserts, Webster's conduct was within the scope of his employment because "Webster being alone with Plaintiff and transporting Plaintiff were fairly and naturally incidental (if not required) by Webster's agency. This was activity he was explicitly directed to do. Moreover, Defendant instructed and expected Webster to engage in sexualized discussion, inquiry and instruction." *Id.* at 20.

Plaintiff's argument cannot withstand New Mexico Supreme Court precedent concluding that priest child sex abuse falls outside the scope of a priest's employment. *Tercero v. Roman Catholic Diocese of Norwich, Connecticut* involved "the alleged sexual molestation of then school boy Plaintiff-Respondent, Tercero, by Father Bissonnette (Bissonnette) between 1966-68, while he was a priest at the Santa Fe Archdiocese." 2002-NMSC-018, ¶ 1, 48 P.3d 50, 53. Although the alleged molester, alleged victim, and alleged acts all occurred in New Mexico, the defendant was the Diocese of Norwich, Connecticut. *Id*. Thus, the question before the New Mexico Supreme Court was whether "New Mexico has long-arm jurisdiction over Defendant-Petitioner, the Diocese of Norwich, Connecticut." *Id.*

The court began its analysis by observing that, "When negligent acts occur outside New Mexico which cause injury within the state, a 'tortious act' has been committed for purposes of

the long-arm [personal jurisdiction] statute." *Id.* ¶ 20. The alleged victim argued that, although

the Diocese maintained responsibility and control over Bissonnette, it failed to supervise him and

therefore committed a tortious act in New Mexico. *Id.* In considering this argument, the court

provided the following framework: "liability is grounded on the maxim 'respondeat superior,'

and is to be determined by considering, from a factual standpoint, the question whether the

tortious act was done while the employee was acting within the scope of employment." *Id.* ¶ 21

(some internal quotation marks and citations omitted). In answering this question, the court

concluded that "the Diocese exercised no control over Bissonnette," *id.* ¶ 23, and then added:

> Moreover and obviously, while the alleged abuse apparently resulted in the course
> of Bissonnette's employment, it was never within the scope of that employment.
> *See generally Moses v. Diocese of Colorado*, 863 P.2d 310, 330 (Colo. 1993) (en
> banc) (holding that the sexual misconduct of a priest cannot be a part of a priest's
> duties, nor customary within the business of the church).

*Id.*

Thus, the New Mexico Supreme Court squarely rejected, as a matter of law, the argument

that priest sexual misconduct is within the scope of his church employment, as did the Colorado

case which *Tercero* favorably cited. Plaintiff does not address *Tercero* or make any attempts to

distinguish it. Plaintiff's argument cannot survive this finding—the Court must follow the New

Mexico Supreme Court's lead in this area of state law.

        2.    Apparent authority

Plaintiff argues that vicarious liability can also lie in cases of apparent authority. Plaintiff

argues that Webster had "apparent authority" to act on behalf of the Church in Las Vegas. Doc.

139 at 20-21. Plaintiff argues that the doctrine of apparent authority "binds a principal by the

apparent authority of his agent if the agent is placed in a position which would lead a reasonably

prudent person to believe that the agent indeed possessed the authority in question." *Id.* (citing

*Vickers v. North American Land Developments, Inc.*, 1980-NMSC-021, ¶ 5, 607 P.2d 603).

"A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission." Restatement (Third) of Agency § 7.08. In the commission of these torts, there must be a "close link between an agent's tortious conduct and the agent's apparent authority" for the principal to be liable. *Id.* cmt. B. "Thus, a principal is not subject to liability when actions that an agent takes with apparent authority, although connected in some way to the agent's tortious conduct, do not themselves constitute the tort or enable the agent to mask its commission." *Id.*

Analysis of Plaintiff's apparent authority argument begins with the question, "Apparent authority to do what?" Plaintiff argues that Webster had authority or apparent authority "to meet alone and unsupervised with children." Doc. 139 at 21. However, even if Defendant bestowed Webster with authority to meet alone with children, or that it at least appeared Webster had authority to do so on behalf of Defendant, Plaintiff does not allege or present evidence that this included authority (actual or apparent) to, in violation of law, dictate that children have sex with him.

Plaintiff further argues that "Defendant manifested to others that Webster was an authority in the sexual lives of congregants, including children." *Id*. In support of this statement, Plaintiff notes that duties of a person in Webster's position included "teaching the line between purity and fornication." Doc. 139 at 1. Minutes from a 1974 Church conference do reflect that, in addressing the topic of the moral ethics of youth, a Church Elder discussed a continuum of sexual activity leading to fornication in the process of "illustrat[ing] the line between a pure young lady and fornication." *See* Doc. 135-3 at 7-8. According to the minutes, in an effort to

keep youth pure, the Elder instructed leaders to teach youth "to avoid that which stimulates them sexually." Doc. 135-3 at 7-8. In other words, the evidence indicates that Defendant instructed its leaders to teach youth to avoid sexual activity, not to engage in sexual activity, with the leader or anyone else.

In short, Plaintiff cites no evidence that Defendant endorsed unmarried sexual activity, much less endorsed children engaging in unmarried sexual activity with adults. Similarly, Plaintiff cites no evidence to support the notion that Defendant manifested to others that Webster had authority to dictate that children have sex with him.

Plaintiff cites no case relying on "apparent authority" to hold a defendant vicariously liable under these circumstances, and the existing decisions in New Mexico appear to hold otherwise. *Peña v. Greffet*, 110 F. Supp. 3d 1103, 1135 (D.N.M. 2015) (apparent authority "requires an objectively reasonable perception that the agent was acting pursuant to the principal's orders" and sexual battery of inmate by a correctional officer is "certainly" not committed pursuant to apparent authority). The Court rejects Plaintiff's "apparent authority" argument.

3.    Ratification

"Ratification is the adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent." *Bd. of Cnty. Comm'rs of Cnty. of Bernalillo v. Chavez*, 2008-NMCA-028, ¶ 15, 178 P.3d 828, 832. Ratification requires "full knowledge of all the material facts concerning the transaction." *See Tee Min. Corp. v. Nat'l Sales, Inc*., 1966-NMSC-173, ¶ 5, 417 P.2d 810, 811. Plaintiff argues that Defendant had knowledge of Webster's actions through Lela Holmes's complaints, and subsequently ratified his actions by trying to reinstate him as Branch President in 1969 after he was out of a leadership position. Doc. 139 at 22.

Plaintiff argues that Defendant should have known Webster was unfit for a leadership position because "Plaintiff presented an affidavit of another member of the congregation that raised concerns to Defendant as to the unfitness of Webster, which was open and obvious to the congregant, including discomfort with Webster's relationship with young girls. There were objections to Webster which were ignored by Defendant." Doc. 95 at 17. Rather than considering Plaintiff's characterization of this affidavit, however, the Court considers the evidence Plaintiff presents—the affidavit itself.

The affidavit is from Lela Holmes, who was an active member of the Church in Las Vegas in the 1960s. Doc. 40-1 ¶ 3. The affidavit can logically be divided into (1) the one paragraph that addresses a "complaint" she made about Webster and (2) other paragraphs that describe concerns she had with Webster but do not allege that she communicated those concerns to anyone else.

Beginning with the first category, in paragraph five, Holmes swears:

I submitted a complaint about Mr. Webster during the 1960's when I lived in Las Vegas because I felt Mr. Webster was a poor example within the Church, particularly for our children. His hygiene was very poor, and his actions were not appropriate for a Church leader. I do not believe my complaint was resolved. As far as I remember, nobody tried to resolve my complaint.

Doc. 40-1 ¶ 5. This complaint, taken at face value, provided the Church no notice that Webster had sexually abused, or was going to sexually abuse, a child.

First, although Holmes asserts that she complained, she does not assert to whom she made that complaint. This testimony does not indicate whether Holmes' complaint was one about which the Church would be aware (such as a complaint made directly to the Church) or a complaint about which the Church would unlikely be aware (such as a complaint made to a friend). Thus, this paragraph leaves the factfinder unable to evaluate whether such complaint should have put Defendant on notice.

Second, even if the Court assumes that Holmes meant she complained directly to Church headquarters, the date of Holmes' complaint ("during the 1960's") is nonspecific. Plaintiff alleges that the abuse occurred in the "mid-to-late 1960s" and during an approximate four-year period when she was between seven to eleven years old (which corresponds to the years 1965 to 1969). Doc. 135 at 12 ¶ OOO (Plaintiff's additional statement of facts); Doc. 94 at 2 ¶ 4; Doc. 137 at 1 ¶ 4. Drawing all reasonable factual inferences in favor of Plaintiff, the non-moving party, at least some of Webster's alleged abuse occurred in 1969. Thus, Holmes' complaint presumably occurred before at least some of the sexual abuse. Nonetheless, the nonspecific date of the complaint makes it difficult to determine whether the complaint occurred before or after any specific instance of abuse.

Finally, and more problematically, even assuming Holmes made her complaint to the Church, she does not say what she told the Church. Instead, she explains her *motivation* for making this undefined complaint. She explains in paragraph five of her affidavit that she complained "because I felt Mr. Webster was a poor example within the Church, particularly for our children." Doc. 40-1 ¶ 5. This is not evidence that she complained to the Church that Webster was a poor example, particularly for children. And, even if she did make such a complaint to the Church, no reasonable factfinder could conclude that a vague complaint about a Branch President being a poor example for children and taking some undefined actions that "were not appropriate for a Church leader" was sufficient to put a Church on notice that this Church leader had molested, or was going to molest, a child.

The second category of allegations in Holmes' affidavit about Webster are more concerning. In paragraph six, Holmes alleges that "Mr. Webster made me and other local Church leaders extremely uncomfortable. I remember that he would bring inebriated persons to services

and often had several unaccompanied little girls with him." Doc. 40-1 ¶ 6. As a result of this discomfort, she refused to let Webster drive her elementary school daughters to a Church function. Doc. 40-1 ¶ 7. And, in paragraph 8, she recalled that "the daughter of another person denied assistance said that Mr. Webster would only approve assistance for her mother if she did what he wanted." Doc. 40-1 ¶ 8.

The primary problem with this second category of information, however, is that Holmes does not represent that she conveyed any of this information to anyone else, much less the Church. Although she does allege that Webster also made other local Church leaders extremely uncomfortable, she does not allege that their discomfort had anything to do with children. A reasonable jury could infer from Holmes' affidavit that Holmes had concerns about Webster being alone with young girls, but her affidavit provides no evidence that the Church shared, or had reason to share, those concerns. As a result, a reasonable jury would be left to speculate, in the absence of evidence, as to what about Webster made other local Church leaders extremely uncomfortable. That is, no evidence exists from which a factfinder could conclude that Church leaders had reason to share Holmes' concerns about Webster being alone with little girls. Because Holmes does not allege that Church leaders shared her discomfort about Webster's interaction with children, that Church leaders had reason to share her discomfort, or that she notified the Church about her discomfort with Webster's interactions with children, no reasonable factfinder could conclude that Holmes' second category of information notified the Church that Webster had sexually abused, or was going to sexually abuse, a child.

In short, no reasonable juror could find that Defendant was on notice of Webster's abuse of Plaintiff based on the declaration of Lela Holmes. Therefore, trying to reinstate Webster as

Branch President—without knowledge that Webster was a child sex abuser—cannot be ratification of the sexual abuse.

        4.    <u>Aided in agency</u>

The parties filed cross-motions regarding the doctrine of aided in agency. "Under the aided-in-agency theory, an employer may be held liable for the intentional torts of an employee acting outside the scope of his or her employment if the employee 'was aided in accomplishing the tort by the existence of the agency relation.'" *Ocana v. Am. Furniture Co*., 2004-NMSC-018, ¶ 30, 91 P.3d 58, 71 (quoting Restatement (Second) of Agency § 219(2)(d)).

Much of the parties' arguments in the context of Defendant's motion for summary judgment incorporate and rely on the briefing related to Plaintiff's motion. *E.g.*, Doc. 139 at 23; Doc. 148 at 5. For purposes of ruling on this issue, the Court considers all the facts and arguments, whether contained in Defendant's motion or Plaintiff's. The Court will view all the facts in the light most favorable to Plaintiff. Even viewing the facts in the light most favorable to Plaintiff, however, Defendant shows an entitlement to summary judgment because it points to an absence of evidence on an element for which Plaintiff would bear the burden of proof at trial.[14] That is, Plaintiff fails to demonstrate that Webster's power and authority over her religious life constituted substantial power that "aided" the commission of his sexual abuse, as opposed to providing a mere opportunity for it.

Much of the parties' briefing focuses on a general question: Is the power a church bestows on clergy sufficient to support a claim under the aided-in-agency doctrine? The power a clergy member has over a child church member, however, is not a constant. It varies depending

---

[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

on the situation. Is the child a student in a boarding school headed by the clergy abuser, a member of a church youth program of which the clergy abuser is in charge, or simply an occasional attendee at church services who only has incidental contact with the clergy abuser? The answers to these questions matter when considering whether the clergy has substantial power over the child and whether that substantial power aided the clergy in abusing the child. The Court is not charged with determining whether a hypothetical situation exists under which Webster could have committed sexual abuse using powers Defendant bestowed on Webster. Instead, the Court must consider whether Plaintiff has provided sufficient evidence that Defendant bestowed Webster with substantial power that Webster used to aid him in sexually abusing this Plaintiff. Plaintiff has not done so. Therefore, the Court grants Defendant's motion and necessarily denies Plaintiff's motion for summary judgment on the same topic.

       i.    <u>Defendant's argument that the aided-in-agency doctrine is bad policy is irrelevant to the status of the law in New Mexico but is relevant to a prediction of whether the New Mexico Supreme Court would expand the doctrine in this case.</u>

Aided in agency is a legal doctrine that first appeared in the Restatement (Second) of Agency:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> . . .
>
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or *he was aided in accomplishing the tort by the existence of the agency relation*.

Restatement (Second) of Agency § 219 (emphasis added).

As the Honorable James O. Browning wrote in an opinion out of this District, this theory "comes close to creating strict vicarious liability for employers, and, despite purporting to be an exception, it nearly swallows the general rule that respondeat superior does not attach to

intentional torts. If § 219(2)(d) cl. 2 were read literally, a creative plaintiff's lawyer could make a colorable argument for vicarious liability in almost every intentional tort case in which the tortfeasor happens to be gainfully employed." *Peña v. Greffet*, 110 F. Supp. 3d 1103, 1118 (D.N.M. 2015).

As Judge Browning further noted, rather than "restating" a principle of law, the Restatement (Second) appears to have created this legal doctrine from whole cloth. *Id.* at 1116-17, 1131 n.15. Further, as Judge Browning noted, the Restatement (Third) of Agency abandons the aided-in-agency doctrine. *Id.* at 1129-31. In commentary, it states: "The purposes likely intended to be met by the 'aided in accomplishing' basis are satisfied by a more fully elaborated treatment of apparent authority and by the duty of reasonable care that a principal owes to third parties with whom it interacts through employees and other agents." Restatement (Third) of Agency § 7.08 cmt. b.

Defendant seizes on the concerns Judge Browning and others have expressed about the potential broad application of the aided-in-agency doctrine set forth in the Restatement (Second) of Agency. Doc. 134 at 7-11. It argues that the doctrine should be disavowed because it was the product of a typographical error in the Restatement (Second) of Agency, was abandoned by the Restatement (Third) of Agency, and is bad policy—as it makes employers liable for almost any intentional act of their employees.

As Plaintiff points out, however, in New Mexico the aided-in-agency ship has already sailed. That is, prior to the Third Restatement's abandonment of the aided-in-agency doctrine, the New Mexico Supreme Court had already adopted the doctrine as law in New Mexico. Doc. 141 at 4. In determining what law to apply in this case, the Court looks not to what the Restatement has most recently said on the subject and does not second guess what the New

Mexico Supreme Court has already concluded. Instead, this Court simply looks to and applies New Mexico Supreme Court precedent.

Nonetheless, when no New Mexico Supreme Court case provides clear guidance as to how the supreme court would apply a legal doctrine in a particular case, this Court must predict how the New Mexico Supreme Court would rule. *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003). In making that prediction, related New Mexico Supreme Court guidance is most important. Nonetheless, decisions of other state courts, widespread abandonment or narrowing of the doctrine, and extensive criticism of a doctrine may be relevant in predicting whether the New Mexico Supreme Court would be likely to expand or narrow application of the doctrine. *Wade v. EMCASCO Ins. Co*., 483 F.3d 657, 665-66 (10th Cir. 2007).

ii.    Cases

The New Mexico Supreme Court first adopted the aided-in-agency doctrine in *Ocana v. American Furniture Co*., 2004-NMSC-018, ¶ 30, 91 P.3d 58, 71. The plaintiff there was an employee of a furniture store. She alleged that a colleague, Thomas Kaminski, "began to sexually harass her soon after he became general manager of the store where she worked." *Id.* ¶ 25. This harassment included staring at her, touching himself in a sexually suggestive manner, parking his car next to hers even though he had a designated parking area, and, on one occasion, rubbing against her with an erection. *Id.* The plaintiff sued her employer under Title VII and the New Mexico Human Rights Act ("NMHRA"). *Id.* ¶¶ 6-7. In addition, she argued that her employer was vicariously liable for the supervisor's intentional torts of assault, battery, and intentional infliction of emotional distress. *Id.* ¶ 29.

The *Ocana* court addressed Plaintiff's Title VII and NMHRA claims first. In defending against those claims, the defendant employer argued in part that it could not be vicariously liable for its supervisor's actions because it had established that it had exercised reasonable care to

prevent and correct promptly any sexually harassing behavior. *Id*. ¶¶ 26-27. The *Ocana* court disagreed, finding that the existence of a factual dispute regarding whether the employer had informed the plaintiff about its sexual harassment policies barred summary judgment. *Id*. ¶ 27.

But the court came out differently when deciding whether summary judgment was appropriate on the plaintiff's vicarious liability claims under an aided-in-agency theory. First, the court adopted the aided-in-agency theory of vicarious liability. *Id*. ¶ 31. Having done so, the court then defined the issue before it as "whether [the plaintiff] presented sufficient evidence showing that Kaminski was aided by his status as her supervisor in committing his alleged torts." *Id*. ¶ 32. The court concluded that she did not. *Id*. To prevail under her aided-in-agency theory, the plaintiff needed to "present sufficient evidence showing that [the supervisor's] supervisory authority aided him in the commission of his torts." *Id*. And, "[h]ere, [the plaintiff] failed to present any evidence showing that [the supervisor's] conduct occurred as a result of an abuse of his supervisory status." *Id*.

*Ocana* thus established several points important to the present case. First, regardless of whether the Second Restatement improvidently recognized the aided-in-agency doctrine and despite the Third Restatement's abandonment of this doctrine, the New Mexico Supreme Court has recognized it and so it is the law of the land in New Mexico. Second, for the doctrine to apply, the power an entity must provide an assailant to be held vicariously liable for that assailant's intentional conduct need not rise to the level of power a prison guard has over an inmate. *Cf.* Doc. 134 at 18 (arguing that the doctrine should be limited to authorities such as "police officers and prison guards"). Instead, the power the entity must bestow to be liable under an aided-in-agency theory need be no more than the power a supervisor has over an employee. Third, for an entity to be vicariously liable for the intentional acts of its agent, a plaintiff who

invokes aided in agency must do more than establish that the entity bestowed its agent with substantial power. The plaintiff must also present sufficient evidence that the agent's authority aided him or her in the commission of the torts such that the agent's conduct occurred *as a result of* an abuse of that power. That a supervisor begins to sexually harass an employee soon after obtaining supervisory power is insufficient on its own. *See Ocana*, 2004-NMSC-018, ¶ 25 (Plaintiff "testified that [the supervisor] began to sexually harass her soon after he became general manager of the store where she worked.").

More than a decade after the New Mexico Supreme Court issued its decision in *Ocana*, Judge Browning was tasked with deciding whether the New Mexico Supreme Court would extend the aided-in-agency doctrine to hold a private prison vicariously liable for a guard's sexual assault of an inmate. *Peña*, 110 F. Supp. 3d at 1105-06. Judge Browning began his analysis with an extensive history of the aided-in-agency doctrine, to include the Restatement's treatment of the theory as well as courts' adoption of the theory in various forms and contexts. *Id*. at 1116-31. After engaging in a thoughtful analysis, Judge Browning predicted that the New Mexico Supreme Court would extend the theory to hold the prison vicariously liable for a guard's sexual assault of the plaintiff, but also predicted that the New Mexico Supreme Court would limit application of the doctrine to situations where a principal provided its agent with "extraordinary power." *Id*. at 1134 ("The Court concludes that the Supreme Court of New Mexico would not limit the aided-in-agency theory's application to the employment context, but, rather, would do as the Supreme Courts of California and Vermont have done, and apply it outside the employment context in cases where the tortfeasor's relationship with his employer gives him 'extraordinary power' over his victim.").

Although not binding, Judge Browning's decision is notable and influential for several reasons. First, the opinion proved prescient: when eventually confronted with the same issue of whether to adopt the aided-in-agency doctrine to hold prisons vicariously liable for sexual assaults guards commit on inmates, the New Mexico Supreme Court answered in the affirmative. *Spurlock v. Townes*, 2016-NMSC-014, ¶ 1, 368 P.3d 1213, 1214. Like Judge Browning, however, the New Mexico Supreme Court determined that application of the aided-in-agency doctrine can turn on the amount of power the principal bestowed on the agent. *Id.* ¶ 18 (concluding that the amount of power bestowed must be "substantial").

Second, the *Spurlock* decision endorsed Judge Browning's analysis, citing and quoting it extensively. *Id.* ¶¶ 16-20. Thus, Judge Browning's analysis provides an indication of how the New Mexico Supreme Court may, or may not, apply the aided-in-agency doctrine in future cases. Indeed, *Spurlock* quoted the following language from *Peña*:

> Requiring a relationship of job-created control between a tortfeasor, and his or her victim, holds the employer liable only when the tortfeasor has capitalized on the *power* that the employer gave the tortfeasor, and not merely the opportunity. Opportunity is generic: a factory worker who sexually assaults the coworker next to him on the assembly line might only have been able to do so because the factory stationed him next to his victim, but the factory did not increase the odds—at least as they were knowable to the employer at the time—of either that specific worker committing sexual assault or of that specific coworker being sexually assaulted. On the other hand, when an employer vests an employee with power over another person—whether the other person is a subordinate employee or a non-employee third party, like an inmate—the employer enables torts that might not otherwise happen—torts that are, essentially, an abuse of that power.

*Id.* ¶ 17. As in *Ocana*, where the New Mexico Supreme Court concluded that the mere fact that a supervisor assaulted an employee at work is insufficient to make a case under the aided-in-agency doctrine, the New Mexico Supreme Court reiterated through adoption of this language from *Peña* that the existence of a power differential between abuser and abused alone is

insufficient to support a claim under the aided-in-agency doctrine. For the aided-in-agency

doctrine to apply, the agent must actually abuse the power the principal provided.

Applying these principles to the facts in *Peña*, Judge Browning wrote:

[the guard's] job did not merely give him the opportunity to batter [the inmate]—
in the way that a[] [prison's] janitor might have an agency-aided opportunity to
batter her by virtue of having access to her—but, rather, it gave him an
extraordinary power over [the inmate], which [the guard] used . . . to coerce [the
inmate] into oral sex.

*Peña*, 110 F. Supp. 3d at 1139. Read together, *Ocana*, *Spurlock*, and *Peña* make clear that

vicarious liability under the aided-in-agency doctrine in New Mexico must be predicated on both

a principal giving substantial power to an agent and on the agent's abuse of that substantial

power to commit an intentional tort.

Third, Judge Browning's opinion is not limited to discussion of guard/inmate sexual

abuse cases. In predicting whether the New Mexico Supreme Court would extend the aided-in-

agency doctrine to the guard/inmate sexual abuse case before him, Judge Browning considered

cases from the supreme courts in California and Vermont—states which, like New Mexico, have

recognized the aided-in-agency doctrine in some contexts. Judge Browning ultimately came out

"in favor of adopting the Vermont and California supreme courts' construction of the aided-in-

agency theory." *Id*. at 1136. Because Judge Browning looked to the Vermont and California

supreme courts' construction of the aided-in-agency theory, and because the New Mexico

Supreme Court adopted Judge Browning's construction (albeit, holding that the doctrine applies

where the principal bestows "substantial" power rather than "extraordinary" power on the agent),

the Vermont and California aided-in-agency cases that Judge Browning analyzed are useful in

deciding what the New Mexico Supreme Court would do if presented with similar cases.

As Judge Browning recognized, *Peña*, 110 F. Supp. 3d at 1125-26, the Vermont Supreme Court in *Doe v. Forrest* held that a sheriff's department could be held vicariously liable under the aided-in-agency theory for one of its deputies sexually assaulting a citizen. 2004-VT-37, 176 Vt. 476 (2004). Three years later, the Vermont Supreme Court was faced with deciding whether this doctrine should extend to allegations that a pastor sexually abused an underage parishioner while "on church property, or at times when the pastor was alone with the parishioner by virtue of his pastoral relationship with the youth." *Peña*, 110 F. Supp. 3d at 1128 (citing *Doe v. Newbury Bible Church*, 2007-VT-72, 182 Vt. 174, 933 A.2d 196 (2007)).

The Vermont Supreme Court answered that question in the negative. *Newbury Bible Church*, 2007-VT-72, ¶ 1. One reason the Vermont Supreme Court distinguished the police officer abuse from the pastor abuse is that a pastor "is vested with no more power than any other person who takes a leadership role in the organization." *Id.* ¶ 9.[15] As the Vermont Supreme Court noted:

> although a pastor's position within the church gives him some authority or power over parishioners, especially children who attend a church school, that power is simply not the same as police power. A pastor's influence over a child is little different from the authority exerted by other adult figures in a child's life. *See John R. v. Oakland Unified Sch. Dist.,* 48 Cal. 3d 438, 256 Cal. Rptr. 766, 769 P.2d 948, 956-57 (1989) (teacher's influence over a student does not compare to that of law enforcement); *Jeffrey Scott E. v. Cent. Baptist Church,* 197 Cal. App. 3d 718, 243 Cal. Rptr. 128, 131 (1988) (declining to extend § 219(2)(d) to church for misconduct of Sunday school teacher).

---

[15] The Vermont Supreme Court made this statement in connection with distinguishing a pastor from a police officer on the basis that one is a private citizen and the other is not. *Newbury Bible Church*, 2007-VT-72, ¶ 9. New Mexico, however, has applied the aided-in-agency theory to assaults which a supervisor working for a private company commits on a subordinate. This demonstrates that New Mexico does not observe a public/private distinction. Nonetheless, New Mexico recognizes that the amount of power a principal vests in an agent is a crucial consideration. Thus, the Vermont Supreme Court's observation about the limited powers of a pastor remains relevant to whether the aided-in-agency theory should be applied to the facts of the present case.

*Newbury Bible Church*, 2007-VT-72, ¶ 10. Much of the same reasoning that motivated the Vermont Supreme Court to recognize the aided-in-agency doctrine in cases where a police officer abuses a citizen but not to a case where a pastor abused a parishioner would likely motivate the New Mexico Supreme Court to similarly limit application of the aided-in-agency doctrine.[16]

Analysis of the aided-in-agency doctrine as applied in California leads to the same conclusion. In *John R.*, "a 14-year-old junior high school student [] allegedly was sexually molested by his mathematics teacher while he was at the teacher's apartment participating in an officially sanctioned, extracurricular program." *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438, 441, 769 P.2d 948, 949 (1989).

> The teacher attempted to convince John that engaging in sex acts with him would be a constructive part of their relationship and, at times, threatened to give John failing grades if John would not go along with his desires and said he would tell people that John had solicited sex from *him.* On one occasion in February of 1981, the teacher succeeded in pressuring John into sexual acts, including oral copulation and anal intercourse. When John protested and told the teacher he would report the incidents to his parents, the teacher threatened to retaliate against him if he revealed what had taken place.

*Id.*

In reaching its decision, the *John R.* court contrasted the outcome of several California appellate court decisions. In *Alma W. v. Oakland Unified School District*, 123 Cal. App. 3d 133, 176 Cal. Rptr. 287 (1981), the court held a school district not liable for a janitor's rape of a

---

[16] The *Newbury Bible Church* opinion does not indicate that the alleged victim in that case had the type of relationship with the pastor that could serve as the source of "substantial" power over the victim (such as being a student in a boarding school where the pastor was headmaster or, possibly, holding a position in the church in which the pastor supervised the parishioner). As set forth below, this Opinion does not foreclose the possibility that New Mexico may apply the aided-in-agency doctrine to a clergy's abuse of a church member where that clergy has "substantial power" over the member and uses that power to aid abuse of that member.

student. *John R.*, 769 P.2d at 954. In contrast, in *White v. County of Orange*, 166 Cal. App. 3d

566, 212 Cal. Rptr. 493 (1985), the court held a county subject to vicarious liability for the

threats made by a deputy sheriff to rape and murder a motorist he had stopped. *John R.*, 769 P.2d

at 954. There, the California Court of Appeals reasoned, "[u]nlike a school custodian, the police

officer carries the authority of the law with him into the community. The officer is supplied with

a conspicuous automobile, a badge and a gun to ensure immediate compliance with his

directions." *Id.* (internal quotation marks omitted). Finally, the *John R.* court considered *Jeffrey*

*E. v. Central Baptist Church*, 197 Cal. App. 3d 718, 243 Cal. Rptr. 128 (1988), which held a

church not responsible for a Sunday school teacher's molestation of a minor and reasoned that, in

*White*, "the errant conduct arose out of an abuse of the employee's *official* authority. By virtue of

the exercise of this authority, the police officer was able to perpetrate his assault." *John R.*, 769

P.2d at 954 (internal quotation marks omitted). In contrast, the assault in *Jeffrey E.* did not arise

out of the exercise of job-created authority over the plaintiff. *Id.*

> Using these lower court case as guidance, the California Supreme Court recognized that
>
> > in the eyes of a child, a teacher's authority can be very great. And here the
> > complaint alleged the teacher used his authority to obtain John's participation in
> > the extracurricular program and thereby obtained the boy's presence at the
> > teacher's home away from other eyes. The teacher told John that sexual conduct
> > was part of a teacher-student relationship and was intended to help John with his
> > problems. The extensive control teachers are authorized to exercise over their
> > students supports the analogy to *White* and lends some credence to the proposition
> > that a school district should not be immune from liability where a teacher's
> > molestation of a student directly flows from the exercise of that job-created
> > authority.

*John R.*, 48 Cal. 3d at 449-50 (citation omitted).

> Nonetheless, the California Supreme Court ultimately determined that the school district

should not be liable for the teacher's conduct. It stated:

> > In sum, we believe the Court of Appeal erred in looking mainly to the factual
> > similarities between this case and *White*, and in failing to consider whether the

underlying justifications for the respondeat superior doctrine would be served by imposing vicarious liability here. We need not and do not decide whether *White* itself was properly decided or whether the job-created authority theory has any validity in evaluating vicarious liability for the torts of police officers. It suffices here to note that the authority of a police officer over a motorist—bolstered most immediately by his uniform, badge and firearm, and only slightly less so by the prospect of criminal sanctions for disobedience—plainly surpasses that of a teacher over a student. The teacher's authority is different in both degree and kind, and it is simply not great enough to persuade us that vicarious liability should attach here for the teacher's tort. Furthermore, invoking respondeat superior here would raise an entirely different specter of untoward consequences, or interference with the purposes for which the authority was conferred in the first place, than might result from the imposition of vicarious liability in the limited context of a police officer's abuse of authority. We doubt that police departments would deprive their officers of weapons or preclude them from enforcing the laws, but we see a significant and unacceptable risk that school districts would be dissuaded from permitting teachers to interact with their students on any but the most formal and supervised basis.

*John R.*, 48 Cal. 3d at 452 (citation omitted).

This decision from the California Supreme Court, along with the Vermont Supreme Court's decision in *Newbury Bible Church* and Judge Browning's decision in *Peña*, run counter to the notion that, categorically, every clergy/church member relationship is sufficient to hold a church vicariously liable under the aided-in-agency doctrine for sexual abuse that the clergy commits on a church member. Further, the Court is aware of no federal case or state supreme court case that has applied the aided-in-agency doctrine to hold a church liable for sexual abuse its clergy commits.

Nor does any language in the New Mexico Supreme Court's *Spurlock v. Townes* decision indicate that the New Mexico Supreme Court would choose to forge this path. *Spurlock* came to the New Mexico Supreme Court by way of the Tenth Circuit, which certified "the question of the civil liability under New Mexico law of a private prison when an on-duty corrections officer sexually assaults inmates in the facility." 2016-NMSC-014, ¶ 1. The certified question asked whether the liability of the prison, Corrections Corporation of America ("CCA"), and the warden

Barbara Wagner, may be reduced by any fault attributable to the victims of the sexual assault. *Id*.

The New Mexico Supreme Court exercised its discretion to reformulate this question. *Id*. ¶ 11. It

"decline[d] to determine the availability of an affirmative defense alleging Plaintiffs'

comparative fault in a claim of liability for negligent supervision of an intentional tortfeasor

because the vicarious liability of CCA and Wagner makes this determination unnecessary." *Id*. ¶

12. That is, the New Mexico Supreme Court concluded that the defendants were vicariously

liable through application of the aided-in-agency doctrine and, because vicarious liability does

not invoke considerations of comparative fault, it was unnecessary to resolve the certified

question. The *Spurlock* court explained:

> [W]e hold that under New Mexico law CCA and Wagner are vicariously liable for
> all compensatory damages caused by the corrections-officer employee when he
> was aided in accomplishing his assaults by his agency relationship with CCA and
> Wagner who were his employers. No affirmative defense of comparative fault is
> available in this context because fault attributed to intentional tortfeasor Townes
> is not subject to reduction based on comparative negligence and because no fault
> on the part of the vicariously-liable CCA and Wagner is required.

*Id.* ¶ 11.

The court explained that "[a]ided-in-agency applies to situations where a tortfeasor, by

reason of his agency position, has substantial power or authority to control important elements of

a vulnerable tort victim's life." *Id.* ¶ 17. To prevail, the plaintiffs had to prove that the assailant

"was aided in accomplishing his assaults by his status as a corrections officer that afforded him

substantial power and control over Plaintiffs." *Id.* ¶ 18. "The 'extraordinary power' wielded by

law enforcement over ordinary citizens has influenced many courts to hold the officers'

employers vicariously liable for the abuse of that power." *Id.* The court also found support in the

New Mexico legislature's "acknowledgment of the power disparity between inmate and

corrections officer and a recognition that this disparity not only facilitates sexual assault of the

vulnerable party but makes meaningful voluntary consent to sexual intercourse an unrealistic inquiry." *Id.* ¶ 19.

The court acknowledged "the concerns of other courts 'that aided-in-agency as a theory independent of apparent authority risks an unjustified expansion of employer tort liability for acts of employees.'" *Id.* ¶ 16 (citing *Ayuluk v. Red Oaks Assisted Living, Inc.*, 201 P.3d 1183, 1199 (Alaska 2009)). The court "agree[d] that the theory should not apply to all situations in which the commission of a tort is facilitated by the tortfeasor's employment." *Id.* However, the court explained that "aided in agency" was appropriate for the inmate/correctional officer relationship in that case because:

> Townes had the authority to enter Plaintiffs' residential block unescorted and unannounced, to remove Plaintiffs from their cells or from their work stations, to move Plaintiffs around the facility including to out-of-the-way areas, to exercise his authority at any hour of the day or night, and to bestow favors or impose sanctions for inmate behavior. Townes approached Plaintiff Spurlock multiple times when she was alone on work detail and assaulted her at her work station. He removed Plaintiffs Carrasco and Carrera from their cells and took them to other locations to rape them. Plaintiffs were told to follow the directions of the corrections officers quickly, without question or argument, and feared retaliation if they did not obey Townes. Inmates who challenge the actions of an officer face stereotyping that reduces their credibility and increases the risk of retaliation for their complaints because they are not taken seriously. Although CCA did have a grievance procedure in place, Plaintiffs presented evidence that it was not effectively followed and that they had experienced retaliation for complaints.

*Id.* ¶ 20.

Notably, nothing in *Spurlock* indicates that the titles of the alleged assailant and alleged victim dictate whether the aided-in-agency doctrine applies. *Spurlock* held that, for the plaintiffs in that case to prevail, they must prove that the assailant "was aided in accomplishing his assaults by his status as a corrections officer that afforded him substantial power and control over Plaintiffs." *Id.* ¶ 18. The Court reads the *Spurlock* court's reference to "correction officers" as incidental to the facts of the case, not as limiting application of the aided-in-agency doctrine

based on the title of the assailant as a correction officer. Indeed, such a limitation would be inconsistent with the New Mexico Supreme Court's recognition in *Ocana* that the aided-in-agency doctrine applies to assailants with other titles; namely, supervisors in employment-related sexual harassment cases.

Instead of using titles as preconditions, the Court reads the preconditions from *Spurlock* as: (1) the principal has provided the agent with substantial power over the alleged victim and (2) that substantial power aided the assailant in committing the assault. Regarding this second element, the Court focuses on how *Spurlock* indicates the assailant must be aided: by his job status that afforded him substantial power and control over the alleged victim. Conversely, job status that does not provide an assailant with power or control over the alleged victim does not give rise to vicarious liability under the aided-in-agency doctrine. *See also Spurlock*, 2016-NMSC-014, ¶ 18 ("The 'extraordinary power' wielded by law enforcement over ordinary citizens has influenced many courts to hold the officers' employers vicariously liable *for the abuse of that power*." (emphasis added)).

Although the inherent power differential in some relationships leaves little room for variance (such as the relationship between prison guard and inmate), this is not always the case. For instance, the power differential between clergy and church member can vary greatly depending on the nature of their relationship; e.g., a clergy who is the head of a boarding school that allows for corporal and other forms of punishment has more power over a church member who attends that school than a clergy who is only familiar with a church member through brief Sunday-morning interactions. The Court does not read *Spurlock* as foreclosing the possibility that, in some situations, the aided-in-agency doctrine could apply to impose vicarious liability on a church for sexual abuse that its clergy commits. That is, application of the aided-in-agency

doctrine turns not on the titles of the parties but, rather, on whether the facts in a particular case support the two above-identified preconditions. And, "whether a particular type of case falls within this category should be a question for the court, not a jury." *Spurlock*, 2016-NMSC-014, ¶ 17 (internal quotation marks omitted).

This reading of *Spurlock* is consistent with the decision of two New Mexico state trial courts that applied the aided-in-agency theory to cases involving childhood sexual abuse by religious leaders. *John Doe "Q" v. Archdiocese of Santa Fe*, Case No. D-202-CV-2015-03583 (N.M. 2d Jud. Dist. Ct. Aug. 11, 2016); *John Doe "52" v. Archdiocese of Santa Fe*, Case No. D-202-CV-2015-09301 (N.M. 2d Jud. Dist. Ct. Sept. 14, 2016).[17] Plaintiff recognizes that these cases are non-binding but argues that, "given this Court's duty to obtain the result that would be obtained in New Mexico state courts, the actual practice of New Mexico state courts as it pertains to this exact issue is instructive." Doc. 97 at 15 n.1 Plaintiff argues that these cases "demonstrate that New Mexico state courts have and would apply the theory of aided-in-agency to the undisputed facts in this case." Doc. 141 at 6.

In *John Doe "Q"*, the plaintiff alleged that "Fr. George Weisenborn sexually abused him between 1968-1973 while Fr. Weisenborn was a priest assigned by Defendant Archdiocese [of Santa Fe] to Plaintiff's parish. Plaintiff seeks to hold Defendant Archdiocese liable for the damages alleged on the grounds that: 1) Fr. Weisenborn was acting within the course and scope of his employment, raising Respondeat Superior liability; and/or 2) Defendant Archdiocese is liable under the 'aided-in-agency' theory of vicarious liability because it cloaked Fr. Weisenborn with great authority over Plaintiff which aided or facilitated his abusive conduct." Doc. 141-1 at

---

[17] These decisions are not published, nor are they available on commercial databases of which the Court is aware. They are attached to Plaintiff's reply in support of her motion for summary judgment as Docs. 141-1 and 141-2.

1-2. The court disagreed that the abuse was within the priest's scope of employment. *Id.* at 2-3.

But it agreed with the plaintiff's aided-in-agency theory.

> The court cited the relevant law from *Ocana* and *Spurlock*, and found that:
>
> > Parish priests such as Fr. Weisenborn occupied a position of substantial power or authority to control important elements of their parishioners' lives especially minor child parishioners such as Plaintiff, during the time period at issue. It is undisputed that, at least at the time in issue some 50 years ago, priests were held in very high regard in their communities. It is also undisputed that Fr. Weisenborn had a history of sexually abusing children within his parishes, which was known to Defendant Archdiocese, when it assigned him to Plaintiff's parish. Plaintiff's parents permitted John Doe Q to move into Fr. Weisenborn's rectory because they trusted Fr. George with their son's health and welfare. Further, like the prisoners in *Spurlock*, an 11-year-old child cannot simply quit the job of being a Catholic parishioner entrusted to a pedophile priest. During the time in question, a priest had a specifically supervisory relationship over his parishioners. The Archdiocese vested Fr. Weisenborn with broad power over the lives and actions of its parishioners and enabled Fr. Weisenborn to have access to, and control over, minors despite knowledge of his history of abusive behavior. For Rule 1-056 NMRA purposes, there are questions of genuine material fact whether Fr. Weisenborn capitalized on the power that the employer gave the tortfeasor, and not merely the opportunity. There is danger inherent in granting one person extraordinary power over another, and the granting of that power should, thus, carry with it some accountability.

*Id.* at 5-6 (cleaned up).

The second order Plaintiff cites, *John Doe "52"*, has no reasoning, analysis, or discussion of facts. It simply says "Plaintiff may invoke the 'aided-in-agency' doctrine adopted by the New Mexico Supreme Court" in *Ocana*, and that factual disputes preclude the grant of summary judgment. Doc. 141-2.

Neither case has a factual summary explaining how the priest used his authority to molest the child. This lack of detail in these case limits their persuasive value. Because the aided-in-agency doctrine is fact-dependent based on the nature and the utilization of the power in a particular case, there is nothing for the Court to analyze regarding whether their reasoning is applicable to the present case.

And, to the extent the decisions contain legal reasoning without application to the facts, the Court disagrees with that reasoning. Plaintiff's church attendance in this case was not involuntary in the sense that a government confining an inmate in prison is involuntary. Plaintiff testified that she went to church because her father wanted her to go to church in exchange for getting to go to the movies, not because of any religious authority. Doc. 135-4 at 5, 7-8. Thus, in the present case, to the extent Plaintiff could not "quit" going to church, this was a result of her father's power over her, not Webster's.

More importantly, the *John Doe "Q"* decision appears to conflate aided-in-agency, a vicarious liability doctrine, with fault of the church itself. As part of its analysis supporting application of aided-in-agency, the court noted that "Fr. Weisenborn had a history of sexually abusing children within his parishes, which was known to Defendant Archdiocese, when it assigned him to Plaintiff's parish" and that the defendant "enabled Fr. Weisenborn to have access to, and control over, minors despite knowledge of his history of abusive behavior." Doc. 141-1 at 5-6. Although these factors would be relevant to a direct claim, such as a claim for breach of fiduciary duty, they are not relevant to aided in agency, which applies in the absence of any knowledge on the part of the principal of the agent's potential for wrongdoing. *See Spurlock*, 2016-NMSC-014, ¶ 17 (no defense of comparative fault available to employer because employer's vicarious liability under aided-in-agency doctrine not predicated on, and does not require, fault of employer).

At most, these cases stand for the proposition that Defendant's primary argument—that aided-in-agency would simply never apply to the clergy/church member context—is wrong. Similarly, the Court is not categorically excluding application of the aided-in-agency doctrine in

every case where church clergy abuses a church member.[18] Having not excluded the possibility

that aided in agency could apply to some instances of clergy abuse, the Court's next task is to

examine whether the undisputed facts in *this* case fit the application of the aided-in-agency

doctrine. On this front, the short state-trial-court decisions are of no help at all.

> iii.   Application of aided in agency to the facts of this case

To successfully invoke aided in agency, Plaintiff must show that the "tortfeasor, by

reason of his agency position, ha[d] substantial power or authority to control important elements

of a vulnerable tort victim's life." *Spurlock*, 2016-NMSC-014, ¶ 17. Plaintiff contends that

Webster had substantial power over many aspects of her religious life: baptism; church youth

programs; punishment for or forgiveness of sins; admittance to the temple; and relief programs

for economically disadvantaged families like hers. *Supra*, pp. 14-17. Although the Court accepts

all these facts as undisputed and views them in the light most favorable to Plaintiff, the Court

finds Plaintiff failed to link these powers to her sexual abuse.

Plaintiff's bird-eye view of Webster's authority does not establish that his power over *her*

was substantial. Defendant's vicarious liability does not turn on whether, as a general matter,

Defendant gave Webster religious authority over members of the church in Las Vegas, NM in

the 1960s. *Cf. Martinelli v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir.

1999) (issue before the court is not whether the plaintiff "was merely one of 300,000

parishioners to whom [the church] owed no particular duty" but that, "irrespective of the duties

of the Diocese to its parishioners generally, the jury could reasonably have found" a fiduciary

---

[18] As noted, for instance, a clergy headmaster of a church-owned boarding school who runs the
school in a manner similar to a prison might expose the church to vicarious liability under an
aided-in-agency theory for sexual abuse the clergy commits at the school through use of
substantial power over the church member that the school bestowed on him.

relationship based on the particulars of *this* plaintiff's situation). Plaintiff's recitation of Webster's general power and authority is irrelevant if Webster did not use that power and authority to aid him in abusing Plaintiff.

That is, the Court is more concerned with Webster's power over Plaintiff than with Webster's power in general. Plaintiff's situation was not comparable to a prison, a boarding school, or even an employment setting. Webster did not control Plaintiff's day-to-day life like a prison guard or boarding school teacher, or even have the power to order her to carry out his instructions at church like a priest has over an altar boy. Rather than exercising power Defendant gave him to abuse Plaintiff, the evidence indicates that Webster took advantage of an opportunity unrelated to the exercise of his power.

Plaintiff testified in her deposition that she would help clean and "do stuff around" the church. Doc. 135-4 at 7 (Plf's dep. at 103:20-25). But when asked if it was Webster asking her to do these things, she said: "No. My daddy told me." *Id.* at 8 (Plf's dep. at 104:1-3). Plaintiff elaborated that while her father was at church cleaning, Webster would take Plaintiff in his car. *Id.* (Plf's dep. at 104:5-9). In other words, Plaintiff's father was directing her to help around the church and creating the opportunity for Webster to take her in his car. This opportunity could have been available to anyone present at the building, such as a janitor, offering a car ride to Plaintiff while her father was busy. It had nothing to do with Webster's authority over her religious life. *Cf. John R.*, 48 Cal. 3d at 449 (principal not liable for janitor's assault where there was "no authority given him over the student" and janitor acted from "no more than an independent, self-serving pursuit wholly unrelated to his custodial duties"); *Peña*, 110 F. Supp. 3d at 1139 (guard's "job did not merely give him the opportunity to batter [the inmate]—in the way that a[] [prison's] janitor might have an agency-aided opportunity to batter her by virtue of

having access to her—but, rather, it gave him an extraordinary power over [the inmate], which [the guard] used . . . to coerce [the inmate] into oral sex.").

Plaintiff argues that "Webster was given access to her and she was entrusted to Webster because of his responsibilities as a branch president and leader in the Las Vegas Branch." Doc. 141 at 7. But "access" and "entrustment by some other actor" equates to opportunity on Webster's part, not his exercise of substantial power. Plaintiff does not state she went with him alone in his car because Defendant taught her, or she believed, that she had to obey religious leaders. Plaintiff does not state that she went with Webster because she feared he would use his power over her religious life, or even that she was aware of this power over her religious life when she went with him.[19]

Even if Webster did not use the religious authority Defendant bestowed on him to coerce Plaintiff, however, Plaintiff maintains that she saw Webster as a "big shot," that her father trusted him as an authority figure, and that Plaintiff relied on Webster's authority to go with him. Essentially, Plaintiff argues that Webster's power and status as a church leader made it more likely that Plaintiff and her father would trust Webster. Further, Plaintiff's argument goes, this status Defendant gave Webster aided him in abusing her. Plaintiff's argument can draw some support from language in *Ocana*. There, the New Mexico Supreme Court defined the issue before it as "whether [the plaintiff] presented sufficient evidence showing that Kaminski was aided by his *status* as her supervisor in committing his alleged torts." *Ocana*, 2004-NMSC-018, ¶ 32 (emphasis added). The supervisor's *status* as the plaintiff's employer, however, turned out to be insufficient to support a claim under an aided-in-agency theory because the plaintiff failed

---

[19] In noting the absence of such allegations, the Court is not expressing an opinion on whether their presence would be sufficient to support an aided-in-agency claim.

to present any evidence that the alleged sexual harassment "occurred as a result of an abuse of [the supervisor's] status." *Id*.

The *Ocana* court did not answer the question of whether trust created as a result of an agent's status could alone support an aided-in-agency claim. The New Mexico Supreme Court, however, provided further guidance on this topic in *Spurlock*. There, the court wrote that "to prevail under an aided-in-agency theory Plaintiffs had to prove that [the guard] was aided in accomplishing his assaults by his status as a corrections officer *that afforded him substantial power and control over Plaintiffs*." 2016-NMSC-014, ¶ 18 (emphasis added). In the next sentence, the *Spurlock* court discusses with approval other court decisions that hold "officers' employers vicariously liable *for the abuse of* [their extraordinary] power." *Id*. (emphasis added). This analysis led to *Spurlock*'s conclusion that the guard "*used the authority* vested in him by his position as a corrections officer *to coerce* Plaintiffs, who were inmates entrusted to his care, into submitting to sexual assault and false imprisonment." *Id*. ¶ 20 (emphasis added). This language indicates that the New Mexico Supreme Court does not consider status alone sufficient to support an aided-in-agency claim. Instead, the status must also afford the agent substantial power and control over the plaintiff and, unless *Spurlock* is expanded, the agent must use that power to coerce the victim. *See also id.* ¶ 16 (agreeing that aided-in-agency "theory should not apply to all situations in which the commission of a tort is facilitated by the tortfeasor's employment"). Here, even if the status Defendant gave Webster increased Plaintiff's trust in Webster and made her feel more comfortable being alone with him before he abused her, the status Defendant gave Webster does not equate to Webster using substantial power over her to sexually abuse her.

Holding an organization vicariously liable for actions its agents take outside the scope of their employment, based on the status the organization conferred on its agent alone (without

regard to whether the agent abused substantial power the organization provided) would extend the reach of the aided-in-agency doctrine too far. The policy justifications for holding a principal vicariously liable based on nothing more than the status conferred on its agent are much weaker than policy justifications for holding a principal vicariously liable for the agent's abuse of *substantial power* it provided the agent. Indeed, as Judge Browning persuasively reasoned in *Peña*, limiting application of the aided-in-agency doctrine to instances in which an agent abuses his or her "extraordinary" power is necessary to ensure that the aided-in-agency exception does not swallow the longstanding rule that principals are not liable for intentional torts their agents commit outside the scope of employment. After *Peña*, the New Mexico Supreme Court acknowledged "the concerns of other courts that aided-in-agency as a theory independent of apparent authority risks an unjustified expansion of employer tort liability for acts of employees." *Spurlock*, 2016-NMSC-014 ¶ 16 (internal quotation marks omitted).

If status alone, without regard to abuse of substantial power, were sufficient to hold an employer vicariously liable for intentional acts an employee commits outside the scope of employment, an employer could be liable for almost any intentional act outside the scope of employment that an employee takes while at work. Status and some degree of power are inherent to many occupations. The titles of supervisor, teacher, coach, and music director, for instance, all come with an inherent degree of power and all confer increased status on the title holder. That is, supervisors, teachers, coaches, and music directors always have some degree of power over subordinate employees, students, athletes, and musicians. It is also almost always the case that, with the status these titles confer comes an additional degree of trust on the part of employees, students, athletes, and musicians. This trust and power differential makes those on the subordinate side of the equation vulnerable to those on the power side of the equation who are

inclined to violate this trust. A victim's trust in a superior might affect a victim's decisions, such as a decision to be alone with the superior. For instance, a student's trust in a teacher might make the student feel more comfortable going alone to the teacher's classroom for help on a school assignment. But a teacher who then decides to exploit the opportunity this situation creates and sexually abuse the child does not necessarily use substantial power the school provided the teacher to aid this abuse. Therefore, the teacher's outside-the-scope-of-employment conduct does not necessarily expose the school to vicarious liability under the aided-in-agency doctrine.

The record in this case provides insufficient evidence that Webster used his religious authority to control Plaintiff. Webster was in charge of church youth programs, but Plaintiff does not say she participated in them, much less that she valued them as an important element of her life that he could control. Webster was in charge of church relief programs, but Plaintiff does not say her family applied for relief or that she feared he would deny it. Webster was an authority over forgiving or punishing sins, but Plaintiff does not explain how he wielded this power over her. Plaintiff states that Webster had the power to perform baptisms, but does not allege that he used the prospect of baptism to control her. Plaintiff says he has the power to conduct interviews and control temple recommends, but says neither that he interviewed her nor that she was concerned about her temple recommend. He did not sexually abuse her using his power to get her alone for an interview; he sexually abused her using the opportunity her father created by having her help clean the church. The Court need not decide whether Webster's powers as described by Plaintiff would be sufficient to expose Defendant to vicarious liability under the aided-in-agency doctrine in a situation where Webster used those powers to aid him in abusing a child. In the situation this case presents, the evidence does not support a conclusion that Webster

*used* any substantial power the Church gave him over Plaintiff to aid him in sexually abusing her.

Finally, although the Court agrees with Plaintiff that, as a young child, she could not just quit the church, the facts in this case show that her inability to do so was the product of her father's power over her, not Webster's. As Defendant notes, Plaintiff testified that, when she was a young girl, her father let her choose whether to go to church and what church to attend. Doc. 134 ¶ H; Doc. 135-4 at 5 (Plf's dep. at 61:16-23). She chose to attend her father's church so that he would let her go to the movies and give her money for popcorn. Doc. 134 ¶ H. Plaintiff not only does not dispute this fact, but also adds: "[T]he family was poor and [] after church, if Plaintiff tried to run away from Webster, he would tell her father that she had done so and [] *her father* would punish her." Doc. 141 ¶ H (emphasis added). That is, her father used his parental power over her life to incentivize her to go to church and punish her if she did not. To the extent someone forced Plaintiff to go to church, that person was her father, using his parental authority, not any person acting on behalf of Defendant.

For the above reasons, the Court grants Defendant's motion for summary judgment as it relates to Plaintiff's aided-in-agency theory. Because the Court grants Defendant's motion, despite drawing all reasonable factual inferences in Plaintiff's favor, it necessarily denies Plaintiff's motion (under which the Court must draw all reasonable factual inferences in the opposite direction). Further, because the Court rejects Plaintiff's aided-in-agency theory, it does not consider Defendant's argument that allowing Plaintiff to proceed on such a theory would violate its rights under the First Amendment.

## II.   IIED MSJ

Regarding the tort of intentional infliction of emotional distress, New Mexico "courts have adopted the approach used in the Restatement (Second) of Torts § 46 (1965)." *Trujillo v. N.*

*Rio Arriba Elec. Co-op, Inc*., 2002-NMSC-004, ¶ 25, 41 P.3d 333, 342. "The following elements must be proven to establish a claim of intentional infliction of emotional distress: (1) the conduct in question was extreme and outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress." *Id.* (internal quotation marks omitted). Defendant argues that Plaintiff cannot prove elements one or two. The Court agrees that, under element two, Plaintiff has insufficient evidence that Defendant's conduct was intentional or in reckless disregard of the Plaintiff. The Court therefore need not address element one.

Plaintiff does not argue that Defendant's conduct was taken with specific intent to inflict emotional distress on Plaintiff. Instead, Plaintiff argues that Defendant acted recklessly, "with utter indifference to the consequences." Doc. 138 at 4 (internal quotation marks omitted). Plaintiff argues there is "a genuine issue as to whether Defendant's conduct in placing and maintaining Webster in a leadership position with the specific duties, responsibilities and authority provided to him despite the obvious and direct signs that he was unfit for such a role and created a danger thereby" was reckless. *Id.* at 5.

As explained above, the Court draws all inferences in Plaintiff's favor and accepts, for the purposes of Defendants' motions for summary judgment, that Defendant granted Webster "sweeping authority" as its highest representative in Las Vegas, and that this authority included meeting alone with children and giving sexualized instructions to children. Doc. 138 at 5. Plaintiff does not argue that a reasonable jury could find that imbuing clergy with such sweeping authority is, by itself, a reckless infliction of emotional distress on church members. Instead, Plaintiff argues that this sweeping authority, *coupled with* evidence that Defendant knew

Webster was unfit to wield such authority, could be the basis for a finding of recklessness. Doc. 138 at 5.

Plaintiff, however, presents insufficient evidence that Defendant knew of Webster's specific unfitness. As discussed above, Lela Holmes' declaration fails to establish that Defendant received complaints that should have put Defendant on notice that Webster was unfit to instruct children on sexual matters. Contrary to Plaintiff's characterization in her brief, Holmes does not say it was "open and obvious" that Webster was a child sex abuser, only that she was uncomfortable letting him drive her daughters to a church function for unstated reasons. Doc. 40-1 ¶ 7. Plaintiff does not make any other arguments regarding Defendant's awareness of Webster's specific unfitness as clergy. Therefore, the Court concludes that no reasonable jury could find that Defendant intentionally or recklessly inflicted emotional distress on Plaintiff on the strength of the evidence Plaintiff presented in response to Defendant's summary judgment motion.

## III.    Punitive Damages MSJ

Plaintiff asks for punitive damages on all three counts of the Complaint. Compl. ¶¶ 35, 44, 49. Defendant moves for summary judgment on the claim for punitive damages, arguing that Plaintiff has no evidence that Defendant knew or should have known about Webster's abuse, or that Defendant authorized or ratified the abuse. Doc. 94 at 1-2. In response, Plaintiff argues that Defendant's conduct was sufficiently culpable to warrant the application of punitive damages, whether through Webster's role and authority to speak on behalf of Defendant, through the authority or ratification of Webster's abuse of Plaintiff, or through the cumulative conduct of Defendant's agents and employees. Doc. 137 at 6. That is, Plaintiff relies on three theories of punitive damages against corporations under New Mexico law: (1) liability for actions of its managerial employees; (2) corporate authorization or ratification; and (3) cumulative conduct.

*Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 21, 140 N.M. 478, 486; Doc. 137 at 4-5. The Court considers each in turn.

      A.     <u>Managerial employee exception</u>

"A corporation may be liable for punitive damages for the wrongful acts of employees who are acting within the scope of employment and who are employed in a managerial capacity." *Chavarria*, 2006-NMSC-046, ¶ 24; *see also* NMRA UJI 13-1827(2)(a) (agent's conduct must be within the scope of employment to support punitive damages). The New Mexico Supreme Court has found that sexual abuse is "obviously" not within the scope of a priest's employment. *Tercero*, 2002-NMSC-018, ¶ 21. Therefore, it is irrelevant whether Webster was a managerial employee because he was, as a matter of law, not acting within the scope of employment. Plaintiff does not make any arguments concerning managerial employees other than Webster, and so the Court does not consider any.

      B.     <u>Corporate authorization or ratification</u>

Plaintiff's punitive damages argument on ratification is similar to the argument she makes in opposition to Defendant's motion for summary judgment on the vicarious liability claim (Doc. 95). She argues that "the entities with supervisory authority over Webster learned [that] he acted inappropriately in his role, making local members of the congregation extremely uncomfortable, including because he often had several unaccompanied little girls with him." Doc. 137 at 9. The undisputed evidence, however, does not support Plaintiff's argument that Defendant upheld Webster in a leadership position with knowledge that he behaved in an inappropriate manner with children.

As explained above, the declaration of Lela Holmes is insufficient evidence to create a genuine issue of material fact on summary judgment. Holmes never specifies to whom she complained—let alone that they were individuals with supervisory authority over Webster—or

that she conveyed her discomfort with Webster and young female children to anyone with supervisory authority in the Church. Plaintiff also asserts that "Holmes maintained her objections to Webster maintaining leadership roles within the congregation, yet despite her objection, Stake President Lemmon installed Webster as First Counselor to the Branch President to continue to preside over and conduct Sacrament Meetings" and "Stake leadership further attempted to reinstate Webster as Branch President in 1969." Doc. 137 at 10. In support, Plaintiff cites evidence that Holmes did object to the installation of Webster as First Counselor to the Branch President. Doc. 97-9 at 5. However, this exhibit does not state the basis of Holmes' objection, much less link it to Webster's unfitness to supervise young female children. Nor does Holmes' affidavit provide this link. Therefore, in the absence of knowledge that Webster was unfit, his installation as First Counselor to the Branch President and the attempt to reinstate Webster as Branch President cannot be evidence that Defendant ratified Webster's sexual abuse.

      C.     <u>Cumulative conduct</u>

Plaintiff also advances the doctrine of "cumulative conduct," under which "an award of punitive damages against a corporation may be based on the actions of the employees viewed in the aggregate in order to determine whether the employer corporation had the requisite culpable mental state because of the cumulative conduct of the employees." *Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, ¶ 30, 258 P.3d 1075, 1084.

In *Clay v. Ferrellgas, Inc.*, 1994-NMSC-080, 118 N.M. 266, the New Mexico Supreme Court held that the separate negligence of two employees, coupled with a failure of the corporate defendant to implement sufficient corporate policy, was sufficient to support a punitive damages award against the corporation. In *Grassie v. Roswell Hosp. Corp.*, 2011-NMCA-024, 258 P.3d 1075, the court of appeals expanded this holding. The court held that the actions of nurses who were negligent (but whose negligence was not a proximate cause of the plaintiff's damages)

could be wrongdoing considered in this "cumulative conduct" analysis to support punitive damages against a corporation. *Id.* ¶¶ 38-47.

Plaintiff contends that the actions of "Stake leadership," Webster himself, and Plaintiff's father (as a local church leader) should be viewed cumulatively. Doc. 137 at 13-15. The problem with Plaintiff's argument is that the cumulative conduct of all these actors—even assuming they are agents or employees of Defendant—does not alter the "culpability" of Defendant in any way. That is, insufficient evidence exists to support a finding that the Church or Plaintiff's father was aware of, or should have been aware of, Webster's alleged conduct. The sum of Plaintiff's evidence remains that the Church placed Webster in a leadership position and that Webster sexually abused her while holding this leadership position. Because Plaintiff has presented insufficient evidence that *anyone* (besides Webster or Plaintiff) knew or should have known Webster was dangerous, Plaintiff's "cumulative conduct" argument is the same as those arguments the Court has already rejected.

First, Plaintiff argues that "Stake leadership was negligent by failing to appropriately screen Webster before placing him in a leadership position with broad authority, and maintaining him in leadership positions after having received information that he was unfit for his position and acted inappropriately with little girls." Doc. 137 at 12-13. Plaintiff does not explain what information in Webster's background would have come to the attention of Stake leadership in a screening process. As discussed above, Plaintiff did not present evidence that Stake leadership maintained Webster in a leadership position knowing he was unfit or that he acted inappropriately with little girls. Thus, Stake leadership committed no wrongdoing that could be added cumulatively onto Webster's wrongdoing.

60

Similarly, Plaintiff identifies no wrongdoing Plaintiff's father committed. Plaintiff only states that her father permitted Webster to drive her home while Plaintiff's father was busy with Church duties. No reasonable jury could find this to be evidence of a "culpable mental state" without any indication that Plaintiff's father knew Webster was sexually abusing Plaintiff.

In sum, the only wrongdoing alleged in this case is Webster's. The actions of Stake leadership and Plaintiff's father are not "cumulative" conduct when their conduct adds nothing to the balance of "culpability" in this case.

## **CONCLUSION**

The Court grants Plaintiff's Motion To Strike Declaration Of Paul Rytting. Doc. 142. The Court denies in part and grants in part Defendant's Motion For Summary Judgment And Memorandum In Support, Doc. 95. The Court denies summary judgment in Defendant's favor on Count I of the complaint (direct liability for negligence). The Court grants summary judgment in Defendant's favor on Count II of the complaint (vicarious liability) and denies Plaintiff's Sealed Motion For Partial Summary Judgment As To Liability, Doc. 97. The Court grants Defendant's Motion For Partial Summary Judgment On Plaintiff's Claim For Intentional Infliction Of Emotional Distress, Doc. 103, and Defendant's Motion For Partial Summary Judgment Relating To Punitive Damages, Doc. 94.

Finally, the Court gives notice under Rule 56(f)(2) of its intent to consider granting summary judgment on Count I on grounds not raised by Defendant, and orders supplemental briefing as described above.

SO ORDERED.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE
Presiding by consent